UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re STRATASYS LTD. SHAREHOLDER SECURITIES LITIGATION | ) ) ) | Master File No. 15-cv-00455-PJS/FLN |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |
| | | <u>DEMAND FOR JURY TRIAL</u> |

**CONSOLIDATED AMENDED COMPLAINT FOR**
**<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ACTION ....................................................................1

II.    JURISDICTION AND VENUE ..................................................................6

III.   PARTIES .....................................................................................................6

     A.    Plaintiffs ...........................................................................................6

     B.    Defendants .......................................................................................7

IV.   SUBSTANTIVE ALLEGATIONS ...........................................................10

     A.    Background of the Company ...........................................................10

     B.    The Company's Acquisition of MakerBot Was Critical to Its Sales Growth and Market Expansion ...........................................11

     C.    MakerBot Begins to Lose Footing to Competitors .................................15

     D.    To Maintain Its Market Position, the Company Rushed MakerBot's 5th Generation Printers to the Market Despite Severe Quality and Reliability Issues ...............................................16

          1.    The Design of the 5th Generation Printers Was Severely Flawed.............18

          2.    MakerBot's 5th Generation Printers Suffered from the Use of Non-Conforming, Uninspected, and Low Quality Materials....................24

     E.    Consumers Rejected MakerBot's 5th Generation Printers, Resulting in Negative Feedback, Product Returns, and Warranty Claims................................26

          1.    MakerBot Received an Avalanche of Complaints and Negative Feedback from Consumers After the 5th Generation Printers Were Released ...............................26

          2.    MakerBot Was Deluged with Expensive Product Returns and Warranty Claims as a Result of the Defective 5th Generation Printers.....27

          3.    Returns and Warranty Claims Related to the 5th Generation Printers Were Expensive and Hurt the Company's Margins ...................................31

     F.    MakerBot's Defective 5th Generation Printers Caused the Company's Sales Growth to Plummet and Disrupted Its Distribution Channels ...............................32

          1.    MakerBot's Direct Sales of the 5th Generation Printers Were Especially Poor ...............................32

**Page**

2.    MakerBot's Indirect Sales Through Distributors Were Also Poor ............33

G.    Numerous Facts Support Defendants' Knowledge of MakerBot's Undisclosed Problems and Their Impact on the Company .........................................................34

    1.    Defendants' Public Statements Confirmed Their Knowledge of the Problems Associated with MakerBot's 5th Generation Printers ...............34

    2.    MakerBot's Production and Sale of the 5th Generation Printers Were Core Operations of the Company, Supporting Defendants' Knowledge ...36

    3.    Former MakerBot Employees Confirmed Defendants' Knowledge of the Problems Associated with the 5th Generation Printers ........................38

H.    Defendants Misled the Market and Failed to Disclose MakerBot's Product Quality Issues and the Resulting Financial Problems Affecting the Company .....39

I.    Defendants Were Motivated to Maintain a Positive Market Perception of the Company, and the Company's Artificially Inflated Stock Value ..........................42

J.    The Company's Stock Price Ultimately Collapsed When the Market Learned of the True Extent of the Company's Problems.....................................................43

V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ........................................................................................................46

A.    Defendants' False and Misleading Statements and Omissions from January 6 Through May 8, 2014 ...........................................................................47

    1.    Press Release and Interview Regarding the Release of MakerBot's 5th Generation Printers ....................................................................................47

    2.    Press Release Regarding the Company's 2014 Financial Guidance and Statements at the Needham & Company Growth Conference ............50

    3.    Press Release, Conference Call, and Annual Filing Regarding the Company's Fourth Quarter and Fiscal Year 2013 Financial Results ........52

B.    Defendants' False and Misleading Statements and Omissions from May 9 Through August 6, 2014 ...........................................................................59

C.    Defendants' False and Misleading Statements and Omissions from August 7 through November 4, 2014....................................................................64

    1.    Press Release, Conference Call, and SEC Filings Regarding the Company's Second Quarter 2014 Financial Results ................................64

**Page**

      2.     Statements from the Company's 2014 Analyst Day Conference Call, the Announcement of Defendant Pettis' Removal as MakerBot CEO, and Media Day Event ................................................................................... 69

   D.   Defendants' False and Misleading Statements and Omissions from November 5, 2014 through February 1, 2015 ........................................ 74

VI.   THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET ................................................................................. 80

VII.   THE FULL TRUTH IS FINALLY REVEALED ............................................. 89

VIII.   POST-CLASS PERIOD REVELATIONS ....................................................... 91

IX.   LOSS CAUSATION ......................................................................................... 92

   A.   February 2-3, 2015 Disclosures .................................................................. 93

   B.   April 28, 2015 Disclosures .......................................................................... 96

X.   ADDITIONAL SCIENTER ............................................................................ 100

   A.   Defendants Knew or Should Have Known of the Performance of the Key Value Drivers of Its Core Business .......................................................... 100

   B.   Defendants Were Motivated and Acted with Scienter to Artificially Inflate the Company's Stock Value to Facilitate Its Acquisitions of Solid Concepts and Harvest Technologies ........................................................ 103

XI.   PRESUMPTION OF RELIANCE .................................................................. 103

XII.   NO SAFE HARBOR ....................................................................................... 106

XIII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS ...................................... 108

COUNT I
FOR VIOLATIONS OF SECTION 10(**b**) OF THE  EXCHANGE ACT AND RULE 10**b**-5 PROMULGATED  THEREUNDER AGAINST ALL DEFENDANTS ............. 110

COUNT II
FOR VIOLATIONS OF SECTION 20(**a**) OF THE EXCHANGE  ACT AGAINST THE INDIVIDUAL DEFENDANTS .................................................................................. 114

PRAYER FOR RELIEF ............................................................................................ 115

JURY TRIAL DEMANDED ..................................................................................... 115

By and through their undersigned counsel, Lead Plaintiffs Mineworkers' Pension Scheme and Macomb County Employees' Retirement System ("Plaintiffs") allege the following against Defendants Stratasys Ltd. ("Stratasys" or the "Company"), David Reis ("Reis"), Erez Simha ("Simha"), Bre Pettis ("Pettis"), and Jennifer "Jenny" Lawton ("Lawton") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation:  (a) review and analysis of public filings made by Stratasys and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning Stratasys, the other Defendants, and related non-parties; and (e) interviews with factual sources, including individuals formerly employed by the Company and its subsidiaries.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities class action against Stratasys and certain of its officers for violations of the federal securities laws.  Plaintiffs bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of themselves and all persons or entities who purchased or acquired the publicly traded common stock of Stratasys (the "Class") between January 6, 2014 and April 28, 2015, inclusive (the "Class Period").  Plaintiffs allege that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price by both misrepresenting and concealing the true operational and financial

conditions of the Company and its indirect, wholly owned subsidiary, MakerBot Industries, LLC ("MakerBot").

2.      Stratasys manufactures and sells three-dimensional ("3D") printers.  Those printers employ an "additive" process to create a 3D object by depositing multiple layers of heated filament (often consisting of a thermoplastic) on top of each other, which cool to form the 3D printed object. The Company's product portfolio consists of different series of 3D printing systems used by customers ranging from individuals and smaller businesses to large, global enterprises in a variety of industries including aerospace, automotive, electronics, dental, and jewelry.

3.      On August 15, 2013, the Company expanded its 3D printing portfolio by acquiring MakerBot for approximately $493.7 million and two performance-based earn-outs.  MakerBot, a Brooklyn-based start-up company co-founded by Defendant Pettis in 2009, was a pioneer of the desktop 3D printer market, developing a strong brand name and a large community of support from 3D printing enthusiasts.  Prior to the Stratasys acquisition, MakerBot rapidly expanded its operations in order to capture growing demand for its printers.

4.      MakerBot was critically important to Stratasys because it extended the Company's reach to the emerging desktop 3D printer market.  This was immediately recognized by the Company, securities analysts, and the market.  Indeed, the Company's stock price rose dramatically following the MakerBot acquisition.

5.      Soon after the Company acquired MakerBot, Defendants announced MakerBot's "5th generation" desktop 3D printers at one of the world's largest trade shows, the Consumer Electronics Show ("CES"), on January 6, 2014 in Las Vegas, Nevada.  The new printers, which were offered in three different sizes (the small-size "Replicator Mini," mid-size "Replicator Desktop," and large-size "Replicator Z18") were intended to substantially improve upon MakerBot's older generation

printers. Defendants touted the new printers' improved reliability, ease of use, seamless production, quality, speed, and performance.

6.       In particular, Defendants heavily marketed the "Smart Extruder" component of MakerBot's 5th generation printers.  The Smart Extruder is the part of the printer that melts thermoplastic filament and then deposits it in layers to create a plastic, 3D-printed object when the filament cools.  The Smart Extruder is designed to improve on MakerBot's older generation of extruders because, unlike prior extruders, it is swappable (allowing a user to remove one Smart Extruder and replace it with another) and it includes three different "smart" sensors designed to pause a print job if there is a problem with the filament and to assist in leveling the printing surface (the "build plate").

7.       However, in pursuit of an aggressive growth strategy to keep up with encroaching competition, Defendants rushed MakerBot's 5th generation printers to the market despite their knowledge of serious quality and reliability issues plaguing the printers.  Most significantly, the Smart Extruder promoted by Defendants was severely defective, frequently clogging with filament and rendering the 5th generation printers inoperable, among other problems.

8.       Because the new MakerBot printers were so poorly designed and manufactured, significant number of purchasers demanded refunds, repairs, replacement printers, or replacement Smart Extruders, which were costly to MakerBot given that the 5th generation printers were under warranty.  The replacements were equally flawed and prone to failure, which compounded the Company's problems and inflated its costs.  As a result, the Company was forced to incur substantial warranty-related charges and reserves, which in turn hurt the Company's gross margins.

9.       Moreover, the quality and reliability problems severely curtailed the sales growth of MakerBot and the Company.  During the Class Period, the Company touted MakerBot sales growth

driven by early sales of 5th generation printers, including bulk sales to unwitting distribution partners, and sales of older generation printers that the Company was phasing out. However, Defendants knew that MakerBot's early sales results and growth projections were illusory. Given the poor quality of the 5th generation printers, and their predictably poor reception by consumers, neither the Company nor its distribution partners could sustain these sales, which in turn limited reorders by the Company's retailers and distribution partners and disrupted the Company's plans to expand its distribution channels.

10.    Numerous former MakerBot employees confirmed that Defendants were fully informed that the 5th generation printers were severely flawed due to rampant quality control and product development issues at MakerBot. Defendants also admitted to being closely involved with the 5th generation printers, which were the core product of the Company's critical MakerBot subsidiary acquired by Stratasys at a hefty price. However, Defendants failed to disclose any of this to investors. Instead, they repeatedly misled the market by boasting of MakerBot's explosive sales growth and unmatched product quality. This ensured that the Company's stock traded at artificially-inflated prices during the Class Period, which also helped it acquire lucrative new technology companies in exchange for shares of inflated Stratasys stock.

11.    By February 2, 2015, Defendants could no longer hide the Company's mounting problems. After the market closed, Defendants stunned investors by warning that the Company's revenue for the fourth quarter of 2014 would miss analysts' expectations, and announcing that MakerBot was experiencing "challenges associated with the introduction and scaling of its new product platform [the 5th generation printers] and the Company's rapidly evolving distribution model." During a conference call the following day, Defendants elaborated that MakerBot's "quality and product reliability is a major issue." Defendants further revealed a massive $100 to

$110 million goodwill impairment charge related to the MakerBot acquisition. These disclosures stood in stark contrast to Defendants' false and misleading Class Period statements, which relentlessly touted MakerBot's sales growth and the quality and reliability of its 5th generation printers.

12.    The Company's stock price plummeted in response to this surprising news. After closing at $80.08 per share on February 2, 2015, the stock suddenly dropped 28% ($22.72) to close at $57.36 per share on February 3, 2015, on unusually high trading volume of more than 20 million shares. The stock decline would have been even greater had the Company revealed the full truth to investors. However, Defendants continued to mislead the market as to the true severity of MakerBot's problems and their impact on Stratasys.

13.    Then, after the market closed on April 28, 2015, Defendants further revealed the severity of the problems associated with MakerBot. Stratasys issued a press release announcing "disappoint[ing]" preliminary first quarter 2015 results and reduced financial guidance for 2015. Defendants partly attributed this to MakerBot, including a dramatic slowdown in its sales and revenue growth. Defendants also announced another MakerBot-related impairment charge of approximately $150 to $200 million, which nearly doubled the $102 million charge that Stratasys took in February 2015 (totaling approximately $300 million in MakerBot write-downs). These charges belied Defendants' misleading statements throughout the Class Period regarding MakerBot's sales demand and product quality.

14.    On this news, the price of Stratasys stock plummeted once again. After closing at $51.30 per share on April 28, 2015, the stock dropped 22% ($11.37) to close at $39.93 per share on April 29, 2015, on unusually high trading volume of more than 11 million shares. As the market continued to digest the news, the Company's shares fell an additional 6% ($2.48) the following day,

closing at $37.45 per share on April 30, 2015, on unusually high trading volume of nearly 6 million shares.  As a result of the revelations of Defendants' fraudulent conduct set forth herein, investors suffered millions in losses.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j (b) and 78t (a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  One of the Company's two principal places of business is located in this District, at 7665 Commerce Way, Eden Prairie, Minnesota 55344, and many of the false and misleading statements and omissions giving rise to the violations of law complained of herein were made in or issued from this District.

17.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

18.    Plaintiffs were appointed to serve as Lead Plaintiffs in this action by Order of this Court dated April 23, 2015.  Dkt. No. 76.  As shown in their certifications filed with the Court on April 6, 2015 [Dkt. No. 26-2] and incorporated herein, Plaintiffs purchased or otherwise acquired Stratasys common stock at artificially inflated prices during the Class Period and suffered economic

losses when true facts about the Company's operating and financial condition were disclosed and the artificial inflation was removed from the price of Stratasys stock.

**B.      Defendants**

19.      Defendant Stratasys is an Israeli corporation with two principal places of business located at 7665 Commerce Way, Eden Prairie, Minnesota 55344 and 2 Holtzman Street, Science Park, P.O. Box 2496, Rehovot 7612401, Israel.

20.      Defendant Reis is, and at all relevant times was, the Chief Executive Officer ("CEO") and a Director of Stratasys, and a member of Stratasys' Executive Committee in an observer capacity.

21.      Defendant Simha is, and at all relevant times was, the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") of Stratasys.

22.      Defendant Pettis was the CEO of MakerBot from the beginning of the Class Period through September 2014, at which time he transitioned to a position at Stratasys responsible for an "Innovation Workshop" called "Bold Machines," which he held through the remainder of the Class Period.  Defendant Pettis co-founded MakerBot in 2009.

23.      Defendant Lawton was the President at MakerBot from the beginning of the Class Period to September 2014, the acting CEO of MakerBot (replacing Defendant Pettis) from September 2014 to March 1, 2015, and Stratasys' VP of Special Projects, reporting directly to Defendant Reis, from March 1, 2015 through the remainder of the Class Period.

24.      Defendants Reis, Simha, Pettis, and Lawton are collectively referred to herein as the "Individual Defendants."

25.      During and prior to the Class Period, the Individual Defendants, as senior executive officers of Stratasys, were privy to confidential and proprietary information concerning Stratasys, its operations, finances, financial condition, and present and future business prospects.  The Individual

Defendants also had access to material adverse non-public information concerning Stratasys, as discussed in detail below.  Because of their positions with Stratasys and/or MakerBot, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

27.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with Stratasys and/or MakerBot, each of the Individual Defendants had access to the adverse undisclosed information about the Company's business prospects, financial condition, and performance as particularized herein, and knew or recklessly

disregarded that these adverse facts rendered the positive representations made by or about Stratasys and its business issued or adopted by the Company materially false and misleading.

28.     The Individual Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

29.     Each of the above officers of Stratasys, by virtue of their high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and financial condition, as alleged herein.  These Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that these false and misleading statements were being issued regarding the Company and omitted material adverse facts regarding the Company, and approved or ratified these statements and failed to disclose these facts, in violation of the federal securities laws.

30.     As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the

Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

31.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of the Company's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's operating and financial condition and the intrinsic value of Stratasys common stock, causing Plaintiffs and other members of the Class to purchase Stratasys common stock at artificially inflated prices.

32.    Defendants are liable for:  (a) making false and misleading statements; and/or (b) failing to disclose adverse facts known to them about Stratasys. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Stratasys common stock was a success, as it:  deceived the investing public regarding the Company's operating and financial condition; artificially inflated the price of Stratasys common stock; and caused Plaintiffs and other members of the Class to purchase Stratasys common stock at artificially inflated prices.

IV.    **SUBSTANTIVE ALLEGATIONS**[1]

A.    **Background of the Company**

33.    Stratasys develops, manufactures, and sells 3D printers, as well as materials for use with its systems, known as consumables.  3D printers utilize an additive manufacturing process in

---

[1]    All former employees are referred to in the masculine to protect their identities.

which successive layers of material build a three-dimensional object.  Specifically, the Company's 3D printers "print" by depositing multiple layers of resin, one on top of another, based on data from computer-aided design files.  This process differs from traditional subtractive design and manufacturing processes which involve machining an object out of a solid block of material.

34.     Stratasys holds itself out as a leading global provider of additive manufacturing solutions for the creation of parts used in the processes of designing and manufacturing products, and for the direct manufacture of end parts.  The Company's product portfolio consists of five series of 3D printing systems and the related consumables used in those systems:  the MakerBot Desktop Series, the Idea Series, the Design Series, the Production Series, and the Dental Series.  The Company's products and services are used in different applications by customers in a broad array of industries, including aerospace, automotive, consumer electronics, dental, jewelry, and more.  Its customers range from individuals and smaller businesses to large, global enterprises, and include a number of Fortune 100 companies.

**B.     The Company's Acquisition of MakerBot Was Critical to Its Sales Growth and Market Expansion**

35.     In 2009, desktop 3D printers began to enter the market, pioneered by MakerBot, a Brooklyn-based start-up company co-founded by Defendant Pettis.  Desktop 3D printers were scaled-down, less expensive versions of 3D printers geared toward individuals, small business owners, and entrepreneurs, allowing them to create 3D models and objects on their desktops.  As such, they were viewed as revolutionary.  As a pioneer of desktop 3D printing, MakerBot developed a strong brand name, garnering a significant amount of media attention, including numerous television and magazine interviews of Defendant Pettis, and a large community of support from 3D printing enthusiasts.  MakerBot rapidly expanded its operations in order to capture growing demand for its printers.

36.     In contrast, Stratasys' 3D printing business historically focused on design and manufacturing applications for industries, such as the aerospace and automotive industries, rather than smaller printers geared toward individual consumers.  Its printing systems were typically large and expensive (up to $750,000 per unit) and therefore were not accessible to most individual consumers.

37.     This changed on June 19, 2013, when Stratasys announced the acquisition of Cooperation Technology Corporation, the direct parent company of MakerBot, a New York limited liability company with its principal place of business located at One Metro Tech Center, 21st Floor, Brooklyn, New York 11201.  As a result of the acquisition, MakerBot would operate as an indirect, wholly owned subsidiary and a reporting unit of Stratasys.  Stratasys agreed to pay a steep price for MakerBot:  $493.7 million and additional performance-based earn-outs, one of which was earned and paid in cash in the amount of $10.8 million in April 2014.

38.     The Company's willingness to pay this steep price reflected MakerBot's critical importance to Stratasys.  MakerBot allowed the Company to tap into the emerging and potentially lucrative desktop 3D printer market, offering printers to individual consumers at a lower price than Stratasys' other products.  This was reflected in Company's press release announcing the acquisition on June 19, 2013.  Stratasys described MakerBot in glowing terms and highlighted its benefit to the Company's sales growth "as desktop 3D printers are becoming a mainstream tool across many market segments":

- MakerBot, founded in 2009, helped develop the desktop 3D printing market and has built the largest installed base of 3D printers in the category by making 3D printers highly accessible.

- The combination of these two industry leaders is expected to drive faster adoption of 3D printing for multiple applications and industries, as desktop 3D printers are becoming a mainstream tool across many market segments.

- 12 -

- "MakerBot's 3D printers are rapidly being adopted by CAD-trained designers and engineers," said David Reis, Stratasys CEO. "Bre Pettis and his team at MakerBot have built the strongest brand in the desktop 3D printer category by ***delivering an exceptional user experience***.  MakerBot has impressive products, and we believe that the company's strategy of making 3D printing accessible and affordable will continue to drive adoption. ***I am looking forward to working with Bre***," added Reis.

- MakerBot is the leader in desktop 3D printing.  Use of desktop 3D printers that provide affordable 3D printing access to individuals is growing rapidly.  ***The merger will allow Stratasys to offer more accessible desktop 3D printers to meet customer demand and accelerate that growth.***

39.     MakerBot's importance to Stratasys was evidenced by the market's reaction.  Securities analysts lauded the MakerBot acquisition, stressing the importance of MakerBot to Stratasys' growth and expansion into the consumer desktop market, and the synergies between the two companies and their compatible technologies.  For example:

(a)     In a report dated June 19, 2013, Piper Jaffray stated, "We view Stratasys' acquisition of MakerBot favorably as we believe it provides Stratasys with the industry leader in low-end system sales and an ecosystem and content portal with significant industry momentum.  We anticipate Stratasys' expansive library of intellectual property will find its way into MakerBot's next generation of 3D printers, making them an even more formidable competitor."

(b)     On June 20, 2013, Janney Capital Markets reported that "[t]he pending acquisition of MakerBot by SSYS is like a reverse Trojan Horse.  Rather than bringing into the portfolio a fully built out system, SSYS will have the ability to send out to the market, a strong and popular consumer brand of 3D printers with fuller features and functionality leveraging its development of professional and production printers. . . ."  The report added that, "[g]iven the opportunity SSYS has to fill-out the MakerBot line with its proprietary patented FDM technology as well as additional materials and build chamber technology, we expect there is a better chance SSYS maintains or accelerates growth beyond 2013 rather than seeing it slow."

- 13 -

(c)     Also on June 20, 2013, BB&T Capital issued a report stating that "[s]trategically, this deal makes oodles of sense, on several fronts, in our opinion. . . . *Stratasys should boost the capabilities to the [MakerBot] Replicator series*.  It is based on FDM technology, which Stratasys invented.  An enclosed, heated print chamber comes immediately to mind, which Stratasys has patented and can meaningfully improve the print quality."  The report added that MakerBot "*puts Stratasys in a new price point*, one that in the last 12 months management has begun to take more seriously.  Previously, its lowest priced unit was the $10K Mojo, and as desktop units went it was a monster.  MakerBot's Replicator is a true desktop unit.  Stratasys and [its competitor] 3D Systems are now lined up along the price spectrum."  Further, BB&T Capital observed that "*[f]inancially, MakerBot is scalable*.  It just expanded its offices, factory, and staff.  It has been built to support growth, and Stratasys may be able to farm that to get profitability up quickly, especially as MakerBot accesses Stratasys' global resellers and cross selling occurs."

(d)     On June 21, 2013, Craig Hallum stated, "We take an extremely favorable view of SSYS's proposed acquisition of MakerBot as we believe it places them firmly in the lead of the rapidly growing 'prosumer' desktop 3D printing market."

40.     Accordingly, Stratasys' stock price climbed in the wake of the MakerBot purchase.  The Company's stock closed at $84.60 per share on June 19, 2013, just before Stratasys announced the acquisition.  By the close of trading on August 15, 2013, when Stratasys announced the completion of the MakerBot acquisition, the stock had risen to $96.78 per share.  The stock continued to soar for the remainder of 2013, closing at $134.70 per share on December 31, 2013, a gain of approximately 59% since the acquisition was first announced on June 19, 2013.

41.     Moreover, following the acquisition, MakerBot printers immediately became the Company's top selling products.  In fiscal year 2013, Stratasys sold approximately 75,818 3D

printing systems globally, approximately 40,550 of which were MakerBot units (approximately 53%). In fiscal year 2014, Stratasys sold approximately 121,661 3D printing systems globally, and approximately 79,906 were MakerBot units (approximately 66%).

42. Defendants continued to emphasize the critical importance of MakerBot during the Class Period. During a presentation at Needham & Company's Growth Conference on January 15, 2014, Defendant Simha described the MakerBot acquisition as follows: "We aim to lead every segment of the market that we act and MakerBot, I think, [the] MakerBot acquisition is a good example for that. We identified the hole in our portfolio and we decided to move. And we moved through buying the market leader in the low end market of 3D printing, MakerBot."

43. At a Stratasys Media Event on October 31, 2014, Defendant Reis was asked by a journalist "exactly which 3D area holds the most promise from an insider's point of view?" He responded that ***"[t]he MakerBot family of 3D printers is by far our top selling in terms of units, we worked to make them as accessible as ever, all you need to do is take a [MakerBot] Replicator Fifth Gen[eration 3D Printer] out of the box and plug it in to begin printing good quality products."***

44. The Company also stressed the importance 3D desktop printing market in its public filings. The Company's SEC Form 20-F for the fiscal year 2014 highlighted the fact that: "Desktop 3D printer usage has shown rapid growth, with the introduction and adoption of affordable entry-level 3D printers and increased availability of content. These entry-level desktop printers are driving substantially increased market adoption."

## C. MakerBot Begins to Lose Footing to Competitors

45. MakerBot was one of the original entrants in the 3D desktop printing market in 2009, with few serious competitors. As such, MakerBot was the clear industry leader in 3D desktop printing. MakerBot capitalized on this position by rapidly growing the company and establishing a

strong brand name.  Over time, however, MakerBot's market dominance began to erode.  By 2013, the company faced mounting competition from numerous 3D printing companies such as 3D Systems Corporation, a large, established player in the industry, and numerous smaller start-ups such as Formlabs, Delta Micro Factory, Affina, Ultimaker, Printrbot, Leapfrog, and Solidoodle, many of which claimed 3D printing technology superior to MakerBot's.  These competitors threatened to halt MakerBot's rapid growth and challenge its market leadership.

> **D.    To Maintain Its Market Position, the Company Rushed MakerBot's 5th Generation Printers to the Market Despite Severe Quality and Reliability Issues**

46.    To keep pace with encroaching competition and maintain its aggressive growth strategy, MakerBot developed a new line of 3D desktop printers known as MakerBot's "5th generation" printers in January 2014.  The new printers were intended to appeal to a broader market, and advance the Company's strategy for aggressive sales growth and market expansion.  MakerBot offered the new printers in three different sizes:  the "Replicator Mini" (retailing at $1,375), the "Replicator Desktop" ($2,899) and the "Replicator Z18" ($6,499).  The printers were intended to be more advanced and user-friendly than MakerBot's older generation printers (such as the "Replicator 2"), while remaining relatively affordable and appealing to consumers seeking a printer for personal use as well as "prosumers" seeking a printer for professional use.

47.    During the Class Period, Defendants repeatedly touted the 5th generation printers for their "unmatched" quality, reliability, ease of use, seamless production, speed, and performance, and their improvement over MakerBot's older generation printers.  In particular, Defendants heavily promoted the "Smart Extruder" component of the 5th generation printers.  The basic function of the Smart Extruder was to melt thermoplastic "filament" and then deposit it in layers to create a plastic, 3D-printed object once the filament cools.  As such, the Smart Extruder was not only a key selling feature of the 5th generation printers, but it was also necessary for them to function.

48.     The Smart Extruder was promoted as a substantial improvement over MakerBot's older generation extruders because, unlike older extruders, it was swappable (allowing a user to remove one Smart Extruder and replace it with another) and included three different "smart" sensors designed to pause a print job if there was a problem with the filament and to assist in leveling the build plate printing surface.

49.     To keep up with fierce competition and advance the Company's aggressive growth expectations, Defendants rushed MakerBot's 5th generation printers to the market.  Unbeknownst to investors and consumers, however, Defendants struggled with the 5th generation printers since their inception.   Serious problems with MakerBot's 5th generation printers became apparent to Defendants during the design, manufacturing, and quality control processes that began well before the Class Period.  Most significantly, the Smart Extruder was severely defective, plagued by filament clogs rendering the printers inoperable, and by malfunctioning "smart" sensors.

50.     Despite these problems, Defendants hastily unveiled the 5th generation printers at one of the world's largest trade shows, the annual CES held in Las Vegas, Nevada in January 2014. A former Software Engineer[2] confirmed that, despite known issues with the Smart Extruders, MakerBot rushed the 5th generation printers to market at the expense of quality in order to coincide their release with the 2014 CES conference.  MakerBot's rushed production at the expense of quality was confirmed by several other former MakerBot employees, who detailed the 5th generation printers' extensive design, manufacturing, and quality control problems.

---

[2]     The former Software Engineer was employed at MakerBot from April 2013 to March 2014, reporting to Chris Sandeen and Alison Leonard.  In this role, he wrote firmware updates for the MakerBot Replicator 2/2X and contributed to various firmware parts and driver for the 5th generation printers (Mini, Replicator, and Z18).

### 1.    The Design of the 5th Generation Printers Was Severely Flawed

51.    The 5th generation printers suffered from a poor design, particularly with respect to the Smart Extruder component, which frequently clogged with filament and failed to properly level the surface on which 3D objects were printed.  These problems rendered the printers unworkable until the user was able to procure a replacement Smart Extruder.  However, this failed to solve the problem because the replacements were equally flawed and prone to failure.  The 5th generation printers were also plagued by continual software issues, causing problems with their operating temperature.  Several former MakerBot employees confirmed that these design problems were known to Defendants before the 5th generation printers were released to the market.

52.    The former Director of Sales[3] recalled that MakerBot had major problems with the Smart Extruders from the very beginning.  Months before the 5th generation printers were unveiled at the CES conference on January 6, 2014, these problems were well-known internally at MakerBot, acknowledged by MakerBot's Product Group, and discussed at the director level of MakerBot.  Despite these known problems, he and MakerBot's other sales directors were told by Alfano and Schulze to push the 5th generation printers, and not to worry about the Smart Extruder because better ones would be developed.  He called this a "we're-going-to-build-the-plane-as-we-fly-it mentality."  He strongly believed that the decision to release the 5th generation printers was due to pressure to meet Wall Street expectations, as well as additional money MakerBot could earn for meeting certain goals during the earn-out period set forth in the Stratasys/MakerBot acquisition agreement.

---

[3]    The former Director of Sales was employed by MakerBot from October 2013 to August 2014, reporting directly to MakerBot's Vice President of Sales, Mark Schulze ("Schulze"), and reporting indirectly to MakerBot's Chief Revenue Officer, Frank Alfano ("Alfano").  His responsibilities included developing a network of resellers in Europe, Asia, and Latin America.

53.     MakerBot's pre-release knowledge of the Smart Extruder problems was corroborated by a MakerBot employee quoted in an article by 3DPrint.com dated December 10, 2014.[4]   The MakerBot employee stated bluntly:  "the bottom line is that *[the 5th generation] product shipped in spite of the known hardware problems.  It makes me sick to know we did this to customers.  Even I could not get [the Smart Extruders] to work.  Another great example of corporate greed winning out over great products*."   He explained that MakerBot shipped these faulty products despite a "special meeting" at MakerBot on Sunday, April 13, 2014 to find solutions to the Smart Extruder problems, which were "plaguing the project."   The meeting was attended by many big names at MakerBot including its Program Manager, VP of Operations, Director of Quality, a Senior Mechanical Engineer, and a Mechanical Engineer.

54.     Following the meeting, the MakerBot employee walked into the meeting room and found a diagram on a whiteboard describing a multitude of serious problems related to the Smart Extruders, which remained on the whiteboard for days.  As evidenced by photos of the whiteboard, which were obtained by 3DPrint.com, these problems include:  "Goal:  Reduce field failure rate"; "Top Failure[s]. . . . Clogging . . . Homing Error. . . "; "Improper design evaluation & oversight"; "Non-robust drawings"; "Lack of discipline to adhere to a plan"; "Compressed manuf[acturing] ramp time to feedback issues and ensure proper assembly"; "Loose starting technical requirements for performance & reliability"; "No standardized testing & validation program"; "Inadequate tests to

---

[4]     *See* Eddie Krassenstein, *MakerBot's Continual Innovation Brings Improvements to Smart Extruder – Reported Rumors Emerge on its Original and Future Development*, 3DPRINT.COM (Dec. 10, 2014, 3:48 PM EST), http://3dprint.com/29687/makerbot-smart-extruder/.  On the same day the article was released, 3Dprint.com added an immediate response from MakerBot's Director of Public Relations, Jennifer Howard, to the top of the article.  *Id.*  Howard did not dispute the contents of the article, but suggested that the Smart Extruder problems had been solved by MakerBot, referencing a new Smart Extruder on the market and "major software and firmware updates recently, including this week, that have improved the print quality and reliability of the Smart Extruder."  *Id.*  Further, she provided no indication that the Smart Extruder problems were having, or ever had, a material impact on MakerBot's or the Company's operations and finances.

verify performance. . ."; "Inadequate # of validation tests to ensure statistically confident qty"; "Lack of robust thermal analysis"; "Inadequate component level inspection of raw mat[e]r[ia]l"; "Lack of control of vendor and . . . suppliers"; "No proper risk identification and mitigation process. . ."; "Lack of adequate training for production associates"; and "Lack of training for engineering staff."[5]

55.    The former 3D Printing Specialist[6] confirmed problems with the Smart Extruders were known by members of MakerBot's engineering and research and development groups for many months prior to the release of the 5th generation printers.  Throughout his tenure at MakerBot, there were constant difficulties getting the 5th generation printers to work.  The print quality of the 5th generation printers was much worse than MakerBot's older generation printer, the Replicator 2.  The poor quality and performance problems of the 5th generation printers were known to the former 3D Printing Specialist and other MakerBot personnel (including engineering and R&D personnel) prior to their release.  He spoke directly with MakerBot engineers who told him the 5th generation printers did not work.

56.    The former 3D Printing Specialist also experienced these problems during the course of his work in MakerBot's "BotFarm," which created 3D printing samples and products for demonstrations and presentations to clients such as Nike and Stephen Colbert of *The Colbert Report*.

---

[5]    The whiteboard photos, attached hereto as **Exhibit A**, appear to have been included in the body of the 3DPrint.com article but later removed.  *See id.* ("Below you will find more photos of different sections of the whiteboard diagram").  However, the photos remain available via 3DPrint.com.  *See* http://3dprint.com/wpcontent/uploads/2014/12/makerbotextruder-whiteboard1.jpg; http://3dprint.com/wp-content/uploads/2014/12/makerbotextruder-whiteboard2.jpg; http://3dprint.com/wp-content/uploads/2014/12/makerbotextruder-whiteboard3.jpg;            and http://3dprint.com/wp-content/uploads/2014/12/makerbotextruder-whiteboard4.jpg (last visited June 29, 2015).

[6]    The former 3D Printing Specialist was employed at MakerBot from September 2012 to April 2015, initially reporting to BotFarm Manager Mike Battaglia and then to Lauren Deitch (who replaced Battaglia) beginning in late 2014.  He also characterized his position as a "Testing Factory Technician."

When employees working in the BotFarm received the 5th generation printers, perhaps a month before they were released to customers, they encountered immediate problems.  He said everyone knew there were problems with the 5th generation printers, and he did not understand how MakerBot could justify the release of the printers with so many known problems.

57.     The problems were substantially due to chronic issues with the Smart Extruders.  The former 3D Printing Specialist said the Smart Extruders typically worked for only a day or two before they needed to be replaced.  During the development phase of the 5th generation printers, MakerBot had assigned code names to 5th generation printers and the Smart Extruder, which was known as "Squid," a fact corroborated by the MakerBot employee quoted in the 3DPrint.com article published on December 10, 2014.  The former 3D Printing Specialist recalled hearing that Squid was not working for months prior to release.

58.     According to the former 3D Printing Specialist, these problems resulted in an internal shortage of Smart Extruders at MakerBot.  To address this, MakerBot was forced to create a refurbishing program in which old Smart Extruders were cleaned and sent back to the BotFarm.  However, this plan did not work because the refurbished Smart Extruders would also break very quickly, often in a day.  There were not enough functional Smart Extruders to keep up with the internal requirements of the BotFarm.

59.     Because of the ongoing problems with the 5th generation printers, the former 3D Printing Specialist said it was a routine and common practice within the BotFarm to take products that had actually been made by the older generation Replicator 2, and put them on the platforms of 5th generation machines to make it appear to visitors that the products had actually been made by the 5th generation printers.  Another common practice was to take an item printed days before and put it into a 5th generation printer to make it appear as if it had just been printed by that machine.

Defendants Pettis and Lawton would routinely tell investors who visited the BotFarm that the examples they were looking at were just printed.

60.    The former 3D Printing Specialist added that Defendant Pettis and the MakerBot sales personnel would say ludicrous things to visitors brought to the BotFarm.  For example, in early 2014, Defendant Pettis told a visitor that MakerBot's printers made virtually no waste.  Even though, if a machine like the 5th generation printer was unable to finish a print job, which was often the case, then whatever unfinished object it had printed constituted waste, as did the loading and unloading of filament.

61.    The 5th generation design flaws were confirmed by the former Software Engineer. He explained that the Smart Extruders had an engineering design defect, which was evident to him from the very beginning.  He said the Smart Extruders should have been re-engineered before they were released, but MakerBot was so far along in production that they chose not to do so.

62.    The former Inside Sales Executive[7] also confirmed that the 5th generation printers were defective, particularly their Smart Extruder component.  He said the 5th generation product was not ready and had been rushed because the design team was told the printers had to be ready for the CES conference in January 2014.  In particular, he explained that the homing device on the Smart Extruder was supposed to self-level, replacing the prior model's need for manual adjustment, but the self-leveling did not work.  Another problem was that the Smart Extruders would become clogged. The former Inside Sales Executive said all of the 5th generation printers had these defects and were not fixable.  Compounding that problem, the former Inside Sales Executive said the 5th generation

---

[7]    The former Inside Sales Executive was employed at MakerBot from March 2014 to August 2014 and reported to MakerBot Director of Sales Joanne Swanson.  He was employed preliminarily as an Inside Sales Specialist, and was promoted to an Inside Sales Executive in April 2014.  He was responsible for selling MakerBot's full product line to end-user consumers, but the sales team's focus during his tenure was on MakerBot's 5th generation printers.

Smart Extruders were non-user serviceable.  This meant that if an Smart Extruder became clogged and a customer opened it in an attempt to fix the clog, then the customer would be voiding the warranty on the printer.  He recalled that customers had to physically send the Smart Extruders back to MakerBot for replacement.

63.     The former Junior Data Analyst[8] also confirmed that the 5th generation Smart Extruders did not work as they were supposed to.  They would clog or fail to dispense filament during a print job.  Moreover, a feature of the Smart Extruders designed to notify users about filament problems did not work.

64.     This was echoed by the former Member of the MakerBot Customer Support Team,[9] who also stated that the main issue with the 5th generation was the Smart Extruder.  He believed that MakerBot knew internally that there were problems with the 5th generation printers prior to their release and shipment to customers.  In particular, he said a lot of engineers and software engineers were not confident to release the 5th generation printers.  He added that everyone anticipated that it would be horrible once the 5th generation was released.

65.     The former Regulatory Compliance Engineer[10] confirmed that there were always problems with the Smart Extruders, which did not perform.  He said it was common knowledge that

---

[8]     The former Junior Data Analyst was employed at MakerBot from April 2013 to August 2014 on the MakerBot Support Team and reported to MakerBot Senior Data Analyst Kathryn Chong.

[9]     The former Member of the MakerBot Customer Support Team was employed at MakerBot from March 2013 to September 2014.  He was initially hired as a Community Support Manager which fell under MakerBot's Customer Support Team.  In March 2014, he was promoted to a Social Media position that was part of MakerBot's Marketing Group.  He ostensibly reported to MakerBot VP of Support Sue Melfi, but dealt primarily with MakerBot Director of Product Specialists Gavin Murphy.  In these roles, the former Member of the MakerBot Customer Support Team monitored and responded to support questions on social media sites, including "Google Groups" discussion forums created by Defendant Pettis.

[10]    The former Regulatory Compliance Engineer was employed at MakerBot from June 2013 to September 2014 and reported to MakerBot Quality Director James Gunipero.  In this capacity, the

the 5th generation printers were released prematurely and had unresolved issues.  Similarly, the former Junior Data Analyst stated that the MakerBot Support Team knew before the 5th generation printers were released that there were problems with the Smart Extruders.

66.     The former Regulatory Compliance Engineer explained that, in addition to the Smart Extruder problems, the software for the 5th generation printers did not work well.  In the period leading up to the launch, there had been changes in the software every day, even several times in a single day.  The former 3D Printing Specialist and the former Member of the MakerBot Support Team both confirmed that there were software issues affecting the 5th generation printers.

67.     In particular, the former Regulatory Compliance Engineer explained that the largest model of the 5th generation printers, the Z18, had problems of various kinds because MakerBot wanted to control everything in the unit through software.  One problem was that the temperature was too high when operating because the Z18 units were enclosed in plastic panels and contained an extra heater within the unit.  MakerBot sought to control the temperature by software (as opposed to modifying the structure of the units), but struggled to do so.  As a result, higher temperatures negatively affected the printing quality of the Z18, varying from unit to unit.  He explained that despite these issues, MakerBot released the Z18 printers anyway.

**2.      MakerBot's 5th Generation Printers Suffered from the Use of Non-Conforming, Uninspected, and Low Quality Materials**

68.     In addition to their flawed design, MakerBot's 5th generation printers were plagued by the use of non-conforming, uninspected, and low quality materials used in an effort to cut costs and get the printers to market as quickly as possible.  These problems further diminished the quality of the printers, as former MakerBot employees confirmed.

---

former Regulatory Compliance Engineer ensured that MakerBot's products complied with government regulatory requirements for electrical products.  He also held certain materials compliance duties, and ensured that MakerBot's products satisfied air quality requirements.

69.     MakerBot's shoddy quality control was evident during the regulatory compliance process.  The former Regulatory Compliance Engineer explained that MakerBot's products had to comply with a variety of governmental requirements in the U.S., European Union, and elsewhere. He encountered constant issues in coming up with a functional 5th generation printer that he could test to satisfy compliance requirements.  In fact, he was never actually provided with a fully functional sample model to test.  Instead, he had to conduct his testing on a 5th generation printer that ran and generated heat (which was acceptable from a regulatory perspective), but could not print.  Quality testing deficiencies were also cited by the former Operations Financial Analyst[11] as a factor in the 5th generation printer issues.

70.     Compounding these problems, MakerBot used poor quality materials, which resulted from MakerBot's use of low-cost suppliers.  This was confirmed by the former Inside Sales Executive, who heard from design and production employees that their team had been pressured to make the printers cheaper.  He heard complaints from several MakerBot employees involved with design and production who voiced frustration with the budgetary and time restraints that were placed on them in an effort to make the printers cheaper and to get them released to the market faster. Supporting these comments, the former Manufacturing Process Intern[12] observed a high fail rate when inspecting and repairing the 5th generation printers as they came off assembly lines prior to shipping.

---

[11]   The former Operations Financial Analyst was employed at MakerBot from October 2013 to September 2014 and reported to MakerBot Finance Director Garrett Wright.  In this position he focused on operations, which included cost of goods, shipments, and manufacturing.

[12]   The former Manufacturing Process Intern was employed at MakerBot from June 2014 to January 2015, reporting to Director of Manufacturing Engineering Scott Crouthamel.  In this role, his responsibilities included arranging the assembly lines for MakerBot's 5th generation printers (the mini, mid, and Z18), inspecting the printers as they came off the assembly lines, and repairing those that failed inspection prior to shipping.

E. **Consumers Rejected MakerBot's 5th Generation Printers, Resulting in Negative Feedback, Product Returns, and Warranty Claims**

71. As detailed above, Defendants knew about the quality and reliability problems of the 5th generation printers during the manufacturing and quality control processes, which began well before the printers were unveiled to the market in early January 2014. Defendants' knowledge of these problems was reinforced as soon as the printers hit the market. Predictably, consumers began to experience the same significant problems with the printers that Defendants had uncovered in-house, including the clogging and malfunctioning of the troublesome Smart Extruders. As a result, Defendants were hit with an avalanche of consumer complaints. Moreover, given that the printers were under warranty, the Company incurred margin-depleting costs to address product returns and customer requests for refunds, repairs, and replacements.

1. **MakerBot Received an Avalanche of Complaints and Negative Feedback from Consumers After the 5th Generation Printers Were Released**

72. Multiple former employees at MakerBot attested to negative feedback MakerBot received regarding the 5th generation printers. According to the former Member of the MakerBot Customer Support Team, MakerBot told customers who pre-ordered the printers that they would ship by February 1, 2014, a date he described as ridiculous. The actual shipping was delayed several times until March 1, and then delayed again until approximately the end of March, even though MakerBot had already charged the credit cards of customers who pre-ordered in January. The former Member of the MakerBot Customer Support Team would respond to customers who posted complaints about these issues and, if wanted a refund, he would direct them to the appropriate person in Customer Support.

73. The former Inside Sales Executive recalled that "sh*t hit the fan" after the 5th generation printers were finally delivered. He explained that by May 2014 he and MakerBot's

technical support team received a significant number of calls after customers began receiving their orders and realizing that their printers were defective. This was confirmed by the former Member of the MakerBot Customer Support Team. One of his duties was to troubleshoot problems customers were having with the 5th generation Smart Extruders. He stated that this was a waste of time, however, because the Smart Extruders needed to be replaced.

74.     According to the former Member of the MakerBot Customer Support Team, the negative commentary on social media grew worse over time. He received very negative commentary via social media because there had been too many unresolved issues with the 5th generation printers. At one point, for instance, he recalled everything was completely negative on Google Groups discussion forums created by Defendant Pettis. The former Member of the MakerBot Customer Support Team told a Social Media Manager that the time he was spending on those forums was no longer valuable because the messages posted were just complaints about 5th generation printers. Although he had no answers to give, it was taking him up to five hours a day to read the complaints.

75.     As a result, the former Member of the MakerBot Customer Support Team decided to recommend that MakerBot shut down the Google Groups forums. Around July or August 2014, a month or two before he left MakerBot, he made a presentation to Defendant Pettis that the forums should be shut down. He said Defendant Pettis was more than happy to shut down the forums since there was nothing positive on them, and the forums were then closed.

> **2.     MakerBot Was Deluged with Expensive Product Returns and Warranty Claims as a Result of the Defective 5th Generation Printers**

76.     Aside from negative customer feedback, the premature release of the troubled 5th generation printers had a predictable result, given that the printers were sold under warranty: customers returned the printers and requested repairs, refunds, and/or replacements. However, the

replacements failed to remedy the problems because they were equally flawed and prone to failure. This was confirmed by the former Junior Data Analyst, who stated that replacement printers provided by MakerBot often experienced problems themselves.  In fact, he recalled in the last several months of his employment, before he departed MakerBot in August 2014, the volume of returned printers increased so much that MakerBot had to become stricter in the returns they would permit.

77.     The former Junior Data Analyst prepared reports regarding the number of repairs, part replacements, product returns, and customer support cases received by phone and e-mail.  He said some of the reports he prepared went to Defendant Lawton and Alfano (MakerBot Chief Revenue Officer), including reports regarding the number of cases coming in and reports detailing specific issues with the printers, product returns, and requisition order parts (*i.e.*, R.O. parts).  He also inserted data regarding product returns – both from individual consumers and retailers – into reports drawn from the SalesForce application.

78.     The former Director of Sales also discussed SalesForce, explaining this was where MakerBot's domestic and direct sales groups entered their sales information.  He said that the SalesForce environment was set up by Stratasys, and could be accessed by Stratasys.  As such, if a MakerBot software engineer wanted to make changes to the SalesForce environment, he had to either request permission from Stratasys, or have Stratasys make the change.

79.     Another former employee, the former Member of the MakerBot Customer Support Team, stated that after the release of the 5th generation printers, everyone had problems, complaints, and wanted refunds or replacements.  He was aware of these trends from his job monitoring social media, and the fact that one of his duties was to direct customers to the appropriate department when their 5th generation printers did not work or they wanted a refund.  Further, he participated in a

weekly "round up" meeting in which he gave updates on what he found in social media.  Issues with the 5th generation printers were discussed in the round up meetings.  The meetings were originally held to prepare for the launch of the 5th generation printers, but continued after their launch because of the bad turnout of the product.

80.     The former Member of the MakerBot Customer Support Team said the scope of the 5th generation problems was "above historical norms" compared to other MakerBot products, and resulted in customers returning the printers to MakerBot to be fixed.  This was necessary because the 5th generation problems were not "user fixable," necessitating a lot of back-and-forth shipping.  In addition to returns, refund requests were frequent.  He said a colleague at MakerBot had determined that approximately 50% of customers in the support "queue" requested refunds.  This was corroborated by the former Inside Sales Executive, who recalled that a majority of units sold were not ready and that almost every person he sold a 5th generation printer to either contacted MakerBot technical support or him directly because of problems with the printers.  He also recalled telling customers in July 2014 they would need to buy two or three extra Smart Extruders when buying a 5th generation printer because of the problems with the Smart Extruders.

81.     The former Manufacturing Process Intern confirmed that MakerBot experienced a heavy amount of returns because the Smart Extruders were bad across all three models of the 5th generation printers.  MakerBot was overloaded with complaints starting in the summer of 2014 and was not scaled-up enough to handle the amount of returns it received.  As a result, MakerBot started hiring more support staff in the fall of 2014 to deal with the problems.

82.     The former Junior Data Analyst corroborated that the main issue giving rise to an increase in product returns was the defective Smart Extruder.  He stated that MakerBot's solution to the problem was to send a new Smart Extruder; however, the consumer often experienced the same

problems with the replacement Smart Extruder.  In fact, he recalled that one consumer received approximately three new Smart Extruders, only to have problems with each of them.  The former Member of the MakerBot Customer Support Team also recalled customers who had to replace their Smart Extruders three or four times.  He said they often simply wanted refunds by that point.  In addition, he recalled a colleague stating in a weekly roundup meeting that one of MakerBot's biggest international clients did not have enough replacement Smart Extruders for its customers.

83.     The former Director of Sales said that the need to replace faulty Smart Extruders had an adverse effect on MakerBot's resellers.  He explained that resellers were administrators of MakerBot's warranties covering the 5th generation printers, meaning they were responsible for replacing failed parts such as the Smart Extruders.  In turn, MakerBot would be responsible for backfilling the replacement parts distributed by resellers to customers.  However, in light of the well-known Smart Extruder problems, the former Director of Sales was concerned that MakerBot would not be able to provide this backfill due to an inadequate supply of Smart Extruders at MakerBot.  As a result, resellers would have to cannibalize their own inventory of 5th generation printers in order to provide replacement Smart Extruders to customers.

84.     In February 2014, the former Director of Sales spoke directly to Defendant Reis about the Smart Extruder problems and the anticipated problem with replacement parts during a one-on-one conversation at a Stratasys event in Brazil.  According to the former Director of Sales, Defendant Reis simply responded to the effect of, "We'll cross that bridge when we get to it."  The former Director of Sales explained that after the 5th generation printers began shipping, the concerns he discussed with Defendant Reis indeed came to fruition.

85.     The former Director of Sales recalled that, after the release of the 5th generation printers, he was instructed by Schulze and Alfano to explain to resellers – only verbally, not in

writing – that they should not worry because MakerBot was working on replacement Smart Extruders.  However, he was told by Schulze and Alfano not to reveal that MakerBot was working on new versions of the Smart Extruders.

### 3.    Returns and Warranty Claims Related to the 5th Generation Printers Were Expensive and Hurt the Company's Margins

86.    The problems with the 5th generation printers were costly to MakerBot.  During the Class Period, the printers were under warranty by MakerBot.  This meant that MakerBot was on the hook for servicing a massive number of defective printers returned by consumers, and also for providing expensive replacement printers, replacement parts and/or full refunds to consumers.  The replacements provided by MakerBot were equally flawed, which compounded the costs and failed to provide a viable solution to the problem.

87.    The warranty costs were so high that they affected the finances of not only MakerBot, but the Company as well.  As Defendants revealed near the end of the Class Period, the Company was forced to take charges and reserves related to MakerBot's warranty costs, which, in turn, compressed the Company's gross margins and slowed its growth rate.

88.    The financial impact of these problems was apparent to the former Operations Financial Analyst early in the Class Period.  Problems with the 5th generation printers, particularly their defective Smart Extruders, first came to his attention by way of product returns and warranty claims about two-to-three months after the printers were released.  He said the Smart Extruder problems were considered serious by MakerBot.  MakerBot was forced to produce more Smart Extruders to replace the ones returned, while also meeting the production requirements for new printers.

**F.     MakerBot's Defective 5th Generation Printers Caused the Company's Sales Growth to Plummet and Disrupted Its Distribution Channels**

89.     In addition to the expenses associated with widespread product returns, repairs, refunds, and replacements, MakerBot's faulty 5th generation printers caused the Company's sales growth to slow drastically, further depleting its gross margins.  After an initial sales push, demand from consumers dried up quickly as they learned of the problems plaguing the printers, whose inferior quality and unreliability did not justify their high price relative to competitors.  Moreover, MakerBot's sales distribution partners could not unload a glut of inventory they had ordered in 2014 due to the limited consumer demand and a quick saturation of the market.  These problems limited reorders of the 5th generation printers, further damaging the Company's sales growth.

**1.     MakerBot's Direct Sales of the 5th Generation Printers Were Especially Poor**

90.     MakerBot sold printers both directly to consumers and retailers and indirectly through distribution partners.  The former Inside Sales Executive stated that MakerBot's direct sales suffered greatly as a result of the 5th generation problems.  The severity of the problems became obvious to him by mid-May, and his sales were very low by June 2014.  He explained that in June 2014 he had his lowest month of sales to date in part because he was receiving inbound calls and e-mails from customers complaining of problems with their 5th generation printers and Smart Extruders, and addressing these problems reduced his ability to devote time to sales.  He further explained that inside sales executives such as himself typically did not "cold call" customers, and instead usually relied on potential customers to submit requests for quotes, samples, or additional information online.  The inside sales executives would then call the leads that had submitted requests online.  During the Class Period, the former Inside Sales Executive's sales numbers declined significantly, and his customer leads from the Internet shut down.  Because customer leads had dried up, a small

number of MakerBot sales executives, including him, began making cold calls to schools in June and July 2014 in an effort to generate some sales.

91.     The former Inside Sales Executive knew from discussions at sales meetings that the average sales for other inside sales executives at MakerBot also decreased dramatically.  As a result, neither his team nor any of the other sales departments at MakerBot were able to meet their sales goals, except for the team that worked with the resellers, because some of the resellers were not yet aware of the problems with the 5th generation printers.  Supporting this point, the former Operations Financial Analyst recalled that, because of the problems with the 5th generation printers, MakerBot's internal projections were already considered "stretch goals" by mid-2014.

92.     By July 2014, the former Inside Sales Executive realized that he needed to leave the company because the poor sales situation was not improving.  He also did not want to sell the 5th generation printers after learning about the defect issues because he has a "conscience."

## 2.     MakerBot's Indirect Sales Through Distributors Were Also Poor

93.     Sales to MakerBot's distribution partners, including re-sellers who would buy from MakerBot and then attempt to "sell through" to consumers, also suffered greatly as a result of the 5th generation defects.  The former Operations Financial Analyst explained that MakerBot had been making a push into distribution and was pushing the distributor relationships hard prior to his departure from MakerBot in September 2014.  However, MakerBot's products were not selling through in the months leading up to his departure because MakerBot had loaded the channel.  Filling the channel with printers had been a main source of MakerBot's growth, but after a while it had an impact on MakerBot's ability to continue growing as much as it had in the past.

94.     The former Operations Financial Analyst added that some distributors were returning products that had been shipped to them.  For example, Microsoft returned a couple hundred thousand

dollars' worth of products to MakerBot because Microsoft did not sell enough.  He was also aware of some big returns separate and apart from the Microsoft return.

### G.      Numerous Facts Support Defendants' Knowledge of MakerBot's Undisclosed Problems and Their Impact on the Company

95.     As set forth above, former MakerBot employees confirmed that during the design, manufacturing, quality control, sales, and customer support processes, Defendants knew of, or at a minimum were severely reckless in disregarding, the undisclosed quality and reliability issues with MakerBot's 5th generation printers, and the detrimental impact of those issues on the finances of MakerBot and the Company.  This is supported by numerous additional indicia of Defendants' knowledge, including Defendants' own statements, Defendants being directly confronted about the issues by their employees, MakerBot's importance as a core operation of the Company, and Defendants' close involvement with MakerBot and the production and sale of the 5th generation printers.

### 1.      Defendants' Public Statements Confirmed Their Knowledge of the Problems Associated with MakerBot's 5th Generation Printers

96.     Defendants made numerous joint appearances before securities analysts to discuss, promote, and answer repeated questions about MakerBot and its products.  In fact, during every quarterly earnings call with analysts throughout the Class Period, Defendants were asked and provided detailed answers about MakerBot and its 5th generation printers.  During these calls, Defendants boasted of the quality and success of MakerBot's 5th generation printers and the impressive sales demand, growth, and prospects of MakerBot and the Company.  Defendants echoed these statements in numerous Company press releases, Company SEC filings, and interviews with media. *See, e.g.*, ¶¶132-33, 136, 141-45.  Through these statements, Defendants acknowledged they were evaluating MakerBot, its 5th generation printers, its financial results and prospects, and the impact of such products and financial results and prospects on the Company.

97.     For example, Defendant Pettis acknowledged in various public statements that he was closely involved with the development of the 5th generation printers, which he unveiled to the public at the 2014 CES conference in Las Vegas on January 6, 2014.  For example, in describing the 5th generation printers at Stratasys' Analyst Day on September 8, 2014, Defendant Pettis emphasized his four-year personal involvement in their development, while boasting of their ease-of-use, technology, "removable smart extruder," and his direct, ongoing involvement with the development of the Smart Extruder:

> Here is our current offering.  ***So I'm so proud of this.  At MakerBot, when we launched this, we were five years, we just turned five, and I spent about – of the previous five years I spent four years developing this technology.***  This is one – this is what I was working towards the whole time, super easy to use, super friendly, networked 3D printing.  We've got small, medium and large, doesn't matter, though, because they're basically all the same 3D printer.  ***They all have the same electronics.  They all have the same [ph] cool head technology, which is a removable Smart Extruder***, and they're all networked, and it' just powerful, easy to use.  They look good too.  I'm really – I worked really hard with our design team to make them look good.  Engineers just look at other 3D printers and they're like, yeah, I want the one that's black and red.  There's two good designs – there's two good color schemes in the world.  There's black and red, everything else.
>
> ***And it's interesting, we're actually on probably our third iteration of the extruder this year, so things have already gotten better this year, because that's how we roll.***  We're always trying to get better and when we can set out – and the software has been updated more times than that, and every time we do it, the algorithms we use get better for splicing.  The algorithms get better for making in-fill.

98.     Defendant Reis' conference calls with analysts during the Class Period reflect his close involvement with MakerBot and its critical 5th generation printers.  For example, Defendants Reis and Pettis made the following statements in response to an analyst's question regarding the "pure consumer MakerBot product" during the Company's earnings call on March 3, 2014:

**Defendant Reis:**

The consumer?  ***Well, you know, Bre is here and we are extremely involved.***  MakerBot Mini compact Replicator is the first move into this market.  Bre?

**Defendant Pettis:**

Yes, I mean this is -- we have really focused with the MakerBot Replicator Mini on an easy-to-use 3D printer. It is one-touch 3D printing.

***But there is no compromise there. The extruder that we have in the MakerBot Replicator Mini is the same extruder that we have in the whole lineup.***

***So it's a smaller 3D printer, but still you have got professional-grade components*** and you have got most of the features of the MakerBot Replicator line in there.  It is just a little smaller footprint.

99.      On Stratasys' August 7, 2014 conference call, Defendants Reis and Simha reassured analysts and investors that inventory levels were "not an issue" with respect to the Company's sales channels and that MakerBot and its other product lines had "no extra inventory. . . . ***It's being controlled extremely close*** and we're operating with absolute minimum operational inventory."

100.     Similarly, Defendant Lawton's statements show her knowledge of the 5th generation problems affecting MakerBot, despite her attempts to downplay them.  She stated in a media interview on January 14, 2015 that ***"[w]e've continued to work on the Smart Extruder, and the Extruder that we have today combined with the firmware and software that we have is a very good experience."***

101.     By choosing to speak about MakerBot and its products, and their actual and projected financial effect on the Company, the Individual Defendants led investors to believe that they had knowledge of such matters and were speaking truthfully to the market about them.

> **2.**     **MakerBot's Production and Sale of the 5th Generation Printers Were Core Operations of the Company, Supporting Defendants' Knowledge**

102.     In addition to their own public statements, Defendants' knowledge is supported by the fact that MakerBot and its production and sale of the 5th generation printers were core operations of the Company.  MakerBot was the top selling unit of the Company during the Class Period.  In fiscal year 2014, Stratasys sold approximately 121,661 3D printing systems globally, approximately

79,906 were MakerBot units (approximately 66%). Further, the Company classified the MakerBot Desktop Series as one of its five core products. MakerBot's importance to the Company is further evidenced by the Company's massive expenditure of approximately $500 million to acquire MakerBot in August 2013.

103.   During the Class Period, the Individual Defendants were high-ranking officers of the Company (*i.e.*, Reis as CEO and Simha as CFO/COO) and MakerBot (*i.e.*, Pettis as CEO and Lawton as Acting CEO and President) who were heavily involved with the Company's core operations. As such, Defendants were intimately aware of the problems affecting the Company's core operations at MakerBot (*i.e.*, MakerBot's production and sale of defective 5th generation printers), and the impact of those problems on Stratasys.

104.   In addition, the importance of MakerBot and its products to the Company is evident from Defendants' own public statements. By repeatedly talking about MakerBot and its 5th generation printers, on conference calls and in press releases, SEC filings, and media interviews, Defendants confirmed that they were of critical importance to the Company's financial and operating results and prospects. Specifically, Defendants repeatedly touted MakerBot for its contributions to the Company's growth, and described it as an important vehicle for the Company's expansion into the desktop market.

105.   For example, in an interview at a Stratasys Media Event on October 31, 2014, Defendant Reis was asked, "So the first question that comes to mind is… exactly which 3D area holds the most promise from an insider's point of view?" He responded: ***"The MakerBot family of 3D printers is by far our top selling in terms of units, we worked to make them as accessible as ever, all you need to do is take a Replicator Fifth Gen out of the box and plug it in to begin printing good quality products."***

### 3.     Former MakerBot Employees Confirmed Defendants' Knowledge of the Problems Associated with the 5th Generation Printers

106.     As detailed in paragraphs 49-105 above, statements from several former MakerBot employees confirmed Defendants' knowledge of the undisclosed quality and reliability issues plaguing MakerBot's 5th generation printers and their detrimental impact on the Company. For example, the former Director of Sales spoke directly with Defendant Reis about problems associated with MakerBot's Smart Extruders. Specifically, at a Stratasys event in Brazil in February 2014, the former Director of Sales addressed the Smart Extruder problems with Defendant Reis, and voiced his concerns that such problems would result in shortages of the Smart Extruders. Defendant Reis simply responded to the effect of, "We'll cross that bridge when we get to it."

107.     Other former MakerBot employees corroborated Defendant Lawton's direct knowledge of the 5th generation printer problems and MakerBot's sales. The former 3D Printing Specialist spoke with Defendant Lawton about problems he was having with 5th generation printers in MakerBot's "BotFarm" where he worked. Defendant Lawton, who was MakerBot CEO at the time, simply responded that MakerBot was continually looking at ways to improve their products. The former Junior Data Analyst recalled certain reports detailing specific product issues and returns were sent to Defendant Lawton. In addition, the former Director of Sales directly reported his international sales metrics to Defendant Lawton on a weekly basis, and she (or Alfano or Schulze) would then report the metrics up the chain to Stratasys.

108.     The former 3D Printing Specialist also saw Defendant Pettis bring visitors to the BotFarm, where problems with the 5th generation printers and their Smart Extruder were so severe that the BotFarm was predominantly comprised of MakerBot's older generation, yet vastly superior, Replicator 2 printers. Defendants Pettis and Lawton also would routinely tell investors who visited the BotFarm that the examples they were looking at were just printed. In reality, it was common

practice was to take an item printed days before and put it into a 5th generation printer to make it

appear as if it had just been printed by that machine.  The former 3D Printing Specialist added that,

because of the ongoing problems with the 5th generation printers, said it was a routine and common

practice within the BotFarm to take products that had actually been made by the older generation

Replicator 2, and put them on the platforms of 5th generation machines to make it appear to visitors

that the products had actually been made by the 5th generation printers.

109.    Defendant Pettis also knew of the extremely negative customer reception to the 5th

generation printers, as the former Member of the MakerBot Customer Support Team confirmed.  He

said Defendant Pettis was "more than happy" to shut down Google Groups discussion forums, which

included criticism of the 5th generation printers, because there was "nothing positive" on them.  The

forums were subsequently shut down as a result.

110.    Defendants Reis' and Simha's close involvement with MakerBot and its production

and sale of its 5th generation printers was supported by their frequent presence at MakerBot's

headquarters in New York.  For instance, Stratasys conducted its Analyst Day conference at

MakerBot headquarters on September 8, 2014, which included an extensive presentation from

Defendant Reis.  The former Director of Sales recalled that space in MakerBot's headquarters,

formally occupied by MakerBot customer service reps, was cleared out so Defendant Simha could

start working there, which was scheduled to begin soon after the former Director of Sales' tenure at

MakerBot ended in August 2014.

### H.    Defendants Misled the Market and Failed to Disclose MakerBot's Product Quality Issues and the Resulting Financial Problems Affecting the Company

111.    Despite being fully informed that the 5th generation printers were severely flawed

due to the quality control and manufacturing issues at MakerBot, which limited sales demand,

compressed margins, and rendered MakerBot's early sales and revenue growth illusory and

unsustainable, Defendants failed to disclose these facts to the market.  Instead, as further detailed in Section V below, Defendants repeatedly misled the market by boasting of the quality of the 5th generation printers and MakerBot's explosive revenue and sales growth.  Defendants were motivated to protect MakerBot's reputation as a cutting-edge technology company and a key growth engine for Stratasys, justifying their massive $500 million expenditure on the acquisition of MakerBot and keeping Stratasys' artificially inflated stock price afloat.

112.    For example, on January 6, 2014, Defendant Pettis unveiled and heavily touted MakerBot's new 5th generation printers at the 2014 CES conference in Las Vegas, despite their myriad quality and reliability problems, and the fact that they were not ready for a market release. Indeed, the 5th generation models Defendant Pettis presented at the conference were not even functional, according to one former MakerBot employee.  Also on the same day, MakerBot issued a press release touting the ***"improved" and "unmatched" reliability, quality, ease of use, seamless production, and performance*** of the 5th generation printers and its Smart Extruders.  On the same day, Defendant Pettis gave an interview to PCMag.com with the same message.

113.    Shortly after the 2014 CES conference, Stratasys gave a presentation to securities analysts at the Needham Growth Conference on January 15, 2014.   In his opening remarks, Defendant Simha touted the "exponential" and "tremendous" growth of MakerBot and the desktop 3D printing market, as well as the quality of the Company's product development:  "***We do care about quality and this is the wide meaning of quality. Quality around research and development and production and processors***."

114.    Defendants continued this misleadingly positive messaging throughout the Class Period.  On every conference call with securities analysts, Defendants Reis and Simha (and at times Defendant Pettis) were repeatedly asked about MakerBot and its products.  Rather than disclose the

serious operational and financial issues affecting MakerBot and the Company, Defendants Reis and Simha emphasized MakerBot's explosive growth and the quality and market acceptance of MakerBot's products. For example, on Stratasys' November 5, 2014 earnings call, a securities analyst asked whether the largest of MakerBot's 5th generation printers, the Z18 was "being well received" by customers. Defendant Reis falsely stated, in no uncertain terms: ***"Yes. The answer is yes, very well received."***

115.    On the same November 5, 2014 conference call, rather than disclosing the MakerBot problems that were significantly hurting sales demand and growth, Defendants Reis and Simha gave the opposite impression, repeatedly emphasizing that demand for the Company's products remained "very strong" based partly on "an impressive contribution from MakerBot." Defendants reiterated their aggressive growth forecasts as well.

116.    Defendant Pettis also stuck to his misleading statements about product quality throughout the Class Period, including statements made during his lengthy presentation at the Company's September 8, 2014 Analyst Day conference, despite the predictably disastrous market reception to the 5th generation printers. As Defendants knew, the 5th generation printers were subject to frequent malfunctions and did not work as advertised, causing customers to return them in droves, and thus did not have ***"[u]nmatched speed, reliability, quality and connectivity,"*** and were not ***"[e]asy-to-use"*** and ***"no-compromise,"*** as Defendant Pettis falsely represented at the conference.

117.    In addition, despite the sales and distribution problems facing the Company as a result of the 5th generation printer problems, leading to a glut of unsold inventory, Defendants falsely reassured investors that there were no problems related to inventory. In response to questions from securities analysts on Stratasys' August 7, 2014 conference call, Defendants Reis and Simha definitively told investors that inventory levels were "not an issue" with respect to the Company's

sales channels and that MakerBot and its other product lines had "no extra inventory. . . . It's being controlled extremely close and we're operating with absolute minimum operational inventory."

### I.   Defendants Were Motivated to Maintain a Positive Market Perception of the Company, and the Company's Artificially Inflated Stock Value

118.   Defendants were highly motivated to conceal the substantial problems at MakerBot in order to ensure that the market maintained its positive perception of the Company's product quality and growth prospects, and, in turn, artificially inflate the price of Stratasys stock.  This was critical because Stratasys had aggressively promoted the expansion of its business into the much-hyped market for desktop 3D printing through the well-known MakerBot brand.  Defendants wanted to protect MakerBot's perception as a cutting edge technology company and growth engine for Stratasys, in an attempt to maintain the lofty, artificially inflated value of the Company's stock.

119.   This was particularly important during the Class Period, when the Company sought to continue its growth by purchasing other companies.  In particular, Defendants sought to maximize the value of the Company stock exchanged for two privately held companies, Solid Concepts Inc. ("Solid Concepts") and Harvest Incorporated ("Harvest Technologies"), which were intended to expand Stratasys' 3D printing services business.  The two acquisitions were substantially aided by the artificially inflated price of Stratasys stock exchanged in the deals.

120.   In particular, on July 15, 2014, the Company acquired Solid Concepts pursuant to a merger agreement dated April 2, 2014.  In connection with this acquisition, the Company filed a July 17, 2014 prospectus supplement on Form 424B7 for the sale of 1,961,155 shares at $103.37 per share, totaling approximately $202.7 million.  The Company disclosed it would pay up to $295 million for the acquisition, a significant portion of which (approximately $109 million) was paid with the Company's stock on July 15, 2014.

121.    On August 7, 2014, the Company filed another prospectus supplement on Form 424B7 for the sale of 277,476 shares at $98.47 per share, totaling approximately $27.3 million, relating to the Company's acquisition of Harvest Technologies.  The prospectus supplement stated that an initial aggregate payment of 175,456 Company shares had been made to Harvest Technologies shareholders on August 1, 2014.

**J.      The Company's Stock Price Ultimately Collapsed When the Market Learned of the True Extent of the Company's Problems**

122.    By February 2, 2015, Defendants could no longer hide the Company's mounting problems.  After the market closed, the Company stunned investors by issuing a press release warning that its revenue for the fourth quarter of 2014 would miss analysts' expectations, based on severe problems associated with its MakerBot unit.  The Company pointed to MakerBot's product quality and reliability problems, its slower growth (only 7% during the quarter, far lower than previous levels), and "challenges associated with the introduction and scaling of its new product platform [the 5th generation printers] and the Company's rapidly evolving distribution model."  The Company also revealed that it was taking a massive $100 to $110 million goodwill impairment charge related to its MakerBot acquisition.

123.    As a result the problems, the Company reported that its own revenue for 2014 would only be in the range of $748- $750 million (lower than the $764 million analysts had been modeling and the Company's prior guidance of $750 -$770 million).  Its 38% revenue growth also fell short of analysts' expectations (49% revenue growth), meaning fourth quarter revenue would be approximately $214 million (below consensus estimates of $230.8 million).  The Company's adjusted earnings per share fell short of expectations as well (2014 EPS of $1.97- $2.03 versus prior guidance of $2.21- $2.31 and consensus estimates of $2.25).

124.    Further, the Company announced expected adjusted earnings per share of just $2.07-$2.24 in 2015 (well below analyst and market expectations of $2.90). Its forecasted 2015 revenues of $940- $960 million also fell short of market expectations ($1 billion). The reduced forecasts implied much slower organic growth than the Company previously led the market to expect.

125.    In response to the Company's unexpected earnings miss and newly revealed problems at MakerBot, the Company's stock price plummeted. After closing at $80.08 per share on February 2, 2015, the stock opened trading at $57.00 per share on February 3, 2015, and ultimately closed at $57.36 per share (a decline of 28%, or $22.72 per share). The stock decline would have been even greater had the Company revealed the full truth to investors. However, Defendants continued to mislead the market as to the true severity of MakerBot's problems and their impact on Stratasys.

126.    On April 17, 2015, the technology website Motherboard reported that MakerBot had laid off 20% of its staff, or roughly 100 employees, citing anonymous sources.[13]  MakerBot confirmed this report on the same day, announcing it was subject to a business reorganization involving a "downsiz[ing]" of its staff, expense reductions, and the closure of MakerBot's three retail stores. However, the announcement couched these moves in a positive light, which served to maintain the artificial inflation in the price of Stratasys stock, once again highlighting MakerBot's "incredible" growth and "leading-edge innovation," downplaying the moves as a "continued scaling of MakerBot," and failing to reveal how severely MakerBot's problems continued to impact the Company:

> At MakerBot, we continue to evolve at an incredible pace. We've grown more than 600% from 2012 to 2014 – in short, we've grown incredibly fast.
>
> As a company that's focused on leading-edge innovation, we've learned to embrace change in order to stay focused.

---

[13]   Jordan Pearson, *MakerBot Just Laid Off 20 Percent of Its Staff*, MOTHERBOARD (Apr. 17, 2015, 2:15 PM EST), http://motherboard.vice.com/read/makerbot-just-laid-off-20-percent-of-its-staff.

Today, we at MakerBot are re-organizing our business in order to focus on what matters most to our customers.  As part of this, we have implemented expense reductions, downsized our staff and closed our three MakerBot retail locations.

With these changes, we will focus our efforts on improving and iterating our products, growing our 3D ecosystem, shifting our retail focus to our national partners and expanding our efforts in the professional and education markets.

"These organizational moves are part of the continued scaling of MakerBot," said David Reis, chief executive officer of Stratasys.

At MakerBot, we're proud of being a highly innovative company that is leading the new product category of desktop 3D printing.  We've experienced significant growth since inception, and achieved market leadership by iteratively testing, proving and pivoting our business.

We look forward to putting the power of desktop 3D printing in the hands of even more people in 2015.[14]

127.    The Company finally revealed the full extent of its problems after the market closed on April 28, 2015.  On that day, Stratasys issued a press release announcing "disappoint[ing]" preliminary first quarter 2015 results, and lowering its financial guidance for the full fiscal year of 2015.  Among other problems, the Company made new revelations regarding the severity of the financial and operational issues affecting the MakerBot unit, including a continued slowdown in sales and revenue growth.  The Company announced an 18% decline in MakerBot revenue during the first quarter of 2015 (compared to the first quarter of 2014), and confirmed Stratasys' restructuring of MakerBot designed in part "to focus efforts at MakerBot on improving and iterating products. . . ."

128.    In addition, the Company announced on April 28, 2015 another massive impairment charge related to its MakerBot acquisition of approximately $150 to $200 million, which nearly doubled the $102 million charge that Stratasys had taken in the previous quarter (totaling nearly $300 million in MakerBot write-downs).  These charges signaled that Stratasys paid far too much to

---

[14]  *An Announcement*, MAKERBOT.COM  (Apr.  17,  2015),  http://www.makerbot.com/blog/2015/04/17/an-announcement.

acquire MakerBot (nearly $500 million), in light of its pervasive product quality, operational, and financial issues.  They also belied Defendants' misleading statements throughout the Class Period regarding the exceptional revenue and sales contributions by MakerBot and the outstanding quality of its products.

129.    On this news, the price of Stratasys stock plummeted once again.  After closing at $51.30 per share on April 28, 2015, the stock dropped 22% ($11.37) to close at $39.93 per share on April 29, 2015, on unusually high trading volume of more than 11 million shares.  As the market continued to digest the news, shares continued to drop an additional 6% ($2.48) the following day, closing at $37.45 per share on April 30, 2015.  These disclosures stood in stark contrast to Defendants' false and misleading Class Period statements described in detail below.  As a result, numerous analysts, including J.P. Morgan Securities LLC, FBR Capital Markets, Cowen and Company, Piper Jaffray & Co., and Brean Capital, LLC, downgraded their ratings and lowered their price targets for Stratasys stock.

## V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS[15]

130.    Throughout the Class Period, Defendants repeatedly made positive statements about MakerBot, including the quality and reliability of its 5th generation printers and its rapid sales growth and impressive revenue contributions, among other things.  However, these statements did not paint a complete and accurate picture of MakerBot under the circumstances.  In reality, Defendants knew that MakerBot was beset by severe quality problems tied to its defective 5th generation printers, which crushed its sales demand and inflated its costs, and in turn damaged the

---

[15]   Plaintiffs contend each of Defendants' statements quoted in this section are materially false and misleading because they either affirmatively misrepresented facts or omitted facts that were required to be disclosed.  The bolded and italicized statements in this section are included solely to provide emphasis, not to limit Defendants' false statements.

Company's finances.  When Defendants elected to disclose positive information about MakerBot and its products during the Class Period, they were under a duty to disclose the additional negative information about MakerBot and its products in order to make the positive information not misleading.  This omitted information would have altered the total mix of information for reasonable investors.  Defendants failed to reveal such information, and instead omitted and concealed it from investors.  In addition, many of Defendants' statements about MakerBot and its 5th generation printers were explicitly and materially false and misleading in themselves.  Defendants' false and misleading statements and omissions are detailed in this section.

A.     **Defendants' False and Misleading Statements and Omissions from January 6 Through May 8, 2014**

1.     **Press Release and Interview Regarding the Release of MakerBot's 5th Generation Printers**

131.     The Class Period begins after the market closed on January 6, 2014.  On that date, Defendant Pettis gave a presentation at the 2014 CES in Las Vegas, Nevada for the purpose of unveiling and heavily promoting MakerBot's new platform of 3D desktop printers, which were described as the "5th generation" of MakerBot printers.  The new platform of 5th generation printers, which Defendant Pettis displayed at the presentation, included:  (a) the MakerBot Replicator Desktop Printer; (b) the MakerBot Replicator Mini Compact 3D Printer; and (c) the MakerBot Replicator Z18 3D Printer.

132.     In conjunction with this presentation, after the market closed on January 6, 2014, Stratasys and MakerBot issued a press release stating in pertinent part:

- MakerBot, the global leader in desktop 3D printing, is launching a comprehensive new 3D Printing Platform and 3D Ecosystem that is designed to enable ***improved reliability, ease of use, and seamless connectivity*** for MakerBot Replicator Desktop 3D Printers and the MakerBot Digitizer Desktop 3D Scanner.

- MakerBot's new 3D Printer Platform includes:

**MakerBot Replicator Desktop 3D Printer**:  A professional quality desktop 3D printer that MakerBot believes will have ***unmatched speed, reliability, quality***, ***and connectivity*** for all 3D printing needs. . . . Offering 100-micron layer resolution, the MakerBot Replicator is app and cloud enabled, offers USB, ethernet and available Wi-Fi connectivity to ensure a ***seamless production workflow*** . . . . ***and features a new MakerBot Replicator Smart Extruder that is easy to swap or replace and detects filament absence and automatically pauses a print, as well as being optimized for MakerBot PLA Filament***. . . .

**MakerBot Replicator Mini Compact 3D Printer**:  The MakerBot Replicator Mini Compact 3D Printer is an ***easy-to-use*** compact 3D printer for everyone.  . . .  The MakerBot Replicator Mini offers fifth generation technology that MakerBot believes defines ***the new standard for ease-of-use, quality and reliability***. . . . .

**MakerBot Replicator Z18 3D Printer**:  The MakerBot Replicator Z18 3D Printer offers massive build volume and MakerBot believes the best price/performance in its category. . . .  The MakerBot Replicator Z18 is app and cloud enabled and USB, ethernet and available Wi-Fi connectivity creates a ***seamless production workflow***. . .[16]

133.    Defendant Pettis echoed these comments in an interview with a popular technology magazine, PCmag.com, published on January 6, 2014.  In the article, Pettis hyped MakerBot's 5th generation printers as "***fifth-generation technology that's setting the standard for reliability, quality, and connectivity***.  ***It's our fastest and easiest 3D printer to use***."[17]

134.    Defendant Pettis' and MakerBot's announcements touting the new 5th generation printers caused artificial inflation to be introduced into the price of Stratasys stock.

135.    The above statements from the Company's press release and PCmag.com interview on January 6, 2014 were materially false and misleading and omitted material facts because:

---

[16]    *CES Sets the Stage for MakerBot Launch of Expanded MakerBot 3D Printing Platform and Ecosystem with a Whole New Generation of 3D Printers and 3D Content*, Stratasys.com (Jan. 6, 2014), http://investors.stratasys.com/releasedetail.cfm?ReleaseID=817361; Makerbot.com (Jan. 6, 2014),      http://makerbot-blog.s3.amazonaws.com/wp-content/uploads/2014/01/Rls_MakerBot_CES_2014_PressConf_f.pdf.

[17]    Damon Poeter, *MakerBot Rolls Out New 3D Printers, Including Replicator Mini*, Pcmag.com (Jan. 6, 2014), http://www.pcmag.com/article2/0,2817,2429195,00.asp.

(a)      MakerBot's 5th generation printers, which were critical to the Company's sales growth and expansion into the 3D desktop printing market, were rushed to the market despite a host of problems known to Defendants well before such statements were made, including serious problems with the printers' Smart Extruder, which rendered the printers unfit for release to the market (*see* ¶¶46, 50-52, 62);

(b)      Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the 5th generation printers were exceptional products of unmatched quality, reliable, easy to use, high value, seamless, standard-setting, and improved over older generations of MakerBot printers;

(c)      MakerBot's 5th generation printers did not have "unmatched" or standard-setting quality, because they lacked quality components, a quality design, and quality manufacturing. Rather, the printers were designed and manufactured poorly, and included malfunctioning components parts such as a "Smart Extruder" that frequently clogged with filament, "smart" sensors that often failed, and faulty software (*see* ¶¶50-69);

(d)      As a result of these problems, the 5th generation printers were not "reliable" at all.  They were extremely unreliable because they frequently malfunctioned and failed to work as marketed (*see id.*).  These problems often resulted in failed, aborted, or delayed printing, meaning that the 5th generation printers did not provide a "seamless" production workflow on any consistent basis (*see id.*);

(e)      Further, the 5th generation printers were not "easy to use" because their use frequently involved problems, malfunctions, and breakdowns that were not easy to fix, and in fact could not be fixed by consumers, which made the printers exceedingly difficult to use (*see id.*); and

(f)     Moreover, the 5th generation printers were not setting or defining any "standard" (in a positive sense) or possessing any "improved" characteristics relative to other 3D printers (*see id.*).  In fact, they were not even an improvement over MakerBot's older generation of printers, which were far superior in terms of quality and reliability (*see* ¶¶55, 108).

## 2.     Press Release Regarding the Company's 2014 Financial Guidance and Statements at the Needham & Company Growth Conference

136.     Shortly after the announcements regarding MakerBot's new 5th generation printers, the Company issued a press release on January 14, 2014 announcing optimistic financial guidance for fiscal year 2014 (including projected revenue of $660 to $680 million).  The press release emphasized the Company's strong financial performance, largely due to MakerBot's rapid sales growth, which was projected to continue at a rate higher than other Stratasys units:  "[t]he company expects organic sales, which exclude MakerBot sales, to grow at least 25% over 2013, with additional growth coming from MakerBot, which is expected to grow at a higher rate."  In the press release, Defendant Reis added that "the performance of MakerBot, which we acquired in August of 2013, is exceeding our expectations, and is on track to be accretive by the end of the year."

137.     The following day, on January 15, 2014, Defendant Simha gave a presentation at a Growth Conference hosted by Needham & Company, one of the securities analysts covering Stratasys' stock.  In his opening remarks, Defendant Simha emphasized that "[w]e do care about quality and this is the wide meaning of quality.  Quality around research and development and production. . . ."

138.     Defendant Simha further highlighted the rapid growth of MakerBot and the desktop 3D printing market:  "MakerBot is the strongest brand in the low-end market today . . . . MakerBot is growing really, really fast. . . . And I think this is also an indication about the market, the low-end market which is growing exponentially. . . ."

139.     Defendant Simha added the following statements promoting MakerBot's new platform of 5th generation printers:

> We introduce[d a] completely new [MakerBot] platform last week in CES in Las Vegas:   four different printers targeting for different markets, meaning low-end, midrange and high end of the low-end semiprofessional product.  The replicator was already available for sales.  The other two would be available around springtime; ***a lot of innovation behind those products***.

140.     The above statements from the Company's press release on January 14, 2014 and the Company's presentation at the Needham Growth Conference on January 15, 2014 were materially false and misleading and omitted material facts because:

(a)     MakerBot's 5th generation printers, which were critical to the Company's sales growth and expansion into the 3D desktop printing market, were rushed to the market despite a host of problems known to Defendants well before such statements were made, including serious problems with the printers' Smart Extruder, which rendered the printers unfit for release to the market (*see* ¶¶46, 50-52, 62);

(b)     Defendants failed to disclose these material problems to the market, and instead gave investors the misleadingly positive perception that the Company was focused on quality research, development, and production, MakerBot was poised to release a new line of innovative 5th generation printers, MakerBot was exceeding expectations, MakerBot's sales were growing at a rapid rate, and such growth would continue in 2014;

(c)     The Company did not have "quality" research, development, and production within its MakerBot unit; rather, MakerBot's research, development, and production were severely deficient, resulting in a poorly designed and manufactured line of 5th generation printers, which included malfunctioning components parts such a "Smart Extruder" that frequently clogged with filament, "smart" sensors that often failed, and faulty software (*see* ¶¶50-69);

(d)      As such, the 5th generation printers did not offer any "innovations" that translated into quality or reliable 3D printing (*see id.*);

(e)      MakerBot's "rapid" sales growth and "impressive" revenue contributions touted by the Company were unsustainable because the quality and reliability problems of MakerBot's 5th generation printers would inevitably curtail consumer demand, substantially slow the Company's sales growth, and disrupt the Company's sales distribution channels (*see* ¶¶89-94); and

(f)      MakerBot's projected sales growth was illusory because the 5th generation printers were under warranty, meaning that their pervasive quality and reliability issues would inevitably result in returns, refunds, repairs, and replacements on behalf of purchasers (*see* ¶¶76-88). As a result, MakerBot's sales of these printers would result in heavy costs to the Company and, in turn, compress the Company's gross margins and financial performance (*see id.*).

> **3.      Press Release, Conference Call, and Annual Filing Regarding the Company's Fourth Quarter and Fiscal Year 2013 Financial Results**

141.    On March 3, 2014, the Company issued a press release regarding its financial results for the fourth quarter and fiscal year of 2013.  The press release highlighted MakerBot's rapid growth, demand, and impressive contribution to the Company's finances.  Defendant Reis stated: "We experienced strong organic growth driven by demand across multiple product lines, as well as an impressive contribution from MakerBot."  The press release further touted MakerBot's revenue contributions and growth prospects as follows:

- MakerBot made a significant contribution . . . to fourth quarter revenue, as its highly affordable and functional desktop 3D printers continued strong positive sales momentum within the rapidly growing desktop category.

- The company expects organic sales, excluding MakerBot sales, to grow at least 25% over 2013, with additional growth coming from MakerBot, which is expected to grow at a higher rate.

142.     On March 3, 2014, Stratasys held a conference call to discuss its financial results for the fourth quarter and fiscal year of 2013.  In his opening remarks, Defendant Reis highlighted the Company's record profit and EPS, strong demand across all product categories, and margin expansion.  He added that MakerBot "performed impressively . . . as the rapidly growing desktop category sustained strong growth sales momentum."

143.     Defendant Simha made similarly positive comments about MakerBot and its "significant revenue contribution. . . . sustaining its strong positive sales momentum within the rapidly growing desktop category."  Shane Glenn, Stratasys' Vice President of Investor Relations ("Glenn"), asserted that that such rapid growth was projected to continue in 2014:  "[w]e expect organic sales, which exclude MakerBot sales, to grow at least 25% over 2013, with additional growth coming from MakerBot, which is expected to grow at a higher rate."

144.     Defendant Reis added that the Company was "pleased with our many recent new product introductions and channel initiatives that we believe will greatly improve 3D printing accessibility and drive expanded usage for our products."  He specifically touted the MakerBot 5th generation printers as follows:

- In addition, at CES last January we launched a new 3D printing platform ***designed to improve system affordability, reliability, ease of use, and user connectivity***.  The new MakerBot Replicator platform is an app-enabled platform that includes three new fifth-generation MakerBot Replicator 3D printers:  The MakerBot Replicator desktop 3D printer; the MakerBot Replicator Mini compact 3D printer; and the MakerBot Replicator Z18 3D printer.

- We believe the new MakerBot platform provides ***unmatched speed, reliability, quality, and connectivity and delivers easy to use and reliable desktop 3D printing*** to a full range of consumers and professional users.  Desktop 3D printing remains one of the fastest-growing opportunities within our industry, and Stratasys is the leading of this category.

145.     In the question-and-answer session that followed, all 11 securities analysts participating in the call questioned Defendants Reis, Simha, or Pettis about MakerBot, which

evidenced the importance of MakerBot to analysts and their evaluation of the Company's stock.  In

response to these questions, Defendants Reis and Pettis stated that they were "extremely involved"

with MakerBot's new "pure consumer" products (*i.e.*, the 5th generation MakerBot Mini Compact

Replicator), boasted that there was "no compromise" with respect to such printer, and emphasized

that it included the same Smart Extruder as the other 5th generation models:

> **Ananda Baruah** - Brean Capital – Analyst:
>
> And then the consumer market as well, you are introducing a new let's say a pure consumer MakerBot product.  But just holistically how you thinking about . . . consumer going forward?
>
> **Defendant Reis**:
>
> The consumer?  ***Well, you know, Bre is here and we are extremely involved.*** MakerBot Mini compact Replicator is the first move into this market.  Bre?
>
> **Defendant Pettis**:
>
> Yes, I mean this is -- we have really focused with the MakerBot Replicator Mini on an easy-to-use 3D printer. It is one-touch 3D printing.
>
> ***But there is no compromise there***.  ***The extruder that we have in the MakerBot Replicator Mini is the same extruder that we have in the whole lineup***.
>
> So it's a smaller 3D printer, but still you have got professional-grade components and you have got most of the features of the MakerBot Replicator line in there.  It is just a little smaller footprint.

146.    When asked whether costs associated with MakerBot's new product line (*i.e.*, the 5th

generation printers) "will have any impact on the profitability level there, and whether that will

continue to be a drag to some degree on gross margin," Defendant Simha rejected that notion:  "We

don't expect the gross margin of MakerBot to be changed significantly as a result of in production of

those new products in 2014."  Defendant Reis reinforced this when asked whether he had seen any

"price-based behavior" among competition or consumers:

> So it is true there are people which are selling less expensive; but MakerBot is able to sustain its gross margin and we saying that we expect it to continue into next year.

And the reason that they are able to do it is because, A, we have great product and, B, we are giving a full solution, which is the only full solution today in the market.

147.     In response to another analyst question, Defendant Simha strongly emphasized that the Company's organic growth would be faster than 25%, and that MakerBot would grow even faster than that:  "We said that the nature, the organic business of Stratasys and Objet will grow more than 25% in 2014; and the MakerBot business will grow faster than that. . . .And again please, when you are looking at the number, please refer to more than 25%. We didn't say 25%. We said more than 25% organic growth."  Defendant Reis echoed this message in response to a separate analyst question:  "First of all, I think we are growing faster than the market. . . . all of [the product lines including desktop] are growing and all of them are creating more demand than what we created in previous years."

148.     On March 3, 2014, Stratasys filed a Form 20-F with the SEC reporting its financial results for the fiscal year ended December 31, 2013.  The report described its "key competitive strengths" as, among other things, its products' "superior printing qualities," "widely-deployed inkjet printer heads or easy-to-use extrusion heads," and "reliability of printing systems."

149.     The report described the MakerBot desktop series as "affordable, designed for easy desktop use and are typically used by individuals operating alone or within an enterprise," and touted the MakerBot acquisition and "rapid growth" of the desktop market as follows:

- We believe that our acquisition of MakerBot will drive faster adoption of 3D printing for multiple applications, as desktop 3D printers are becoming a mainstream tool across many market segments.  Desktop 3D printer usage has shown rapid growth, with the introduction and adoption of affordable entry-level 3D printers and increased availability of content.  These entry-level desktop printers are driving substantially increased market adoption.

- With the introduction of entry-level systems, we have seen unit volume increase faster than revenue growth, and we expect that trend to continue in the near future.

- MakerBot has continued to experience strong sales of its desktop 3D printers.

150.    The Form 20-F was signed by Defendant Reis on behalf of Stratasys.  Defendants

Reis and Simha also signed separate certifications, pursuant to Rules 13a-14(a) and 15d-14(a) of the

Exchange Act, that the Form 20-F "does not contain any untrue statement of a material fact or omit

to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report"

and "fairly present[s] in all material respects the financial condition, results of operations and cash

flows of the company as of, and for, the periods presented in this report."  Defendants Reis and

Simha also certified that they were responsible for establishing and maintaining certain disclosure

controls  and  procedures  and  internal  controls  over  financial  reporting,  and  making  certain

disclosures  to  the  Company's  auditors  and  audit  committee  related  to  such  internal  controls.

Defendants Reis and Simha signed an additional joint certification that the Form 20-F "fully

complies  with  the  requirements  of  Section  13(a)  or  15(d)  of  the  [Exchange  Act]"  and  "fairly

presents, in all material respects, the financial condition and res[ults of] operations of the Company."

151.    Also on March 3, 2014, the Company filed a Form 6-K with the SEC, which included

as  exhibits  an  earnings  conference  call  script  and  PowerPoint  presentation  that  contained

substantially similar statements to those made during the March 3, 2014 conference call.

152.    Analysts reacted positively to Defendants' statements on March 3, 2014 regarding

MakerBot's strong growth and revenue contributions, MakerBot's rosy outlook for 2014, and the

launch of MakerBot's supposedly unmatched 5th generation printers.  For example:

(a)    In a report dated March 3, 2014, RBC Capital Markets noted that the

Company is "conservative with their 25% organic guide given our belief that MakerBot is positioned

to materially exceed expectations. . . .";

(b)     On March 3, 2014, William Blair maintained its "Market Perform" rating and "continued to view Stratasys as one of the highest-quality companies in the additive fabrication space"; and

(c)     Also on March 3, 2014, Deutsche Bank issued a report maintaining its positive view of the Company, "Buy" rating, and price target of $160.

153.     During a conference call on April 2, 2014 to discuss the Company's acquisitions of Solid Concepts and Harvest Technologies, Defendant Reis boasted that, since the MakerBot acquisition closed in August 2013:  "We have observed impressive growth at MakerBot as well as exciting new products launches that has addressed new segments of the desktop marketplace.  We are confident that each of these transactions has strengthened our market leadership and improved our outlook for growth."

154.     The above statements from the Company's press release, conference call and SEC filings on March 3, 2014, and its conference call on April 2, 2014, were materially false and misleading and omitted material facts because:

(a)     MakerBot's 5th generation printers, which were critical to the Company's sales growth and expansion into the 3D desktop printing market, were rushed to the market despite a host of problems known to Defendants well before such statements were made, including serious problems with the printers' Smart Extruder, which rendered the printers unfit for release to the market (*see* ¶¶46, 50-52, 62);

(b)     Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the 5th generation printers were exceptional products of "unmatched" quality and reliability, there was "no compromise" in the design and manufacturing of such printers, MakerBot's sales were growing at a rapid rate, such

- 57 -

growth would continue in 2014, and costs associated with MakerBot would not have a negative effect on gross margins;

(c)     MakerBot's 5th generation printers did not have "unmatched" or standard-setting quality, because they lacked quality components, quality design, and quality manufacturing. Rather, the printers were designed and manufactured poorly, and included malfunctioning components parts such a "Smart Extruder" that frequently clogged with filament, "smart" sensors that often failed, and faulty software (*see* ¶¶50-69).  In other words, MakerBot "compromised" greatly in rushing the printers to market;

(d)     As a result of these problems, the 5th generation printers were not "reliable" at all.  They were extremely unreliable because they frequently malfunctioned and failed to work as marketed (*see id.*);

(e)     Further, the 5th generation printers were not "easy to use" because their use frequently involved problems, malfunctions, and breakdowns that were not easy to fix, and in fact could not be fixed by consumers, which made the printers exceedingly difficult to use (*see id.*);

(f)     As such, the 5th generation printers did not offer "improved" characteristics relative to other 3D printers (*see id.*).  In fact, they were not even an improvement over MakerBot's older generation of printers, which were far superior in terms of quality and reliability (*see* ¶¶55, 108);

(g)     MakerBot's "rapid" sales growth and "impressive" revenue contributions touted by the Company were unsustainable because of the quality and reliability problems of MakerBot's 5th generation printers, which would inevitably curtail consumer demand, substantially slow the Company's sales growth, and disrupt the Company's sales distribution channels (*see* ¶¶89-94);

(h)     MakerBot's projected sales growth was illusory because the 5th generation printers were under warranty, meaning that their pervasive quality and reliability issues would inevitably result in returns, refunds, repairs, and replacements on behalf of purchasers (*see* ¶¶76-88). As a result, MakerBot's sales of these printers were bound to result in heavy costs to the Company and, in turn, compress the Company's gross margins and financial performance (*see id.*); and

(i)     The Company's Form 20-F for fiscal year 2013 was materially false and misleading because it failed to disclose the materially adverse conditions described in this paragraph.

**B.     Defendants' False and Misleading Statements and Omissions from May 9 Through August 6, 2014**

155.    On May 9, 2014, the Company issued a press release announcing its first quarter 2014 financial results and reiterated the Company's guidance for 2014 (including revenue guidance of $660 to $680 million).  The press release also stated that the Company "expects organic sales, excluding MakerBot sales, to grow at least 25% over 2013, with additional growth coming from MakerBot, which is expected to grow at a higher rate."

156.    Also on May 9, 2014, the Company hosted a conference call with securities analysts to discuss its first quarter 2014 results.  During his opening remarks, Defendant Reis boasted of impressive MakerBot revenues and its new 5th generation printers, which he described as providing "unmet" and "improved" reliability, quality, and ease of use:

- MakerBot products and services contribut[ed] impressive revenue . . . a 79% increase over the revenues that MakerBot generated as an independent company during the first quarter of 2013.  We invested in sales, marketing and product development projects during the first quarter, especially around MakerBot products, investments which we believe will help us sustain strong growth over the coming periods. . . .As you know, at Stratasys we have a strong track record of acquisitions to drive shareholder value including our transactions with MakerBot and Objet.

- At CES [2014] we announced ***a new 3D printing platform designed to improve system affordability, reliability, ease of use and user connectivity*** . . .Toward the end of the first quarter we began shipping the new MakerBot

Replicator 3D printer and announced the availability of the MakerBot Mini Compact 3D printer and the MakerBot Z18 3D printer for preorder.  The amount of the new MakerBot replicator products has been strong and we expect all three products to have begun shipping by the end of the second quarter.

- Our new MakerBot replicator product line provides *unmet . . . speed, reliability, quality and connectivity. . . . [and] easy to use and reliable desktop 3D printing* to a full range of customers, consumers and professional users.

157.    During the call Defendant Simha stated that "[w]e are very pleased with our first quarter results," citing among other things "impressive organic sales growth combined with a strong revenue contribution from MakerBot."  He added that "system revenue increased by 71% in the first quarter over the same period last year driven in large part by MakerBot's impressive contribution to the quarter . . . we are very pleased with our first-quarter results.  We generated impressive organic sales growth combined with a strong revenue contribution from MakerBot."  Similarly, regarding future guidance, Glenn stated that the Company anticipated "organic sales, which exclude MakerBot sales, to grow at least 25% over 2013 with additional growth coming from MakerBot which is expected to grow at a higher rate."

158.    During the question-and-answer section that followed, more than half of the securities analysts on the call questioned Defendants Reis and Simha about MakerBot.  One analyst observed that it "sounded pretty clear that MakerBot was much better than you guys expected" and requested "early color" on the 5th generation Mini and Z18 models.  Defendant Simha's answer conveyed only the following positive information:  "The mini will be available [for shipment] I think in the next two weeks, [Z]18 at the end of Q2.  But we do see strong flow of booking for both mini and Z18."

159.    In a separate exchange, Defendants Reis and Simha were quick to reject an analyst's suggestion that the Company's North American revenue growth was "down year over year particularly with MakerBot."  Defendant Reis responded that "MakerBot grew almost 80% quarter

over quarter. . . . So I am not sure where this confusion comes from." Defendant Simha added: "So, no, there was a strong growth -- strong business in North America and we can catch up later on because I think that your numbers are wrong."

160.    When asked whether the Company's gross margins were "sustainable for the course of the year, especially with MakerBot ramping up even further from here," Defendant Simha stated that, while MakerBot's gross margins were lower than Stratasys' traditional business, this would not have a material impact on the Company's gross margins, and MakerBot itself would have "healthy margins at the end of the day":

> I think that the combined gross margin despite the fact of MakerBot gross margin which is lower than the traditional business went up this quarter. And I think we have a high level of confidence with the gross margin in 2014 to be at the level of 2013. May be a little bit higher. *I think that MakerBot, despite of the fact that they carry lower gross margin they do have healthy margins at the end of the day.*

161.    On May 9, 2014, the Company filed a Form 6-K with the SEC, which included as exhibits an earnings conference call script and PowerPoint presentation that contained substantially similar statements to those made during the May 9, 2014 conference call. Also on May 9, 2014, the Company filed a Form 6-K with the SEC, reporting its quarterly consolidated financial statements for the three months ended March 31, 2014, which also reflected information discussed in the press release and during the conference call on May 9, 2014.

162.    Analysts reacted positively to Defendants' statements on May 9, 2014 confirming MakerBot's strong sales and revenue growth and contributions, the quality of MakerBot's 5th generation printers, and that MakerBot's gross margins would by "healthy" in 2014. For example:

(a)    On May 9, 2014, Jeffries issued a report noting that "early bookings for the new MakerBot printers have been strong" and that "MaketBot continues to be a bigger driver than we had anticipated"; and

(b)     Canaccord Genuity on May 9, 2014, issued a report increasing its estimates for the Company and reiterating its "Buy" rating on the Company's stock.

163.    The above statements from the Company's press release, conference call and SEC filings on May 9, 2014 were materially false and misleading and omitted material facts because:

(a)     MakerBot's 5th generation printers, which were critical to the Company's sales growth and expansion into the 3D desktop printing market, were rushed to the market despite a host of problems known to Defendants well before such statements were made, including serious problems with the printers' Smart Extruder, which rendered the printers unfit for release to the market (*see* ¶¶46, 50-52, 62).  Indeed, the Smart Extruder problems were so serious that high-level MakerBot engineers and executives held a special meeting on Sunday, April 13, 2014 in an emergency attempt to address them, diagramming numerous problems plaguing the Smart Extruders on a whiteboard (*see* ¶¶53-54);

(b)     Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the 5th generation printers were exceptional, easy-to-use products of "unmet" and "improved" quality and reliability, that there was a "strong flow of booking" for the 5th generation Mini and Z18 models, that MakerBot's revenues and sales growth were "impressive," that such growth would continue in 2014, and that MakerBot would have "healthy margins";

(c)     MakerBot's 5th generation printers did not have "unmet" quality, because they lacked quality components, a quality design, and quality manufacturing.  Rather, the printers were designed and manufactured poorly, and included malfunctioning components parts such a "Smart Extruder" that frequently clogged with filament, "smart" sensors that often failed, and faulty software (*see* ¶¶50-69);

(d)     As a result of these problems, the 5th generation printers were not "reliable" at all.  They were extremely unreliable because they frequently malfunctioned and failed to work as marketed (*see id.*);

(e)     Further, the 5th generation printers were not "easy to use" because their use frequently involved problems, malfunctions, and breakdowns that were not easy to fix, and in fact could not be fixed by consumers, which made the printers exceedingly difficult to use (*see id.*);

(f)     As such, the 5th generation printers did not offer "improved" characteristics relative to other 3D printers (*see id.*).  In fact, they were not even an improvement over MakerBot's older generation of printers, which were far superior in terms of quality and reliability (*see* ¶¶55, 108);

(g)     The "impressive" sales growth and revenues, and "strong flow[s] of bookings" touted by the Company were unsustainable because of the quality and reliability problems of MakerBot's 5th generation printers, which were curtailing consumer demand, substantially slowing the Company's sales growth, and disrupting the Company's sales distribution channels (*see* ¶¶89-94); and

(h)     MakerBot's projected sales growth was illusory because the 5th generation printers were under warranty, meaning that their pervasive quality and reliability issues were resulting in expensive returns, refunds, repairs, and replacements on behalf of purchasers (*see* ¶¶76-88).   As such, MakerBot's sales of these printers were resulting in heavy costs and margin compression, contrary to Defendants' reassurances that MakerBot's margins would be "healthy" and that the Company's margins would not materially increase in 2014 (*see id.*).

C. **Defendants' False and Misleading Statements and Omissions from August 7 through November 4, 2014**

1. **Press Release, Conference Call, and SEC Filings Regarding the Company's Second Quarter 2014 Financial Results**

164. On August 7, 2014, the Company issued a press release announcing its second quarter financial results (including "quarterly records" in revenue, net income, and earnings per share) and substantially increasing the Company's 2014 financial guidance (including an increase in projected revenue from $660-$680 million to $750-$770 million).

165. The press release touted MakerBot's revenue contribution "driven by channel expansion initiatives and the *successful introductions of new products within the rapidly expanding segment for desktop 3D printers*." Defendant Reis added that sales of MakerBot products and services were "impressive," and said this was "driven by our expanding distribution network and *the successful launch of three MakerBot branded 3D printers in the first half of the year*."

166. Also on August 7, 2014, Defendants hosted a conference call to discuss the Company's second quarter 2014 financial results and 2014 outlook. On the call, Defendant Reis boasted of "impressive" contributions from MakerBot and "strong demand" for "[a]ll of the new MakerBot fifth-generation products":

- Equally impressive were the sales of MakerBot products and services, which contributed $33.6 million to revenue during the second quarter, a 100% increase over the revenue MakerBot generated as an independent company during the same period last year.

- We were very pleased with the performance of MakerBot during the second quarter, which contributed $33.3 million in revenue during the period, a very impressive achievement. ***All of the new MakerBot 5th generation products are now shipping, and we are observing strong demand across the entire product line***.

167.    Defendant Simha added the following remarks, boasting of MakerBot's "impressive" contributions to the Company's revenue:

- MakerBot branded products and services contributing $33.6 million to second quarter revenue, a 100% increase over the revenue MakerBot generated as an independent company during the same period last year, the Company significantly raising its financial guidance for fiscal 2014 to account for our improved outlook. . . .

- Within product revenue, system revenue increased by 108% in the second quarter over the same period last year, driven in large part by MakerBot's impressive contribution to the quarter.

- In summary, we are very pleased with our second quarter results. We generated impressive organic sales growth combined with a strong revenue contribution from MakerBot.

168.    During the question-and-answer section that followed, over half of the securities analysts on the call questioned Defendants Reis and Simha about MakerBot.  One analyst asked Defendants about the impact of the 5th generation Z18 printer on the Company's second quarter, and how they saw it playing out for the remainder of the year.  In response, Defendant Simha gave no indication that there were any problems with the product, and replied only that there were "very nice workings around Z18" and it was "too early to measure any trends" given that the product started to ship relatively late.

169.    Separately, in response to questions about the amount of inventory in the Company's sales channels, and whether it was fueling reported growth, Defendants Reis and Simha emphasized there were "very small numbers" of inventory and "no extra inventory" in the sales channels:

**Troy Jensen** - Piper Jaffray – Analyst

Your biggest competitor reports sales into channel inventory.  I'm just curious how much that would be for you guys or if you've been aided recently by that channel inventory growth?

**Defendant Reis**:

Troy, *we have a very, very strict policy here in determining -- we take it very closely*. Actually we do not allow our channels, we do not see it as a business of inventory going above a certain limit. I would say that this quarter as well as previous quarters, 2% to 3% of our revenue are in the channel. I think this is the minimum amount of inventory that is needed for them to run the business efficiently.

**Defendant Simha**:

It's being followed, Troy, by channel, by territory, and we're extremely strict in this respect. So, we have no access to inventories whatsoever into channel.

**Defendant Reis**:

*It's not an issue*.

**Defendant Simha**:

*Not an issue*.

\*　　　\*　　　\*

**Paul Coster** - JPMorgan - Analyst

And your point about no excess inventory as it relates to MakerBot but perhaps you can tell us to what extent you expect the growth to be fueled by continued channel expansion and international expansion over the next year or two versus organic growth? Is it like a 50-50 split for instance?

**Defendant Reis**:

I want to make sure we're absolutely clear. When we say *we have no extra inventory*, it's including all product lines. Not only MakerBot. It's including also Stratasys core. *It's being controlled extremely close and we're operating with absolute minimum operational inventory. It has to be in the channel and it's very small numbers.* This is number one.

170.　　Also on August 7, 2014, the Company filed a Form 6-K with the SEC, which included as exhibits an earnings conference call script and PowerPoint presentation that contained substantially similar statements to those made during the August 7, 2014 conference call. On the same day, the Company filed a separate Form 6-K with the SEC reporting its financial results for the second quarter of 2014.

171.　　Analysts reacted positively to Defendants' statements on August 7, 2014 regarding the Company's second quarter 2014 sales and revenue. For example:

(a)     On August 7, 2014, Jeffries raised its estimates and price target from $140 to $155 in response to the Company's "[r]evenues beat on the back of accelerating organic and MakerBot rev[enue] growth";

(b)     On August 7, 2014, J.P. Morgan increased its estimates to reflect Stratasys' "strong momentum and to align with the guidance."  J.P. Morgan also increased its price target to $139 and reiterated its "Overweight" rating;

(c)     RBC Capital Market issued an August 7, 2014 report raising the "price target to $130 on upwardly revised estimates" and maintaining [its] "Outperform" rating;

(d)     Credit Suisse raised its EPS estimates and target price to $138 to "reflect higher organic revenue growth assumptions over 2014-16 and lower through-cycle tax rate." Credit Suisse also reiterated its "Outperform" rating;

(e)     Canaccord Genuity issued an August 7, 2014 report raising its price target from $120 to $150 and reiterating its "Buy" rating;

(f)     Also on August 7, 2014, Stephens raised its revenue estimates for both 2014 and 2015 following the "impressive 2Q results and [management's] updated guidance with respect to LT operating goals."  Stephens further raised its price target from $104 to $125; and

(g)     On August 8, 2014, UBS raised its price target from $120 to $135 in reaction to the Company's higher estimates and reiterated its "Buy" rating.  UBS noted that the Company's "beat is in part due to the better-than expected MakerBot traction."

172.    After the Company reported "record" second quarter 2014 results, handily beating analysts' estimates, and significantly raised its 2014 forecasts, attributing this strong performance and outlook partly to the contributions and success of its MakerBot unit, the Company's share price

remained artificially inflated.  After closing at $98.91 per share on August 6, 2014, it closed at $113.69 per share on August 7, 2014.

173.    The above statements from the Company's press release, conference call, and SEC filings on August 7, 2014 were materially false and misleading and omitted material facts because:

(a)    MakerBot's 5th generation printers, which were critical to the Company's sales growth and expansion into the 3D desktop printing market, were rushed to the market despite a host of problems known to Defendants well before such statements were made, including serious problems with the printers' Smart Extruder, which rendered the printers unfit for release to the market (*see* ¶¶46, 50-52, 62).  Indeed, the Smart Extruder problems were so serious that high-level MakerBot engineers and executives held a special meeting on Sunday, April 13, 2014 in an emergency attempt to address them, diagramming numerous problems plaguing the Smart Extruders on a whiteboard (*see* ¶¶53-54);

(b)    Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the introduction and launch of the 5th generation printers were successful, that there was "strong demand" for "[a]ll of the new MakerBot fifth-generation products," that MakerBot's revenue and sales growth and contributions were impressive, and that there was "no extra inventory" at MakerBot;

(c)    The launch and introduction of the 5th generation printers immediately resulted in severely negative feedback from consumers, as well as product returns and requests for refunds, repairs, and replacements (*see* ¶¶71-75).  Thus, the launch and introduction of those printers were  not "successful" as Defendants misleadingly claimed;

(d)    MakerBot's "impressive" initial sales growth and revenue contributions and "strong demand" for its 5th generation printers were unsustainable because of the quality and

reliability problems of such printers, which were curtailing consumer demand, substantially slowing the Company's sales growth, and disrupting the Company's sales distribution channels (*see* ¶¶89-94);

(e)     As a result, the sales of these printers were resulting in a glut of inventory in MakerBot's distribution channels that could not be sold (*see* ¶94), contrary to Defendants' statements that MakerBot's inventory levels were "not an issue," "being controlled extremely close," and that there was "no extra inventory" at MakerBot; and

(f)     MakerBot's projected sales growth was illusory because the 5th generation printers were under warranty, meaning that their pervasive quality and reliability issues were resulting in expensive and margin-reducing returns, refunds, repairs, and replacements on behalf of purchasers (*see* ¶¶76-88).

## 2.     Statements from the Company's 2014 Analyst Day Conference Call, the Announcement of Defendant Pettis' Removal as MakerBot CEO, and Media Day Event

174.     On September 4, 2014, Defendant Reis issued a statement confirming a report by 3DPrint.com that Stratasys would be replacing Defendant Pettis with Defendant Lawton as MakerBot CEO, among other management changes. The announcement stated that this was a "promotion" to enable Defendant Pettis to "influence and direct the vision of MakerBot and Stratasys." He added that "[w]e are excited about these promotions and pleased to continue the positive momentum that Stratasys and MakerBot have experienced and achieved."[18]

175.     On September 8, 2014, Stratasys held an Analyst Day Conference at MakerBot's office in Brooklyn, New York, attended by approximately 10 securities analysts. Defendants Reis

---

[18]    Brian Krassenstein, *MakerBot's Bre Pettis to Step Down as CEO in Order to Head Up 'New Innovation Workshop' at Stratasys*, 3DPRINT.COM (Sept. 4, 2014, 1:45 PM), http://3dprint.com/14012/makerbot-ceo-bre-pettis/.

and Pettis both spoke extensively at the conference, once again hyping MakerBot, its 5th generation printers and its strong growth history and prospects.  During his opening remarks, Defendant Reis stated as follows:

> 11 months ago in August, we bought MakerBot. It's where you [are] sitting at this morning. It was a very interesting acquisition and I think also I can say today a very successful acquisition. . . . But as I said, this was the second big merger, very successful:  ***I think you saw it in the Q2 results of MakerBot, 100% growth year-over-year***, by far the number one desktop company in our industry.

176.    During the September 8, 2014 Analyst Day conference, Defendant Pettis gave a lengthy presentation that heavily touted the quality of MakerBot products and the company's growth as a leader of the "next Industrial Revolution."  Regarding the 5th generation printers he stated that "of the previous five years I spent four years developing this technology."  He added that MakerBot was on its "third iteration" of the Smart Extruder, and called it "super easy to use," "cool technology," and a "wear part, so that people know they have to get them, that they will wear out." He failed to explain, however, that the Smart Extruders were not just "wearing out" during the course of normal usage, but were inherently defective, and often rendering 5th generation printers inoperable.  Specifically, his comments on these matters were as follows:

> Here is our current offering. ***So I'm so proud of this. At MakerBot, when we launched this, we were five years, we just turned five, and I spent about – of the previous five years I spent four years developing this technology.*** This is one – this is what I was working towards the whole time, super easy to use, super friendly, networked 3D printing. We've got small, medium and large, doesn't matter, though, because they're basically all the same 3D printer. They all have the same electronics. They all have the same [ph] cool head technology, which is a removable smart extruder, and they're all networked, and it's just powerful, easy to use. . . .
>
> I always talked about this, the big thing here is that it's easy to swap and replace. If you have a MakerBot [4th Generation] Replicator 2, great, rock-solid 3D printer, eventually you have to do maintenance on it. And on the Replicator 2, it's actually – we made it user serviceable, so it's easy. . . . but when you have a MakerBot Replicator Smart Extruder, you just take it off and stick a new one on.  ***We are actually classifying this as a wear part, so that people know they have to get them, that they will wear out.*** And it also leaves the door open for us to create other types

of extruders that we could stick on there, because it's modular.  We like things future compatible.

I mean, we're exploring the frontier here.  We're creating these markets.  But before we launched the MakerBot Replicator Mini, people weren't talking about consumer 3D printing so much.  That word wasn't really in use.  When you think about your first 3D printer, most people look at this. When people know about 3D printing, they usually look at the Z18. . . .

The Z18 is probably our most disruptive 3D printer that we launched, the most disruptive 3D printer we launched. And it's because it just got this amazing build volume and the performance is powerful*.  **And it's interesting, we're actually on probably our third iteration of the extruder this year, so things have already gotten better this year, because that's how we roll.**  We're always trying to get better and when we can set out – and the software has been updated more times than that, and every time we do it, the algorithms we use get better for splicing.  The algorithms get better for making in-fill.

177.    During Defendant Pettis' Analyst Day presentation on September 8, 2014, he presented slides touting MakerBot and its 5th generation printers, which the Company later filed with the SEC Form 6-K on September 10, 2014.  One such slide stated that MakerBot was "Leading the Next Industrial Revolution by setting the standard in reliable and affordable desktop 3D printing, scanning and entertainment."  Slides showcasing the MakerBot Replicator Mini called it an "***[e]asy-to-use, no-compromise*** compact 3D printer for everyone, from beginners to professionals" and "Fast and [E]asy One-Touch 3D Printing."  One slide touted the MakerBot Replicator Desktop 3D Printer and its ***"[u]nmatched speed, reliability, quality and connectivity*** for all your 3D printing needs, while another displayed a picture of MakerBot's Smart Extruder and highlighted its features.

178.    During the September 8, 2014 Analyst Day conference, Glenn made the following statements, bragging of accelerated MakerBot growth of nearly 100% that led Stratasys to "raise our financial guidance, and long-term revenue growth projection":

We talked a lot about MakerBot. David [Reis] talked a lot about the one area of our business where we could possibly be seeing some inflection in the growth rate of that business, growing almost 100% or around 100% when you look at the revenue contribution of MakerBot in the second quarter relative to what the company did in the second quarter of last year. ***And of course, our favorable outlook also led us to***

***raise our financial guidance, and long-term revenue growth projection that we have for the company.***

179.    Glenn's presentation was accompanied by slides touting the financial results of Stratasys, which were filed on SEC Form 6-K on September 10, 2014.  The slides included various graphs highlighting Stratasys' strong financial results and summarized Stratasys' "Quarter Highlights" included "MakerBot impact, including launch of Replicator Mini & Z18"; "Ongoing impressive organic and inorganic sales growth"; and "Broad-based demand across our product lines."

180.    Defendant Reis again spoke about MakerBot during an interview with a journalist at a Stratasys Media Event in New York on October 31, 2014.  The journalist asked Defendant Reis, "So the first question that comes to mind is . . . exactly which 3D area holds the most promise from an insider's point of view?"  He responded:  ***The MakerBot family of 3D printers is by far our top selling in terms of units, we worked to make them as accessible as ever, all you need to do is take a Replicator Fifth Gen out of the box and plug it in to begin printing good quality products***."[19]

181.    The above statements from the Company's Analyst Day Conference, announcement regarding Defendant Pettis' removal as CEO, and Media Day Event were materially false and misleading and omitted material facts because:

(a)    MakerBot's 5th generation printers, which were critical to the Company's sales growth and expansion into the 3D desktop printing market, were rushed to the market despite a host of problems known to Defendants well before such statements were made, including serious problems with the printers' Smart Extruder, which rendered the printers unfit for release to the market and required a re-design that Defendants knew was necessary, but released the printers

---

[19]    David Sher, *Exclusive:  We are Ready for the HP Challenge, Says Stratasys' CEO David Reis*, 3D PRINTING INDUSTRY.COM (Nov. 3, 2014), http://3dprintingindustry.com/2014/11/03/exclusive-stratasys-david-reis-normal/.

anyway (*see* ¶¶46, 50-52, 62). Indeed, the Smart Extruder problems were so serious that high-level MakerBot engineers and executives held a special meeting on Sunday, April 13, 2014 in an emergency attempt to address them, diagramming numerous problems plaguing the Smart Extruders on a whiteboard (*see* ¶¶53-54);

      (b)    Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the 5th generation printers were of exceptional quality and reliability, among other attributes;

      (c)    MakerBot's 5th generation printers did not have "unmatched" quality, because they lacked quality components, a quality design, and quality manufacturing. Rather, the printers were designed and manufactured poorly, and included malfunctioning components parts such a "Smart Extruder" that frequently clogged with filament, "smart" sensors that often failed, and faulty software (*see* ¶¶50-69);

      (d)    As a result of these problems, the 5th generation printers were not "reliable" at all. They were extremely unreliable because they frequently malfunctioned and failed to work as marketed (*see id.*);

      (e)    The 5th generation printers were not "easy to use" because their use frequently involved problems, malfunctions, and breakdowns that were not easy to fix, and in fact could not be fixed by consumers, which made the printers exceedingly difficult to use (*see id.*);

      (f)    The Smart Extruder was not merely a "wear part"; it was a defective part that often failed and rendered the 5th generation printers inoperable regardless of wear (*see* ¶¶73, 80-85, 88);

      (g)    MakerBot's "impressive" sales growth and revenues were unsustainable because of the quality and reliability problems of MakerBot's 5th generation printers, which were

curtailing consumer demand, substantially slowing the Company's sales growth, and disrupting the Company's sales distribution channels (*see* ¶¶89-94); and

(h)     MakerBot's projected sales growth was illusory because the 5th generation printers were under warranty, meaning that their pervasive quality and reliability issues were resulting in expensive and margin-depleting returns, refunds, repairs, and replacements on behalf of purchasers (*see* ¶¶76-88).

**D.     Defendants' False and Misleading Statements and Omissions from November 5, 2014 through February 1, 2015**

182.     On November 5, 2014, the Company issued a press release announcing its third quarter financial results and revised its 2014 financial guidance, which the Company filed with the SEC on Form 6-K.  The press release included comments from Defendant Reis, who continued to tout the Company's "impressive growth" and "strong market demand," and the fact that "Makerbot sales continue to impress."  In the press release, Stratasys reiterated its prior revenue guidance of $750-$770 million for the fiscal year ending December 31, 2014, but lowered net income guidance, blaming this on "the recent acquisition of GrabCAD, with the expectation that ongoing development costs, as previously disclosed, are expected to negatively impact the fourth quarter. . . . "

183.     On the same day, November 5, 2014, Stratasys hosted a conference call to discuss the Company's third quarter 2014 financial results and its fiscal year 2014 outlook.  During the call, Defendant Reis again highlighted MakerBot's "impressive contribution" to sales.  He also touted MakerBot's sales distribution channel expansion:

> In the third quarter, we announced two significant channel expansions for our MakerBot brand products.  First, Home Depot, which is now carrying MakerBot fifth-generation 3D printers in selected stores as a pilot program, and second is the creation of MakerBot Europe, the result of the acquisition of MakerBot's German distributor HAFNER'S BURO.

184.    During the call, Defendant Simha added the following remarks, once again highlighting MakerBot's "impressive" sales growth:

- We generated impressive year-over-year organic revenue growth of 35%, driven by strong demand for our products and services. ***MakerBot branded product and services revenue was also impressive, increasing by over 80%*** when compared to the pro forma revenue that MakerBot generated during the third quarter of 2013.

- Within product revenue, system revenue increased by 59% in the third quarter over the same period last year, ***driven in large part by MakerBot's impressive contribution to the quarter.*** Note that MakerBot became an organic revenue source as of August 15, midway through the period.

185.    In the question-and-answer session that followed, Defendant Simha boasted that "when you look at what happened to Stratasys this quarter and year to date, ***we are growing extremely fast, 35% organic growth, with and without MakerBot. It's a little bit higher than what we planned and what we expected to grow.***"

186.    Later in the call, Defendant Reis was asked about the introduction of 5th generation printers during the third quarter, and the "customer appetite . . . for the [5th generation] Z18 in particular." Defendant Reis provided no hint that there any problems related to the 5th generation printers, and instead highlighted MakerBot's sales growth. Moreover, he stated emphatically that "we see very good acceptance to the Z18" and the Z18 is being "very well received":

**Jonathan Shaffer** - Credit Suisse - Analyst

Hi, guys. Good afternoon. I was just wondering if you might be able to give a little bit of color around the MakerBot growth in the quarter. ***I know you had a couple of large product introductions, including the Z18 and the Mini, and I was just wondering what kind of customer appetite you're seeing for the Z18 in particular.***

**Defendant Reis**:

Again, we don't disclose a breakdown between the different product lines, but I think what is very visible is the fact that we did grow MakerBot sales 80% Q over Q. ***I can share with you that we see very good acceptance to the Z18, without indicating the exact number of units.***

**Jonathan Shaffer** - Credit Suisse - Analyst

Thanks a lot, guys.

**Glenn (Stratasys VP of Investor Relations)**:

Jonathan, the 80% was based on a pro forma basis, when you look at the quarter over quarter -- year over year.

**Jonathan Shaffer** - Credit Suisse - Analyst

Sure. I just meant more underlying appetite, no specific numbers.  Is the Z18 being well received?

**Defendant Reis**:

*Yes.  The answer is yes, very well received*.

187.    Also on November 5, 2014, the Company filed a Form 6-K with the SEC, which included as exhibits an earnings conference call script and PowerPoint presentation that contained substantially similar statements to those made during the November 5, 2014 conference call.

188.    Analysts reacted positively to Defendants' statements on November 5, 2014 regarding MakerBot's sales growth and the introduction of the 5th generation printers:

(a)     Craig-Hallum issued a report on November 5, 2014 noting that Stratasys "remains a market leader in an underpenetrated market" and stated that the Company's "reach should only grow with its recent merger with MakerBot . . . ."  In response to continued investment in R&D and SG&A, Craig-Hallum decreased its price target to $105 from $115, but maintained its rating on the Company's stock;

(b)     On November 5, 2014, in response to the Company's "impressive revenue growth" and "reported EPS in line with consensus," RBC Capital Markets maintained its "Outperform" rating and $130 price target; and

(c)     J.P. Morgan issued a report dated November 5, 2014 noting that Stratasys is "capitalizing on its leadership position, investing heavily to sustain future growth prospects."  J.P.

Morgan slightly reduced its price target from $139 to $132, but reiterated its "Overweight" rating on the Company's stock.

189.    On December 10, 2014, 3Dprint.com published an article regarding problems with MakerBot's Smart Extruder (*see* ¶¶53-54).  The article included an immediate response from MakerBot's Director of Public Relations, Jennifer Howard, at the top of the article.  Howard did not dispute the contents of the article, but suggested that the Smart Extruder problems had been solved by MakerBot, referencing a new Smart Extruder on the market and "major software and firmware updates recently, including this week, that have improved the print quality and reliability of the Smart Extruder."  Further, she provided no indication that the Smart Extruder problems were having, or ever had, a material impact on MakerBot's or the Company's operations and finances.

190.    In an interview with 3DPrint.com on January 14, 2015, Defendant Lawton spoke positively about the Smart Extruder on the 5th generation printers, and how it worked well with 3D printing composite materials and improved on extruders that appeared on prior models of 3D printers.  After hearing Defendant Lawton boast about such purported attributes, the interviewer probed, "[t]ell me more about where you are at with the Smart Extruders.  I know there have been some issues with it in the past."  In response, Defendant Lawton admitted that "***there were problems with the early extruders***" and that the Smart Extruder "***didn't necessarily always behave smartly***."  However, she downplayed this by misleadingly suggesting that the problems were limited to "early" and "past" versions of the Smart Extruders, that the Smart Extruders had been fixed, and the Smart Extruder was now "a very good experience" and "self-serviceable" while failing to disclose the negative impacts of the defective Smart Extruders (such as depressed sales growth and a deluge of warranty claims) that were materially hurting the Company's finances:

> We have always iterated on our technology, and I look at our printers as something that increase in value versus decrease in value because of the level of innovation and

iteration that goes into our products.  ***We've continued to work on the Smart Extruder, and the Extruder that we have today combined with the firmware and software that we have is a very good experience.*** We recognized that there were problems with ***the early extruders***, and one of the benefits of MakerBot is that we have a warranty for our extruder. If you look at some of the other players out there, they don't warranty the extruder. So the benefit of the warranty is that people have made use of it.

As we started to uncover some of the problems that people have been having, we made changes to the extruder to make it a much better experience.  The way that the [Smart] Extruder works is different from the extruder on the Replicator 2, which is a much simpler extruder. We wanted to add a lot of technology and "smarts" to it and it ***didn't necessarily always behave smartly***. It does the Z-homing, and it does detection of filaments. It also has a lot of statistics and logging capabilities, so we can get information about [it].

Really when you look back on it, one of the things we missed was understanding [that] how people interact with a Replicator 2 versus how they interact with a 5th Generation MakerBot Replicator is very different. When you get a clog with the Replicator 2, you don't think, "Now what?" You unclog it or figure out what to do with it. You don't stop and think of it as downtime. ***The purpose of the Smart Extruder was that if you have a problem, you put a new one on and you would be able to keep running. One of the things that we didn't do a good job of at first, was explaining to people that to have that experience, you first needed to have a second extruder.*** We've also learned over the last year that we can make the extruder serviceable, ***so the current version of the extruder is [now] self-serviceable***. In the next few weeks we will put out videos of how you can take it apart and unclog it. That combined with having a second extruder makes it so that you really have maximum uptime.[20]

191.    The above statements from the Company's press release, SEC filings and conference call on November 5, 2014 regarding the Company's third quarter 2014 financial results, Jennifer Howard's response to the December 10, 2014 3DPrint.com article, and Defendant Lawton's 3DPrint.com interview on January 14, 2015, were materially false and misleading and omitted material facts because:

---

[20]   Eddie Krassenstein, *Exclusive Interview with MakerBot CEO Jenny Lawton on the Future of MakerBot, Next Generation Printer, Smart Extruders, & More*, 3DPRINT.COM (Jan. 14, 2015), http://3dprint.com/36759/makerbot-ceo-jenny-lawton/.

(a)     MakerBot's 5th generation printers, which were critical to the Company's sales growth and expansion into the 3D desktop printing market, were rushed to the market despite a host of problems known to Defendants well before such statements were made, including serious problems with the printers' Smart Extruder, which rendered the printers unfit for release to the market (*see* ¶¶46, 50-52, 62). Indeed, the Smart Extruder problems were so serious that high-level MakerBot engineers and executives held a special meeting on Sunday, April 13, 2014 in an emergency attempt to address them, diagramming numerous problems plaguing the Smart Extruders on a whiteboard (*see* ¶¶53-54);

(b)     Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the 5th generation printers were being "very well received" and "well accepted," MakerBot was generating impressive financial results, and MakerBot was successfully developing its sales channels;

(c)     The defective Smart Extruders also were not designed to be "self-serviceable" or repaired by consumers. In fact, if the consumers tried to repair them, they would void MakerBot's warranty (*see* ¶62). The problems also were not curable by installing a "second extruder" or a "new" Smart Extruder, because those replacement Smart Extruders were subject to the same problems, and would also malfunction and render the printers inoperable (*see* ¶¶57, 62, 73, 76, 80);

(d)     MakerBot's "impressive" sales growth and revenues were unsustainable because of the quality and reliability problems of MakerBot's 5th generation printers, were curtailing consumer demand, substantially slowing the Company's sales growth, and disrupting the Company's sales distribution channels (*see* ¶¶89-94). As such, neither the 5th generation Z18 printer, or any

other 5th generation printers, were being "very well received" or "well accepted," contrary to Defendant Reis' statements; and

(e)     MakerBot's projected sales growth was illusory because the 5th generation printers were under warranty, meaning that their pervasive quality and reliability issues were resulting in expensive and margin-depleting returns, refunds, repairs, and replacements on behalf of purchasers (*see* ¶¶76-88).

## VI.   THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET

192.   On February 2, 2015, investors were stunned by Defendants' partial revelations of material financial and operational problems facing the Company.  On that date, after the market closed, Stratasys issued a press release providing an update on its anticipated financial results for 2014, and  its outlook for 2015. Among other things, the press release revealed that the Company was taking a significant impairment charge, that earnings per share would fall significantly short of the guidance repeatedly touted by Defendants during the Class Period, and that MakerBot sales had significantly slowed.  The release provided in part:

> During December 2014, Stratasys updated the goodwill impairment analysis of its MakerBot reporting unit.  As a result, the Company expects to recognize a non-cash, non-tax-deductible goodwill impairment charge of approximately $100 to $110 million in the fourth quarter.  The Company does not expect this accounting write down to affect its ongoing business or future financial performance.  These are preliminary and unaudited results based on current expectations and are subject to quarter-end closing adjustments; accordingly, actual results may differ.

> Stratasys projects preliminary fourth quarter revenue growth of approximately 38% over the same period last year, including organic revenue growth of 25%.  ***However, the fourth quarter was impacted by slower growth of MakerBot product and services revenue during the period.  MakerBot revenue is estimated to have grown by approximately 7% in the fourth quarter over the prior year, and is estimated to represent approximately 12% of preliminary total Stratasys revenue for the fourth quarter.***

> ***Throughout 2014, MakerBot invested significantly in the introduction of its 5th Generation Replicator 3D printers and 3D printing ecosystem, and in the***

*development of a multi-tier distribution strategy enabling broader distribution. These continuing investments are intended to provide MakerBot with the ability to further scale and build superior product platforms positioned for long-term growth, as the adoption of 3D printing expands.  However, during the fourth quarter, MakerBot was affected by challenges associated with the introduction and scaling of its new product platform and the Company's rapidly evolving distribution model.*

During 2014, and specifically in the fourth quarter, MakerBot made significant hardware and software improvements to its product line.  Furthermore, during the second half of 2014, the Company engaged national partners in the United States, including Staples, Home Depot, Sam's Club and Dell – reaching new audiences through increased exposure for this new product category.  *Given the nature and scope of these new partnerships compared with MakerBot's traditional distribution model, less predictable sales patterns and reorder rates have been introduced into the business model.*

193.     On the following day, before the market opened on February 3, 2015, the Company held a conference call with securities analysts to discuss its preliminary financial results from fiscal year 2014 and its 2015 guidance.  On the call, Glenn announced that 2014 revenue and net income were "expected to fall short of our previous guidance" (citing anticipated 2014 revenue of $748-$750 million and a GAAP net loss of $116-$129 million).  Glenn reiterated the contents of the February 2 press release, and explained that the Company was encountering severe problems at MakerBot that, in turn, materially impacted the Company's finances.

194.     During the same call, Defendant Reis discussed the Company's decision to implement an extensive investment plan intended to "put greater focus on long-term manufacturing-related opportunities," among other things.

195.     During the question and answer session that followed, Defendants Reis and Simha spoke with surprised analysts regarding problems stemming from MakerBot.  In particular, after Defendants had continually hyped the quality of MakerBot's 5th generation printers throughout the Class Period, Defendant Reis finally admitted that the Company "missed" on quality and product

reliability issues at MakerBot, and that MakerBot had substandard quality assurance and manufacturing processes:

**Wamsi Mohan** - BofA Merrill Lynch - Analyst

And what processes are you putting in place to ensure that you don't have issues similar to the extruder issues on the MakerBot side more broadly across the Company? Did you think that this was a very isolated incident, and what confidence should we have that this business should actually grow at the Company average rate in 2016?

**Defendant Reis**:

*I think that the quality and product reliability is a major issue*, was a major issue in Stratasys prior to the MakerBot acquisition. It's also, by the way, a major focal attention also in MakerBot itself. Unfortunately, we came out with three new products at a very small company, which was growing in a dramatic rate, 600% in the last two years, *and here we missed.*

*I think we could have had better quality assurance and better quality manufacturing, which we're improving now.* It's not a one-day activity. I think Stratasys has much more experience, and we are supporting the MakerBot subsidiary, which is an organic part of us, and we are definitely trying to do it better. And can I guarantee that it's not going to happen again in a very innovative company and fast-moving company, the answer is no, but we are definitely trying to do our best to decrease these kind of events. *It's not something that we are happy to announce or be part of.*

196.    Separately, Defendant Simha presented a far more pessimistic outlook for MakerBot's sales growth than Defendants had repeatedly presented to the market throughout the Class Period:

**Patrick Newton** - Stifel, Nicolaus & Co. - Analyst

And then I guess as my follow up, can you help us understand the embedded organic growth rate that's in your 2015 guidance? I think if we back out the Solid Concepts acquisition, it looks to be roughly 20%. And then if we were to strip out the headwinds that you have at MakerBot, what is the remaining organic growth rate of the business?

**Defendant Simha**:

Yes, so we said in the press release, the core business in 2015 is expected to grow by more than 25%. The organic growth is a combination of growth in the core business and growth in MakerBot, which we didn't provide any guidance, but I think that we

can say that ***we do not expect MakerBot to continue in growing 2015 in the pace and the way that they grew in 2014. It's going to be much lower growth rate***, and if you calculate the numbers, and you can calculate the numbers, because you have all the information in front of you, ***it's going to be a very low growth rate in 2015***.

And I think that the numbers that we saw in Q4 will have also some impact on Q1 business of the Company. MakerBot will not grow so fast also in Q1.

197.    In response to separate analyst questions regarding the dramatic MakerBot slowdown,

Defendants Simha and Reis added:

**Defendant Simha**:  We didn't provide any numbers, but I think that you can do the calculation with all the information that is in front of you, where the core business is growing more than 25%, MakerBot is growing very, very, very slow in 2015. Then you have all the information in front of you.

**Defendant Reis**: . . . we are cautious about MakerBot's growth during 2015, specifically in the first half of this year. We need to make sure we overcome all of the issues that we have, and also we're doing huge effort, we are very optimistic about it. We are talking a very conservative approach here.

198.    On this news, the price of Stratasys stock fell dramatically.  After closing at $80.08 per share on February 2, 2015, it suddenly dropped 28% ($22.72) to close at $57.36 per share on February 3, 2015, on unusually high trading volume of more than 20 million shares.

199.    The stock price decline would have been even worse had Defendants revealed the true severity of the problems associated with MakerBot.  However, during the conference call, Defendant Reis attempted to downplay the problems.  For example, he reassured one analyst: "We did see, and we saw the quarters before, and I don't have any indication that it changed, very strong demand for MakerBot products."  In another exchange, Defendant Reis stated that issues regarding MakerBot's sales distribution channels had only a "minor impact on the quarter results" and had "more with reduced inventories and increased inventories. But again, it was a very small effect of the overall picture that we saw as a result of the technical challenges that we faced."  Further, Defendant Reis downplayed the Company's MakerBot-related goodwill impairment, calling it merely an

"accounting transaction" and maintaining that the amount Stratasys paid to acquire MakerBot was still considered the "right price" at the time:

**Holden Lewis** - Oppenheimer - Analyst

But I also wanted to ask, assuming that is somewhat dilutive and looking at the MakerBot that you're taking $100m-plus writedown, as you look at more M&A, does the experience with MakerBot, with having to write down, having to invest a lot of money in post-acquisition, how are you looking at valuations both in the market, as well as what you're likely to pay going forward for new businesses relative to what you would have paid in the past?

**Defendant Reis**:

The write-off of MakerBot, and I'm sure you understand, it's an accounting transaction, which actually represents the fair value of the goodwill that is sitting on our balance sheet. We measure the assets on our balance sheet every year, and once we come to an understanding that it does not represent the fair value, we had to take an impairment.

And practically, this impairment stems for a different view looking forward compared to the assumption that we had once we acquired the MakerBot. This is coming together with the performance of MakerBot in 2014 and our view to 2015, which is different than the one that we had during the acquisition.

I think that going back to the acquisition, the price and the amount that we paid -- and again, don't misunderstand, MakerBot is a great company. It grew 600% during the last 2.5 years, market leader, 80,000 systems out there. I think that the price that we paid in those days was the right price.

200.    Despite Defendants' attempts to downplay the surprising news regarding the financial and operational problems facing the Company, the market and analysts began to recognize the true meaning and importance of these revelations.  As a result, analysts issued reports downgrading the Company's stock and commenting on the problems at MakerBot including its dramatically slower growth and product quality issues.  For example:

(a)    In response to MakerBot's shortfall, RBC Capital issued a report on February 2, 2015, citing "MakerBot headwinds [as] a surprise" and seeking clarity on a number of factors including, but not limited to, MakerBot's long-term growth and the possibility of inventory write-downs;

(b)    On February 3, 2015, Jeffries issued a report citing MakerBot's reliability issues with its Smart Extruder as the source of the fourth quarter miss and dramatically reduced its price target from $110 to $70;

(c)    On February 2, 2015, Canaccord Genuity issued a report lowering its estimates and price target from $120 to $100 in response to the Company's disappointing pre-announcement;

(d)    On February 2, 2015, Oppenheimer issued a report addressing the disappointing pre-release, and noting that "slow growth and aggressive spend[ing] at MakerBot hurt 4Q14";

(e)    Also on February 3, 2015, Cowen issued a report downgrading Stratasys from "Outperform" to "Market Perform" and cutting its estimates and price target from $135 to $55 in response to slowing growth of MakerBot desktop printers which appear to have "quality issues and a channel transition";

(f)    RBC Capital Market issued another report on February 3, 2015 maintaining its "Outperform" rating but reducing its price target from $100 to $82.  The report cited "MakerBot's revenue shortfall and organic revenue growth's down tick" as the "main factors that drove the material stock price downdraft. . . ."; and

(g)    On February 3, 2015, J.P. Morgan downgraded Stratasys to "Neutral" and lowered its price target from $70 to $60 in response to MakerBot's deceleration in sales which "suggests that entry-level end-market demand is slowing, the channel is maturing, or competition is ramping relative to prior expectations. . . ."

201.    On February 24, 2015, Stratasys issued a press release announcing that it would be "transitioning key executives and expanding responsibilities" at MakerBot as "part of the continued

scaling and integration of MakerBot." Stratasys announced that, as part of this transition, Defendant

Lawton would be replaced by Jonathan Jaglom as CEO of MakerBot and "promoted" to the position

of Executive Vice President of Special Projects for Stratasys, reporting directly to Defendant Reis.

202.   On March 2, 2015, the Company held a conference call to discuss its fourth quarter

and fiscal year 2014 results.  In his prepared remarks, Defendant Reis echoed the  Company's

revelations on February 2-3, 2015 regarding MakerBot's product quality and sales problems.

However, Defendant Reis attempted to downplay these problems by emphasizing MakerBot's

supposedly positive attributes, for example:

- [W]e are excited about our opportunity to build upon MakerBot's leading position in the new product category with desktop 3D printing and we continue to invest to provide MakerBot with the ability to further skill and build superior product platforms positioned for long-term growth as adaption of 3D printing extends.

- I want to highlight some of MakerBot's achievements over the past two years. MakerBot has experienced rapid growth since inception, with sales expanding by over 600% from 2012 to 2014 and, to date, has sold approximately 80,000 units, by far the largest number of desktop 3D printers in the industry. MakerBot maintains significant brand leadership and has developed an extensive 3D printing ecosystem through software, mobile application, user community content and strategic partnerships.

203.   Similarly, Defendant Simha reiterated his remarks on the February 3, 2015 call

regarding problems at MakerBot, but added that "[i]t is important to remember that we are leading

the industry in creating a new market within the desktop category and we expect some volatility as

we build out the necessary infrastructure to continue our growth plans."

204.   During the question-and-answer portion of the conference call, Defendant Reis

continued to mislead the market about the true extent of the problems at MakerBot.  For example,

when pressed by an analyst as to the timing of the Smart Extruder issues, Defendant Reis falsely

claimed that the "extent of the quality issue with the extruder" did not become evident until "at the

end of Q4 and the beginning of even Q1 2015," when in fact Defendants knew about these problems

during the production and development of the 5th generation printers that began well-before the

Class Period:

> **Joe Wittine** - Longbow Research – Analyst:
>
> Deeper into the question previously on what actually drove the slowing in sales at MakerBot, if you could talk through the timing of the extruder issues specifically. From our understanding, the issue was known shortly after the launch, I guess, early summer, and the extruder swaps were done shortly thereafter. So really, I'm struggling to understand what has still been impacting the business in the fourth quarter, and especially why first-quarter sales would still be impacted. Thanks.

> **Defendant Reis**:
>
> It took time to realize the scope of the quality issues, and I think we explained it in length in the previous call. The nature of distribution during this year specifically was changed to work with the master distributors and resellers. ***So although there was maybe some indication on normal warranty issues in the second half, the extent of the quality issue with extruder became evident really at the end of Q4 and the beginning of even Q1 2015.*** Now we're in the process today of exchanging extruders for customers that have faulty extruders. This process takes time. And it's affecting the overall sales, not just extruder issues specifically.

205.    Further, Defendant Reis denied that there would be any "shift in strategy" at

MakerBot other than a "natural kind of shift. . . in the coming years":

> **Ben Hearnsberger** - Stephens Inc. - Analyst
>
> Okay, thanks. And then with the recent change in leadership at MakerBot, can you maybe expand on the differences in strategy that we can expect from the new leadership there?

> **Defendant Reis**:
>
> Again, I don't see a shift in strategy. I think it is through the natural kind of shift, what we expect in the coming years, not only this year is to move MakerBot from an extremely rapid, fast-growing start-up company to a more mature, fast-growing company. And this leadership change is supporting it.

206.    Six weeks later, on April 17, 2015, Vice's Motherboard website reported that

MakerBot had laid off 20% of its staff, or roughly 100 employees, citing inside sources at

MakerBot.[21]   MakerBot confirmed the Motherboard report on the same day, announcing a "downsiz[ing]" of its staff, expense reductions, and the closure of all three of MakerBot's retail stores.  However, the announcement maintained artificial inflation in the Company's stock price as it couched these moves in a positive light, once again highlighting MakerBot's "incredible" growth and "leading-edge innovation," downplaying the moves as a "continued scaling of MakerBot," and failing to reveal how severely MakerBot's problems continued to impact the Company:

> At MakerBot, we continue to evolve at an incredible pace. We've grown more than 600% from 2012 to 2014 – in short, we've grown incredibly fast.
>
> As a company that's focused on leading-edge innovation, we've learned to embrace change in order to stay focused.
>
> Today, we at MakerBot are re-organizing our business in order to focus on what matters most to our customers. As part of this, we have implemented expense reductions, downsized our staff and closed our three MakerBot retail locations.
>
> With these changes, we will focus our efforts on improving and iterating our products, growing our 3D ecosystem, shifting our retail focus to our national partners and expanding our efforts in the professional and education markets.
>
> "These organizational moves are part of the continued scaling of MakerBot," said David Reis, chief executive officer of Stratasys.
>
> At MakerBot, we're proud of being a highly innovative company that is leading the new product category of desktop 3D printing. We've experienced significant growth since inception, and achieved market leadership by iteratively testing, proving and pivoting our business.
>
> We look forward to putting the power of desktop 3D printing in the hands of even more people in 2015.[22]

---

[21]   Jordan Pearson, *MakerBot Just Laid Off 20 Percent of Its Staff*, MOTHERBOARD (Apr. 17, 2015, 2:15 PM EST), http://motherboard.vice.com/read/makerbot-just-laid-off-20-percent-of-its-staff.

[22]   *An Announcement*, MAKERBOT.COM (Apr. 17, 2015), http://www.makerbot.com/blog/2015/04/17/an-announcement.

## VII.   THE FULL TRUTH IS FINALLY REVEALED

207.    The Company finally revealed the full extent of its problems to investors after the market closed on April 28, 2015.   On that day, Stratasys issued a press release announcing "disappointing" preliminary first quarter 2015 financial results, substantially reducing its full-year 2015 financial guidance, and elaborating on the severity of the financial and operational problems caused by MakerBot.   In particular, the Company announced a further decline in MakerBot revenue and a massive new impairment charge of approximately $150 to $200 million related to the MakerBot acquisition (nearly doubling the $102 million impairment charge Stratasys had taken the prior quarter) and confirmed the Company's reorganization of MakerBot designed in part "to focus efforts at MakerBot on improving and iterating products":

> The Company's first quarter results were lower than expected across most geographies and industries compared to growth levels the Company has experienced historically. . . .

> "We are disappointed with our first quarter results," said David Reis, Chief Executive Officer of Stratasys. . . . ."

> While the Company remains confident in its long-term market prospects, in light of the current growth environment, management has re-examined its 2015 operating plans and has taken immediate action to adjust near-term operating expenditures for the remainder of 2015, and is reducing 2015 capital expenditures plans to a level of $80 to $110 million. . . .

> **MakerBot revenue declined by 18% in the first quarter over last year. The Company has initiated a reorganization within MakerBot that is intended to focus efforts at MakerBot on improving and iterating products**, growing the 3D ecosystem, and expanding the focus on professional, education and consumer markets. As the reorganization progresses, MakerBot growth rates are expected to ramp up to, or exceed, overall company averages by 2016.

> The Company has re-examined the long term operating plan of the MakerBot reporting unit, and expects to recognize **an additional non-cash impairment charge of approximately $150 to $200 million** in the first quarter. These results are based on current expectations and are subject to quarter-end closing adjustments.

208.    On this news, the price of Stratasys stock plummeted once again.   After closing at $51.30 per share on April 28, 2015, the stock dropped 22% ($11.37) to close at $39.93 per share on

April 29, 2015, on unusually high trading volume of more than 11 million shares.  As the market continued to digest the news, and additional securities analysts downgraded their Stratasys stock ratings, shares continued to drop an additional 6% ($2.48) the following day, closing at $37.45 per share on April 30, 2015, on unusually high trading volume of nearly 6 million shares.

209.    In wake of this news, analysts issued reports citing the Company's below-consensus financial results and the quality problems at MakerBot.  For example:

(a)    On April 28, 2015, Dougherty & Company LLC issued a report downgrading Stratasys stock in response to the "second major disappointment this year" and several challenges facing the Company to which "there is no immediate fix."  The report observed that "Stratasys tried to scale MakerBot's distribution and product diversity too quickly, leading to quality-control problems";

(b)    Also on April 28, 2015, Canaccord Genuity issued a report lowering it price target to $45 from $51 based on expectations for slower long-term growth;

(c)    Oppenheimer issued a report entitled "And the (Down) Beat Goes On . . ." on April 28, 2015, stating, "At least MaketBot now better reflects its true value" in response to the $150-$200 million write-off;

(d)    On April 28, 2015, Credit Suisse issued a report entitled "MakerBot Challenges Continue; Management Initiates Restructuring Plan" in response to the negative pre-announcement.  Credit Suisse lowered its EPS estimates and reduced its target price from $90 to $56;

(e)    Deutsche Bank lowered its Stratasys stock price target from $72 to $60 in a report dated April 28, 2015, stating that "the MakerBot revenue declines were a disappointment, given this has been a growth driver for the company";

(f)     In a report issued after the market closed on April 29, 2015, titled "Demand Drying Up Quicker Than Ink," RBC Capital Markets drastically reduced its price target from $82 to $44 and downgraded the Company's stock in response to reduced demand in the 3D printing industry; and

(g)     On April 29, 2015, Stephens also downgraded the Company and sharply lowered its price target from $75 to $40.

## VIII.   POST-CLASS PERIOD REVELATIONS

210.    Following the Class Period, Defendants continued to discuss the product quality and sales distribution problems at MakerBot that hampered the Company's growth and margins during the Class Period.

211.    On May 11, 2015, Stratasys held a conference call to discuss its financial results for the first fiscal quarter of 2015.  During the call, Defendants reiterated the negative news revealed to the market during the Company's preliminary earnings announcement on April 28, 2015.  In his opening remarks, Defendant Reis again stated that he was "disappointed" with the Company's first quarter results and discussed the Company's restructuring efforts at MakerBot.

212.    Defendant Simha added that the amount of the Company's MakerBot-related goodwill impairment expense was at the high end of the $150-$200 million range announced on April 28, 2015:  "We have updated the goodwill impairment analysis of our MakerBot reporting unit, and as a result, we recognized a non-cash goodwill and other intangible asset impairment expense of $194 million in the first quarter."

213.    During the question-and-answer session with securities analysts, Defendant Reis characterized the MakerBot restructuring as a "turnaround" and stressed patience as to the process:  "We are doing a lot of changes and I think there's a very positive attitude and acceptance in MakerBot.  I am personally very confident that the turnaround will be successful and hopefully it's

not going to take too much time. . . . we need to give it the time to go through this reorganization."

Further, when pressed by an analyst, he acknowledged that "external issues were known" with

respect to product quality issues and two of MakerBot's large distributors:

> **Brian Drab** - William Blair & Company – Analyst:
>
> Thanks for that answer, but can you comment specifically on have you have a lot of pushback at this point from Home Depot or Dell or Staples? Are you having -- can you talk about the challenges of -- if you are rebuilding, the challenges of rebuilding those relationships? And how have they responded to the quality issues that they have had after recently agreeing to distribute those products?
>
> **Defendant Reis**:
>
> As far as I am updated now is those relationships are continuing. I think MakerBot took the right steps as soon as the external issues were known, to work with those companies to make sure that the effect on customers is minimal. And I think we will continue with the relationships. This is what I can say at this time.

214.    On May 12, 2015, MakerBot's new CEO, Jonathan Jaglom admitted that "the market

was not as big as we thought it was two years ago . . . . The tremendous growth this company has

gone through – 600 percent a year. How do you do that? The outcome of fast growth to that extent

is, you're bound to – I don't want to call them mistakes, but you're bound to lose focus."[23]

## IX.    LOSS CAUSATION

215.    As detailed herein, Defendants' fraudulent scheme artificially inflated the Company's

stock price by misrepresenting and concealing the true nature of the Company's products,

operations, and financial results and prospects, including that MakerBot's key line of 5th generation

printers were rushed to the market despite a host of severe quality and reliability issues; the printers

were so poorly designed and manufactured that consumers demanded costly refunds, repairs, and

replacements from the Company; and the quality and reliability problems of the printers dramatically

curtailed the Company's sales growth and disrupted its sales distribution channels.

---

[23]    Brian Merchant, *Remaking MakerBot*, MOTHERBOARD (May 12, 2015), http://motherboard.vice.com/read/remaking-makerbot.

216.   Defendants' false and misleading statements and omissions, individually and collectively, concealed the true business prospects of Stratasys, resulting in the Company's stock being artificially inflated until, as indicated herein, the relevant truth about the Company's financial and operational condition and future business prospects was revealed.   While each of these misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price and give the market the false notions that MakerBot's 5th generation printers were high quality, reliable, well-received, and in strong demand, and that MakerBot's financial contributions and prospects were consistently strong throughout the Class Period.   These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period.   Indeed, Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $135.88 during the Class Period, on January 9, 2014.

217.   As stated in ¶¶192-209, a truer picture of the Company's financial and operating conditions was not revealed to the market all at once but rather the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of the Company's Class Period statements, as set forth below:

**A.     February 2-3, 2015 Disclosures**

218.   The truth began to emerge after the market closed on February 2, 2015, when, as detailed in ¶¶192-200 above, the Company issued a press release providing an update on its anticipated financial results for 2014, and providing an outlook for 2015, followed by a conference call with securities analysts before the market opened on February 3, 2015.   In these statements, Defendants revealed the Company's weaker-than-anticipated financial results and outlook,

MakerBot's product quality and reliability issues, that MakerBot's sales had significantly slowed, and that the Company was taking a cash impairment charge relating to its MakerBot acquisition of in the amount of approximately $100 to $110 million. As a result of the information revealed to the market, the Company's stock dropped approximately 28% ($22.72), falling from a close of $80.08 per share on February 2, 2015, to a close of $57.36 per share on February 3, 2015, on unusually high trading volume of more than 20 million shares. The market's negative reaction to the Company's February 2-3, 2015 revelations is demonstrated in the following stock chart:



219. The decline in the Company's stock price by approximately 28% on February 3, 2015, was the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing MakerBot and the Company that had been concealed

or misrepresented by Defendants.   The drop would have been more dramatic had Defendants disclosed the true extent of the financial and operational difficulties facing MakerBot and the Company.

220.   The timing and magnitude of the Company's stock price decline on February 3, 2015 negated any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.   This point is evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices[24] as the revelation of the truth became known to the market:

---

[24]   Stratasys has identified the S&P 500 Index and the NASDAQ Composite Index as benchmarks for its common stock performance.   *See* Stock Information, STRATASYS.COM, http://www.stratasys.com/corporate/investor-relations/stock-information (last visited June 30, 2015). The peer comparison is based on the stock prices of the following 3D printing industry competitors of Stratasys:  3D Systems Corporation (NYSE:  DDD), FARO Technologies Inc. (NASDAQ: FARO), and MKS Instruments, Inc. (NASDAQ:  MKSI).



**B.    April 28, 2015 Disclosures**

221.    Additional news regarding the severity of the Company's problems was revealed to investors after the market closed on April 28, 2015, when, as detailed in ¶¶207-209 above, the Company issued a press release announcing disappointing preliminary first quarter 2015 financial results and providing more clarity on the severity of the financial and operational issues facing the Company and its MakerBot unit.  As a result of the information revealed to the market, the Company's stock dropped approximately 22% ($11.37), falling from a close of $51.30 per share on April 28, 2015, to a close of $39.93 per share on April 29, 2015, on unusually high trading volume of more than 11 million shares.  As the market continued to digest the news, and additional securities analysts downgraded their Stratasys stock ratings, shares continued to drop an additional 6% ($2.48)

the following day, closing at $37.45 per share on April 30, 2015, on unusually high trading volume of nearly 6 million shares.  The market's negative reaction to the Company's April 28, 2015 revelations is demonstrated in the following stock chart:



222.     The decline in the Company's stock price by approximately 27% on April 29 and April 30, 2015, was the direct result of the nature and extent of the revelations made to the market regarding the severity of the financial and operational issues facing Stratasys and its MakerBot unit that had been concealed or misrepresented by Defendants.

223.     The timing and magnitude of the Company's stock price decline on April 29 and April 30, 2015 negated any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to

Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices as the revelation of the truth became known to the market:



224.    The timing and magnitude of the Company's stock price declines on February 3, 2015 and April 29-30, 2015, negating any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct, are further evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices as the revelation of the truth became known to the market:



225.    In sum, the rapid declines in the Company's stock price on February 3 and April 29-

30, 2015, were direct and foreseeable consequences of the revelation of the falsity of Defendants'

Class Period misrepresentations and omissions to the market.  Thus, the revelations of truth, as well

as the resulting clear market reactions, support a reasonable inference that the market understood the

Company's prior statements were false and misleading.  In short, as the truth about Defendants' prior

misrepresentations and concealments was revealed, the Company's stock price quickly sank, the

artificial inflation came out of the stock, and Plaintiffs were damaged, suffering true economic

losses.

226.    Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiffs on February 3

and April 29-30, 2015 were direct and proximate results of Defendants' misrepresentations and

omissions that artificially inflated the Company's stock price and the subsequent significant declines in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## X.   ADDITIONAL SCIENTER

227.   The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

228.   The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Stratasys, its operations, and its business practices, their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Stratasys, were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

229.   These facts, in conjunction with the additional indicia of scienter detailed herein, collectively support a strong inference of each Individual Defendant's scienter.

### A.   Defendants Knew or Should Have Known of the Performance of the Key Value Drivers of Its Core Business

230.   Defendants were told specifically of the severe quality and reliability problems affecting MakerBot's 5th generation printers.  The former Director of Sales spoke directly with

Defendant Reis about problems associated with MakerBot's Smart Extruders. Specifically, at a Stratasys event in Brazil in February 2014, the former Director of Sales addressed the Smart Extruder problems with Defendant Reis, and voiced his concerns that such problems would result in shortages of the Smart Extruders (*see* ¶¶84, 106). Other former MakerBot employees corroborated Defendant Lawton's direct knowledge of the 5th generation printer problems, including the pervasive problems encountered in the "BotFarm" (*see* ¶¶77, 107). Defendants Pettis and Lawton also experienced these problems firsthand by frequenting the BotFarm, and making false representations to visitors about the defective printers showcased there (*see* ¶¶59, 108). Further, Defendant Pettis had firsthand knowledge of the extremely negative customer reception to the 5th generation printers; indeed, he was "more than happy" to shut down Google Groups discussion forums as a result of such feedback (*see* ¶¶75, 109).

231.    As further detailed above, substantial portions of Company's unit sales and revenue were derived from its MakerBot subsidiary, and the MakerBot Desktop Series represented one of the Company's five core products (*see e.g.* ¶¶34, 41, 43, 136, 141-43, 155-57, 166-67, 179-80, 182-84, 192-93, 202). Additionally, Defendants repeatedly emphasized the importance of MakerBot and MakerBot's products to the Company, and the Company's expansion into the fast-growing desktop 3D printing market, in press releases, on conference calls with securities analysts (in which they answered repeated questioned from Defendants about such matters), and in filings with the SEC (*see* ¶¶131-33, 136-39, 141-51, 153, 155-61, 164-70, 174-80, 182-87, 190, 192-97, 199, 201-06). Therefore, MakerBot's products, particularly its new line of 5th generation printers, were of critical importance to the Company, its financial performance, and its future business prospects. MakerBot's importance to the Company is further evidenced by the Company's expenditure of approximately $500 million to acquire MakerBot in August 2013.

232.    During the Class Period, the Individual Defendants were high-ranking officers of the Company (*i.e.*, Reis as CEO and Simha as CFO/COO) and MakerBot (*i.e.*, Pettis as CEO and Lawton as Acting CEO and President) who were heavily involved with the Company's and MakerBot's operations and finances, and had day-to-day responsibilities, received internal reports, and participated in meetings concerning critical matters affecting the Company's core business.  As such, the Individual Defendants were intimately aware of the problems affecting the Company and its products, particularly its critical line of MakerBot 5th generation printers, and the impact of those problems on the Company.  Indeed, Defendants repeatedly addressed these topics on earnings calls with analysts, boasting of the quality and success of MakerBot's 5th generation printers and MakerBot's and the Company's impressive sales demand, growth, and prospects.

233.    Moreover, Defendants acknowledged that they continuously evaluated and discussed MakerBot's products and their impact on the Company's core financial metrics, including unit sales, revenues, and margins.  As a result, as the Company's and MakerBot's most senior executives, the Individual Defendants knew, or at a minimum were reckless in disregarding, that MakerBot's 5th generation printers were plagued with severe quality and reliability problems that were negatively impacting these metrics.  By choosing to speak about MakerBot, the quality, reliability, and other attributes of MakerBot's 5th generation printers and MakerBot's financial and operational results and prospects, the Individual Defendants led investors to believe that they had knowledge, and/or had acquired knowledge, of such matters and were speaking truthfully to the market about them.

234.    Defendants Reis and Simha also undertook the affirmative obligation to obtain knowledge in order to ensure the Company's disclosures to the market were truthful by executing certifications of the Company's SEC filing as detailed above in ¶150.

B.     **Defendants Were Motivated and Acted with Scienter to Artificially Inflate the Company's Stock Value to Facilitate Its Acquisitions of Solid Concepts and Harvest Technologies**

235.    In addition to the foregoing, Defendants were highly motivated and acted with scienter in that they kept from disclosure the negative facts and circumstances described herein in order to artificially inflate the price of Stratasys common stock and maximize the value of stock sales covered by the prospectuses dated July 17, 2014 and August 7, 2014, in connection with the acquisition of two privately held companies, Solid Concepts and Harvest Technologies, respectively.

236.    On July 15, 2014, the Company acquired Solid Concepts pursuant to a merger agreement dated April 2, 2014.  In connection with this acquisition, the Company filed a July 17, 2014 prospectus supplement on Form 424B7 for the sale of 1,961,155 shares at $103.37 per share, totaling approximately $202.7 million.  The Company disclosed it would pay up to $295 million for the acquisition, a significant portion of which (approximately $109 million) was paid with the Company's stock on July 15, 2014.

237.    On August 7, 2014, the Company filed another prospectus supplement on Form 424B7 for the sale of 277,476 shares at $98.47 per share, totaling approximately $27.3 million, relating to the Company's acquisition of Harvest Technologies.  The prospectus supplement stated that an initial aggregate payment of 175,456 Company shares had been made to Harvest Technologies shareholders on August 1, 2014.

## XI.    PRESUMPTION OF RELIANCE

238.    A Class-wide presumption of reliance is appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose

– positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

239. A Class-wide presumption of reliance is also appropriate in this action under the fraud-on-the-market doctrine. As a result of Defendants' materially false and misleading statements, the Company's publicly traded securities traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to Stratasys, and have been damaged thereby.

240. At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a) The Company's stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Stratasys regularly made public filings with the SEC, including SEC Forms 6-K and 20-F, and related press releases;

(c) Stratasys regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d) Stratasys was followed by several securities analysts employed by major brokerage firms, such as J.P. Morgan Securities LLC, FBR Capital Markets, Cowen and Company,

Piper Jaffray & Co., and Brean Capital, LLC, among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

241.    As a result of the foregoing, the market for the Company's securities promptly digested current information regarding Stratasys from all publicly available sources and reflected such information in the prices of the Company's securities.

242.    Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices.

243.    At the times they purchased or otherwise acquired the Company's securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

244.    As a result of the above circumstances, the presumption of reliance applies.

245.    In sum, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

       (a)    Defendants made public misrepresentations during the Class Period;

       (b)    The misrepresentations were material;

       (c)    The Company's securities traded in an efficient market;

       (d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

       (e)    Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XII.   NO SAFE HARBOR

246.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from Stratasys' Class Period filings.

247.    For example, Stratasys' 2013 Form 20-F filed with the SEC on March 3, 2014, contained the following boilerplate "caution":

> **We may not be able to introduce new 3D printers, high-performance systems and consumables acceptable to customers or to improve the technology, software or consumables used in our current systems in response to changing technology and end-user needs.** (emphasis in original).

248.    This supposed risk warning failed to even mention MakerBot and did not warn the market of the known quality and reliability issues associated with MakerBot's 5th generation printers that were impacting consumer demand and slowing the Company's sales and revenue growth. Rather, this "caution" was untethered to the known problems at hand, rendering it meaningless.

249.    The generic nature of this disclosure is further illustrated by the fact that it was repeated in the Company's 2014 Form 20-F filed with the SEC on March 3, 2015, a point in time when Stratasys had already announced a $100-$105 million impairment directly related MakerBot, as well as slowed growth and aggressive spending to address the issues with the Fifth Generation printers.  Moreover, 3D Systems Corporation, a Stratasys competitor, included a similar risk warning

concerning its company's ability to "deliver products that meet changing technology and consumer needs" in its 2013 and 2014 Form 10-K, further demonstrating its boilerplate nature.

250.     Likewise, Stratasys issued a risk warning in both its 2013 Form 20-F and 2014 Form 20-F, concerning its rapid growth in operations, stating, in part:

> **We have experienced rapid and significant growth in our operations and intend to continue to grow, and if we cannot adequately adapt our infrastructure and properly integrate the internal or external sources of our growth in order to generate the intended benefits from it, our results of operations will suffer.** (emphasis in original).

251.     This boilerplate risk warning also failed to adequately warn the market of the issues surrounding the integration of MakerBot following its acquisition, including problems surrounding the release of MakerBot's 5th generation printers and the material impact the resulting decline in sales and revenue was having on the Company's financial and business operations.

252.     Accordingly, the risk warnings provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking."

253.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, as detailed above in the Substantive Allegations section, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Stratasys who knew that those statements were false or misleading when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions

about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

254.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of Stratasys between January 6, 2014 and April 28, 2015, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

255.   Because Stratasys has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's SEC filings, as of shortly before the close of the Class Period, Stratasys had more than 50 million shares outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

256.   Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

257.   Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation.  Plaintiffs have no interests that are contrary to, or in conflict with, the members of the Class they seek to represent.

258.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

259.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(f)    whether the market prices of the Company's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of the Company's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

260.     Plaintiffs repeat and re-allege the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

261.     During the Class Period, Stratasys and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (a) deceive the investing public, Plaintiffs, and the other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded securities; and (c) cause Plaintiffs and the other members of the Class to purchase the Company's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Stratasys and the Individual Defendants, and each of them, took the actions set forth herein.

262.     These Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Stratasys, as alleged below.

263.     In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

264.     Stratasys and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

265.     These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value, performance and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary in order to make the statements made about the Company's financial and operational results and prospects  not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

266.    The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others:  (a) the Individual Defendants were high-level executives at the Company or MakerBot during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers were privy to, and participated in, the creation, development, and reporting of the Company's and MakerBot's internal sales, marketing, projections, and/or reports; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's and MakerBot's management team, internal reports, and other data and information about the Company's and MakerBot's financial and operational results and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

267.    Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Individual Defendants' and the misstatements and omissions throughout the Class Period regarding the Company's and MakerBot's true financial and operational results and prospects, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

268.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by, Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

269.     At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Stratasys publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

270.     By virtue of the foregoing, Stratasys and the Individual Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

271.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales

of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was removed from the Company's stock.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

272.    Plaintiffs repeat and re-allege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

273.    The Individual Defendants acted as controlling persons of Stratasys within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

274.    In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

275.    As set forth above, Stratasys and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their

controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange

Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and

other members of the Class suffered damages in connection with their purchases of the Company's

securities during the Class Period, as evidenced by, among others, the stock price declines discussed

above, when the artificial inflation was released from the Company's stock.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and

judgment, as follows:

A.      Declaring that this action is a proper class action and certifying Plaintiffs as class

representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as

Class Counsel for the proposed Class;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

action, including attorneys' fees and expert fees; and

D.      Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  July 1, 2015                          ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                              JACK REISE (FL BAR NO.: 058149)


                                         _____
                                                  s/ Jack Reise

ROBERT J. ROBBINS
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com
eshonson@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

*Lead Counsel for Plaintiffs*

ZIMMERMAN REED, PLLP
CAROLYN G. ANDERSON, MN 275712
BRIAN C. GUDMUNDSON, MN 336695
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55402
Telephone:  612/341-0400
612/341-0844 (fax)
Carolyn.Anderson@zimmreed.com
Brian.Gudmundson@zimmreed.com

*Liaison Counsel for Plaintiffs*

VANOVERBEKE MICHAUD
   & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Plaintiffs*