UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

IN RE: STRATASYS LTD.                    Case No. 15-CV-0455 (PJS/FLN)
SHAREHOLDER SECURITIES
LITIGATION
                                         ORDER


_____


Jack Reise, Robert J. Robbins, Elizabeth A. Shonson, Samuel H. Rudman,
David A. Rosenfeld, ROBBINS GELLER RUDMAN & DOWD LLP;
Carolyn G. Anderson, Brian C. Gudmundson, ZIMMERMAN REED,
PLLP; Thomas C. Michaud, VANOVERBEKE MICHAUD & TIMMONY,
P.C., for plaintiffs.

Koji F. Fukumura, Ryan Blair, John C. Dwyer, COOLEY LLP; Wendy J.
Wildung, FAEGRE BAKER DANIELS LLP, for defendants.

In these consolidated putative class actions, plaintiffs bring claims of securities

fraud under both Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

and the Securities and Exchange Commission's ("SEC's") implementing regulation,

Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as claims of controlling-person liability under

Section 20 of the 1934 Act, 15 U.S.C. § 78t.  Plaintiffs sue on behalf of all those who

acquired the common stock of defendant Stratasys Ltd. ("Stratasys") between January 6,

2014 and April 28, 2015.

This matter is before the Court on defendants' motion to dismiss for failure to state a claim. For the reasons set forth below, defendants' motion is granted, and plaintiffs' consolidated amended complaint is dismissed with prejudice.

## I. BACKGROUND

### A. Stratasys and MakerBot

Stratasys manufactures and sells 3D printers. Compl. ¶ 33.[1] Guided by data from computer-aided design files, 3D printers deposit layers of resin to create three-dimensional objects. Compl. ¶ 33. Stratasys's 3D printers are used in a broad array of industries, including aerospace, automotive, consumer electronics, dental, and jewelry. Compl. ¶ 34. Stratasys's printing systems are typically large and expensive, costing hundreds of thousands of dollars per unit. Compl. ¶ 36.

In August 2013, Stratasys acquired MakerBot Industries LLC ("MakerBot"), a manufacturer of desktop 3D printers, for approximately $493.7 million and two performance-based earn-outs. Compl. ¶ 3. Desktop 3D printers are scaled-down, less-expensive versions of 3D printers that are geared toward individuals, small-business owners, and entrepreneurs. Compl. ¶ 35. The acquisition of MakerBot allowed Stratasys to tap into the emerging market for desktop 3D printers. Compl. ¶ 38. MakerBot operated as an indirect, wholly owned subsidiary of Stratasys. Compl. ¶ 37.

---

[1]All citations to "Compl." are to the consolidated amended complaint docketed at ECF No. 84 in Case No. 15-CV-0455 (PJS/FLN).

On January 6, 2014 (a few months after being acquired by Stratasys), MakerBot announced the development of a new "5th generation" (or "5G") of desktop 3D printers, consisting of three models: the Replicator Mini ("Mini"), the Replicator Desktop ("Replicator"), and the Replicator Z18 ("Z18").  Compl. ¶ 5.  A key component of the 5G printers was the "Smart Extruder."  Unlike prior extruders, the Smart Extruder was designed to be swappable; it also included sensors that assisted in leveling the build-plate printing surface, and it could be paused in the middle of a print job if there was a problem with the filament.  Compl. ¶¶ 47-48.  The complaint does not clearly identify the dates on which the 5G printers began shipping, but it appears that the Replicator, Mini, and Z18 shipped at the end of March 2014, the end of June 2014, and the beginning of August 2014, respectively.  Hr'g Tr. 7, 65, Dec. 11, 2015 [ECF No. 104]; Compl. ¶¶ 72, 156, 166.

Plaintiffs allege that the 5G printers and their Smart Extruders were plagued with problems from the beginning, including sensors that malfunctioned, filaments that clogged and rendered the printers inoperable, and software issues that caused problems with the printers' operating temperature.  Compl. ¶¶ 49, 51.  Despite these problems, plaintiffs say, Stratasys rushed the 5G printers to market and repeatedly touted their "unmatched" quality, reliability, ease of use, speed, and performance.  Compl. ¶¶ 47,

132.  Defendants also made positive statements about MakerBot's past financial results and future financial prospects that plaintiffs contend were misleading.

The allegedly false and misleading statements that defendants made during the class period (January 6, 2014 through April 28, 2015) are detailed below.  The Court divides the statements into two groups:  statements about the quality of the 5G printers, and statements about MakerBot's financial performance.

### B.  Quality of the 5G Printers

On January 6, 2014, defendant Bre Pettis, the CEO of MakerBot, announced the upcoming release of the 5G printers at a trade show in Las Vegas.  Compl. ¶ 131.  On the same day, Stratasys and MakerBot issued a press release announcing the launch of "a comprehensive new 3D Printing Platform and 3D Ecosystem that is designed to enable improved reliability, ease of use, and seamless connectivity for MakerBot Replicator Desktop 3D Printers and the MakerBot Digitizer Desktop 3D Scanner." Compl. ¶ 132.

The press release went on to say that "MakerBot believes [the Replicator] will have unmatched speed, reliability, quality, and connectivity for all 3D printing needs," that its connectivity features are designed "to ensure a seamless production workflow," and that the Replicator "features a new MakerBot Replicator Smart Extruder that is easy to swap or replace and detects filament absence and automatically pauses a print, as

well as being optimized for MakerBot PLA Filament."  Compl. ¶ 132.  The press release

described the Mini as "easy-to-use" and stated that it "defines the new standard for

ease-of-use, quality and reliability."  Compl. ¶ 132.  Finally, the press release stated that

the Z18 "offers massive build volume," that it offered "the best price/performance in its

category," and that its connectivity features create "a seamless production workflow."

Compl. ¶ 132.  In an interview published on the same day, Pettis described the

5G printers as "technology that's setting the standard for reliability, quality, and

connectivity.  It's our fastest and easiest 3D printer to use."  Compl. ¶ 133.

In a January 15, 2014 presentation, defendant Erez Simha, the CFO and COO of

Stratasys, stated that Stratasys "care[s] about quality"—in particular "[q]uality around

research and development and production."  Compl. ¶ 137.  With regard to the

5G printers, Simha said there was "a lot of innovation behind those products."  Compl.

¶ 139.

In a March 3, 2014 conference call, defendant David Reis, Stratasys's CEO and a

member of the board of directors, repeated that the new 5G printers were "designed to

improve system affordability, reliability, ease of use, and user connectivity" and that

they provide "unmatched speed, reliability, quality, and connectivity" that "delivers

easy to use and reliable desktop 3D printing . . . ."  Compl. ¶ 144.  During a question-

and-answer session, Pettis called the Mini an "easy to use 3D printer" and said that

there was "no compromise" because it used the same Smart Extruder as the other

5G printers.  Compl. ¶ 145.  Reis called the 5G printers a "great product" and said that

they provide "a full solution . . . ."  Compl. ¶ 146.

In a Form 20-F filed the same day, Stratasys described its "key competitive

strengths" as its products' "superior printing qualities," "widely-deployed inkjet printer

heads or easy-to-use extrusion heads," and "reliability of printing systems."  Compl.

¶ 148.  The report also described the MakerBot desktop series as "affordable, designed

for easy desktop use . . . ."  Compl. ¶ 149.

On May 9, 2014, during a conference call with analysts, Reis again stated that the

5G printers were "designed to improve system affordability, reliability, ease of use and

user connectivity" and that the 5G printers provide "unmet . . . speed, reliability, quality

and connectivity" and are "easy to use and reliable . . . ."  Compl. ¶ 156.

On September 8, 2014, Stratasys held an Analyst Day conference at MakerBot's

New York office.  Compl. ¶ 175.  This conference came shortly after Stratasys

announced that Pettis would begin working for Stratasys directly as head of a "New

Innovation Workshop" and that defendant Jennifer Lawton would replace Pettis as

CEO of MakerBot.  Compl. ¶ 174 & n.18.  Pettis gave a presentation about MakerBot

products, stating that MakerBot was on its "third iteration" of the Smart Extruder,

explaining that it is a "wear part," and characterizing the 5G printers as "super easy to

use," "powerful," "no compromise," and possessed of "[u]nmatched speed, reliability, quality, and connectivity . . . ."  Compl. ¶¶ 176-77.  He also stated that the software had been updated several times and that the Z18 has "amazing build volume."  Compl. ¶ 176.

On October 31, 2014, Reis gave an interview during a Stratasys Media Event. Compl. ¶ 180.  Reis stated that MakerBot was working to make its printers "as accessible as ever" and that "all you need to do is take a Replicator Fifth Gen out of the box and plug it in to begin printing good quality products."  Compl. ¶ 180.

### C. Financial Performance

On January 14, 2014, Stratasys issued a press release announcing its financial guidance for fiscal year 2014, including projected revenue of $660-680 million.  Compl. ¶ 136.  The press release stated that Stratasys "expects organic sales, which exclude MakerBot sales, to grow at least 25% over 2013, with additional growth coming from MakerBot, which is expected to grow at a higher rate."  Compl. ¶ 136.  Reis added that "the performance of MakerBot . . . is exceeding our expectations, and is on track to be accretive by the end of the year."  Compl. ¶ 136.

At a conference the next day, Simha said that "MakerBot is the strongest brand in the low-end market today . . . . MakerBot is growing really, really fast. . . . And I think

this is also an indication about the market, the low-end market which is growing

exponentially."  Compl. ¶ 138.

On March 3, 2014, Stratasys issued a press release regarding its financial results

for 4Q13 and FY13.  Reis stated that Stratasys experienced "strong organic growth" with

"an impressive contribution from MakerBot."  Compl. ¶ 141.  The press release stated

that MakerBot "made a significant contribution . . . to fourth quarter revenue, as its

highly affordable and functional desktop 3D printers continued strong positive sales

momentum within the rapidly growing desktop category."  Compl. ¶ 141.  Stratasys

reiterated that it expected sales to grow at least 25% over 2013, with additional growth

coming from MakerBot at an even higher rate.  Compl. ¶ 141.  During a conference call

on the same day, Reis and Simha made similar comments about MakerBot's impressive

performance and strong growth.  Compl. ¶¶ 142-43, 147.  Reis also pointed to "our

many recent new product introductions and channel initiatives that we believe will

greatly improve 3D accessibility and drive expanded usage for our products."  Compl.

¶ 144.  Simha stated that Stratasys did not expect the production of the 5G printers to be

a drag on gross margin.  Compl. ¶ 146.  Finally, in a Form 20-F filed the same day,

Stratasys stated that it was experiencing "strong sales" of its desktop 3D printers, that it

believed that the desktop 3D printer market would continue to grow, and that its

acquisition of MakerBot would help drive that growth.  Compl. ¶ 149.

During a conference call on April 2, 2014, Reis stated that "[w]e have observed impressive growth at MakerBot as well as exciting new products launches" that have "strengthened our market leadership and improved our outlook for growth." Compl. ¶ 153.

On May 9, 2014, Stratasys issued a press release announcing its 1Q14 financial results and reiterating that it expected MakerBot to grow at a rate higher than 25%. Compl. ¶ 155. During a conference call that same day, Reis stated that MakerBot products and services "contribut[ed] impressive revenue . . . . a 79% increase over the revenues" of MakerBot as an independent company in 2013. Compl. ¶ 156. Simha characterized MakerBot's revenue contribution as "strong" and stated that "system revenue increased by 71% in the first quarter over the same period last year driven in large part by MakerBot's impressive contribution to the quarter . . . ." Compl. ¶ 157. Simha also said that "we do see strong flow of booking for both mini and Z18." Compl. ¶ 158. Simha asserted that MakerBot has "healthy margins at the end of the day," despite the fact that "they carry lower gross margin . . . ." Compl. ¶ 160.

On August 7, 2014, Stratasys issued a press release announcing its 2Q14 results and increasing its projected 2014 revenue from $660-680 million to $750-770 million. Compl. ¶ 164. Stratasys also characterized its launch of the 5G printers as "successful" and MakerBot sales as "impressive." Compl. ¶¶ 165. During a conference call, Reis

reiterated that MakerBot's sales were "impressive" and stated that "we are observing strong demand across the entire product line" of 5G printers.  Compl. ¶ 166.  Reis also reported that MakerBot contributed $33.6 million in revenue during 2Q14, which was a 100% increase from the same period the previous year.  Compl. ¶ 166.  Simha made similar statements.  Compl. ¶ 167.  In response to a question about channel inventory, Reis and Simha stated that only two to three percent of revenue was due to channel inventory, that Stratasys and MakerBot had "no extra inventory," and that channel inventory was "not an issue."  Compl. ¶ 169.  Finally, on the same day, Stratasys filed a Form 6-K with the SEC containing substantially similar statements.  Compl. ¶ 170.

During the analyst conference on September 8, 2014, Reis repeated the information about MakerBot's 100% growth in 2Q14 and characterized the acquisition as "very successful."  Compl. ¶ 175.  Stratasys's presentation also noted MakerBot's impressive growth and broad-based demand.  Compl. ¶ 179.

On November 5, 2014, Stratasys issued a press release announcing its 3Q14 financial results.  Compl. ¶ 182.  Reis noted Stratasys's "impressive growth" and "strong market demand," and stated that "MakerBot sales continue to impress." Compl. ¶ 182.  During a conference call, Simha stated that MakerBot's product and services revenue increased by over 80% and its system revenue increased by 59% compared to the same period the previous year, calling this an "impressive contribution

to the quarter."  Compl. ¶ 184.  Simha also stated that Stratasys was "growing

extremely fast, 35% organic growth, with and without MakerBot" and that this rate of

growth was "a little bit higher than what we planned and what we expected . . . ."

Compl. ¶ 185.  Reis stated that "we see very good acceptance to the Z18" and that the

Z18 was being "very well received."  Compl. ¶ 186.  On the same day, Stratasys filed a

Form 6-K making similar statements.  Compl. ¶ 187.  Although Stratasys reiterated its

prior increased revenue guidance of $750-770 million for FY14, it lowered its net income

guidance on the basis of a recent acquisition, explaining that ongoing development

costs were expected to have a negative impact.  Compl. ¶ 182.

### D.  Negative Disclosures and Stock Drops

On December 10, 2014, 3DPrint.com published an article quoting an anonymous

MakerBot employee who claimed that the 5G printers "shipped in spite of the known

hardware problems.  It makes me sick to know we did this to customers.  Even I could

not get [the Smart Extruders] to work.  Another great example of corporate greed

winning out over great products."  Compl. ¶ 53.  In response to the article, non-party

Jennifer Howard, MakerBot's director of public relations, stated that "major software

and firmware updates recently, including this week . . . have improved the print quality

and reliability of the Smart Extruder."  Compl. ¶ 189.

In a January 14, 2015 interview with 3DPrint.com, defendant Lawton admitted that "there were problems with the early extruders" and that the Smart Extruder "didn't necessarily always behave smartly."  Compl. ¶ 190.  Lawton insisted, however, that "[w]e've continued to work on the Smart Extruder, and the Extruder that we have today combined with the firmware and software that we have is a very good experience."  Compl. ¶ 190.  She also conceded that "at first" MakerBot "didn't do a good job of" explaining that users should buy a second extruder so that, when the first extruder becomes clogged, users can continue to use the printer while cleaning the clogged extruder.  Compl. ¶ 190.  She further stated that "[w]e've also learned over the last year that we can make the extruder serviceable, so the current version of the extruder is self-serviceable.  In the next few weeks we will put out videos of how you can take it apart and unclog it."  Compl. ¶ 190.

On February 2, 2015, Stratasys issued a press release updating its anticipated financial results for 2014 and its financial outlook for 2015.  Compl. ¶ 192.  Stratasys announced that it was taking a goodwill impairment charge on MakerBot of approximately $100-110 million in 4Q14.  Compl. ¶ 192.  Stratasys also announced that MakerBot experienced slower growth—only 7%—in 4Q14, attributing this to "challenges associated with the introduction and scaling of its new product platform and [Stratasys's] rapidly evolving distribution model."  Compl. ¶ 192.  The next day,

Stratasys held a conference call during which it explained that 2014 revenue and net income were expected to fall short of previous guidance, citing anticipated 2014 revenue of $748-750 million and a GAAP net loss of $116-129 million.[2]  Compl. ¶ 193. Reis acknowledged that "quality and product reliability is a major issue" and stated that "we could have had better quality assurance and better quality manufacturing, which we're improving now."  Compl. ¶ 195.  Simha stated that they expected MakerBot to have a "much lower growth rate" in 2015.  Compl. ¶ 196.  After these disclosures, the price of Stratasys stock dropped from $80.08 to $57.36.  Compl. ¶ 198.

On March 2, 2015, Stratasys held a conference call to discuss its 4Q14 and FY14 results.  Compl. ¶ 202.  Reis again emphasized MakerBot's rapid growth and strong sales over the previous two years.  Compl. ¶ 202.  In response to a question about problems with the Smart Extruder, Reis stated that "[i]t took time to realize the scope of the quality issues," and that "although there was maybe some indication on normal warranty issues in the second half, the extent of the quality issue with the extruder became evident really at the end of Q4 and the beginning of even Q1 2015."  Compl. ¶ 204.

---

[2]As defendants point out, the anticipated revenue figure of $748-750 million was above Stratasys's initial 2014 guidance and very close to the upwardly revised guidance of $750-770 million.  ECF No. 94 at 14.  At oral argument, defendants stated that their actual 2014 revenue was $750.4 million—well above the initial guidance and within the upwardly revised guidance.  Hr'g Tr. 9.

On April 17, 2015, MakerBot confirmed that it had laid off 20% of its staff

(roughly 100 employees) and closed its three retail stores.  Compl. ¶ 206.  At the same

time, MakerBot noted its past growth:  "We've grown more than 600% from 2012 to

2014—in short, we've grown incredibly fast."  Compl. ¶ 206.

On April 28, 2015, Stratasys issued a press release announcing "lower than

expected" 1Q15 results and reducing its 2015 guidance; the disappointing results were

attributed in part to the fact that MakerBot's revenue had declined by 18% in the first

quarter compared to the previous year.  Compl. ¶ 207.  Stratasys also announced that it

expected to recognize an additional impairment charge on MakerBot of $150-200 million

in the first quarter.  Compl. ¶ 207.  After these disclosures—which plaintiffs allege

"finally revealed the full extent of [Stratasys's] problems" to the market, Compl.

¶ 207—Stratasys's stock dropped from $51.30 to $39.93.  Compl. ¶ 208.

## II.  ANALYSIS

### A.  *Standard of Review*

#### 1.  Securities Fraud Claims

Plaintiffs bring two claims: (1) a claim for securities fraud under both

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's

implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) a claim of

controlling-person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t.

Section 78j states, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b)      To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78(j).  Rule 10b-5 states, in turn:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)      To employ any device, scheme, or artifice to defraud,

(b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To recover on their securities-fraud claims under § 78j(b) and Rule 10b-5,

plaintiffs must prove (1) a material misrepresentation or omission; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a

security; (4) reliance on the misrepresentation or omission; (5) economic loss; and

(6) loss causation.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1191-92

(2013).

To prevail on their § 78t controlling-person claim, plaintiffs must first establish a

separate underlying violation of the 1934 Act.  *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th

Cir. 2010).  If plaintiffs are not successful in pursuing their § 78j(b) and Rule 10b-5

securities-fraud claim, then their § 78t controlling-person claim will fail as well.

2.  PSLRA Standards

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b),

imposes a heightened standard of pleading in securities-fraud cases.  To adequately

plead a securities-fraud claim, a complaint must "specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed."  15

U.S.C. § 78u-4(b)(1).

In addition, "with respect to each act or omission alleged to violate this chapter,"

the complaint must "state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  That

"required state of mind" (or scienter) includes the intent to deceive, manipulate, or

defraud.  *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010).  Scienter also

includes recklessness, but it must involve "'an extreme departure from the standards of

ordinary care . . . that present[s] a danger of misleading buyers or sellers which is either

known to the defendant or is so obvious that the defendant must have been aware of

it.'"  *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653-54 (8th Cir. 2001)

(quoting *Camp v. Dema*, 948 F.2d 455, 461 (8th Cir. 1991)).

It is not sufficient for the inference of scienter to be plausible or reasonable; it

must be strong—that is, "cogent and at least as compelling as any opposing inference of

nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314

(2007).  The court must consider the allegations as a whole in determining whether they

collectively give rise to a strong inference of scienter.  *Rand-Heart of N.Y., Inc. v. Dolan*,

812 F.3d 1172, 1177 (8th Cir. 2016).  But in making that determination, the court must

disregard "catch-all" or "blanket" assertions that do not satisfy the particularity

requirements of the PSLRA.  *Green Tree Fin. Corp.*, 270 F.3d at 660.  If the complaint fails

to satisfy the PSLRA's requirements, the complaint must be dismissed.  15 U.S.C.

§ 78u-4(b)(3).

## B.  *Plaintiffs' Complaint*

Applying the strict standards of the PSLRA, the Court finds that plaintiffs'

complaint must be dismissed.  First, the bulk of defendants' allegedly misleading

statements about the quality of the 5G printers consists of non-actionable puffery.

Second, plaintiffs' allegations fall short of establishing a strong inference of scienter.

### 1.  Puffery

"[S]ome statements are so vague and such obvious hyperbole that no reasonable

investor would rely upon them."  *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.

1997).  Indefinite predictions of "growth," for example, are not actionable.  *Id.*  Although

statements regarding the quality of products or services can be actionable, those

statements must purport to be based on objective data and thus subject to verification.

*See In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 894 (D. Minn. 2007), *aff'd*, 527 F.3d 749

(8th Cir. 2008).[3]  Vague, hyperbolic statements that a company has made "important

advances" in technology, that a company's product is the "Holy Grail," or that a

company's product is "one of those things that come across once in [a] lifetime" are

inactionable puffery.  *Id.* at 895-96.

Under these standards, nearly all of defendants' statements regarding the quality

of the 5G printers are inactionable puffery.  Statements claiming that the 5G printers

offer "improved" or "unmatched" quality, reliability, and connectivity, "seamless

production workflow," ease of use, "a lot of innovation," "superior printing qualities,"

and "amazing build volume" are not verifiable.  Compl. ¶¶ 132, 133, 139, 144, 148, 156,

---

[3]The Eighth Circuit affirmed Judge Michael J. Davis's dismissal of the case "for the reasons stated in the district court's thorough opinion."  *NVE Corp.*, 527 F.3d at 752.

176, 177. Likewise, statements that Stratasys cares about quality, and that the 5G printers are a "no compromise," "great product" that "define[s] a new standard," provides a "full solution," "print[s] good quality products," and is "affordable," "powerful," and "accessible" are not actionable.[4] Compl. ¶¶ 132, 137, 145, 146, 149, 176, 177, 180.

In fact, just about the only statements regarding the quality and features of the 5G printers that are potentially falsifiable (and thus actionable) are statements that the 5G printers provide "unmatched speed" and are MakerBot's "fastest" 3D printers. Compl. ¶¶ 132, 133. But plaintiffs do not allege any facts demonstrating that the 5G printers are not faster than MakerBot's other printers or other desktop 3D printers on the market. Instead, plaintiffs allege that the 5G printers break down a lot because the Smart Extruder frequently clogs with filament. The Court therefore concludes that all of the statements that defendants made about the quality of the printers during the class period are non-actionable, either because they are puffery or because their falsity is not sufficiently pleaded.

---

[4]Plaintiffs contend that the Supreme Court has held that indefinite and unverifiable statements of opinion can be actionable. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991). But *Virginia Bankshares* was an action brought under § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), that concerned statements in a proxy solicitation about the advisability of a corporate merger. The Eighth Circuit has repeatedly held that vague puffery is not actionable in a Rule 10b-5 case without reference to *Virginia Bankshares*.

2. Scienter

*a. Quality of the 5G Printers*

Even if these statements regarding the quality of the 5G printers were actionable, plaintiffs do not adequately allege scienter.

First, as discussed in more detail below, plaintiffs' lack of specificity with respect to the financial impact of the problems with the 5G printers during the class period undermines any inference of scienter (as does the fact that defendants *increased* Stratasys's revenue projections in August 2014).

Second, any inference of scienter with respect to defendants' statements about the quality of the printers is further undermined by the fact that defendants were making changes to the printers throughout the class period.  The desktop 3D printer market is emerging, and the 5G printers are complex devices that were being continuously modified during the class period.[5]  *See In re NVE Corp.*, 551 F. Supp. 2d at 894 (defendants' allegedly false statements "must be viewed in light of the fact that [Magnetic Random Access Memories] is an innovative and developing technology, which Plaintiffs do not dispute").

_____

[5]*See* Compl. ¶ 4 (noting the "emerging" desktop 3D printer market); Compl. ¶ 66 (alleging that, in the period leading up to the launch of the printers, the software was being continuously modified); Compl. ¶ 97 (Pettis stating on September 8, 2014 that "we're actually on probably our third iteration of the extruder this year . . . . [A]nd the software has been updated more times than that . . . .").

Plaintiffs offer allegations from nine former MakerBot employees[6] that the

5G printers were defective, but most of these allegations are at a high level of

generality.[7]   Even when the former employees are specific in describing a defect—for

example, when they allege that the extruders clogged or that the self-leveling function

did not work, *see, e.g.*, Compl. ¶¶ 62-63—the employees do not (presumably because

they cannot) identify the causes of these problems.   Plaintiffs offer the statement of a

former software engineer that the Smart Extruder was defectively designed, Compl.

¶ 61, but the software engineer does not identify the nature of the defect, nor do

plaintiffs explain how a software engineer could reliably opine on the design of a

---

[6]Plaintiffs also refer to statements by a tenth employee that were quoted in a news article published in December 2014.  As discussed below, however, the lack of detail regarding the basis of the employee's knowledge substantially weakens the probative value of his statements.

[7]*See, e.g.*, Compl. ¶ 52 (citing "major problems with the Smart Extruders"); Compl. ¶ 55 (citing "problems with the Smart Extruders," "constant difficulties," "poor quality," and "performance problems"); Compl. ¶ 56 (citing "known problems"); Compl. ¶ 57 (citing "chronic issues with the Smart Extruders" that were "not working"); Compl. ¶ 59 (citing "ongoing problems"); Compl. ¶ 61 (noting unspecified "design flaws" and an unspecified "engineering design defect"); Compl. ¶ 64 (citing "problems" and stating that the "main issue" was the Smart Extruder); Compl. ¶ 65 (citing "problems" and "unresolved issues" and stating that the printers "did not perform"); Compl. ¶ 74 (citing "negative commentary on social media" and "unresolved issues"); Compl. ¶ 76 (citing "problems" with replacement printers); Compl. ¶ 79 (stating that "everyone had problems, complaints"); Compl. ¶ 81 (the Smart Extruders were "bad"); Compl. ¶ 82 (describing Smart Extruder as "defective" and mentioning unspecified "problems" that customers had); Compl. ¶ 84 (employee spoke to Reis about "Smart Extruder problems" in February 2014).

hardware part.  Moreover, the software engineer left MakerBot in March 2014, Compl.

¶ 50; the first of the three models of 5G printers was just beginning to be shipped

around that time.

Compounding the problem, the former employees are extremely vague with

respect to the timeframes to which their allegations relate.  Many employees offer no

timeframe whatsoever; others simply make broad references such as "many months

prior to the release of the 5th generation printers."  Compl. ¶ 55.  Notably, all but two of

the nine employees left MakerBot by September 2014, and the remaining two offer no

allegations specific to the fourth quarter of 2014.  Without additional detail as to the

nature or the timing of the specific defects, it is difficult to conclude that defendants'

statements regarding the quality of the printers were knowingly or recklessly false at

the time they were made.[8]  *See In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 891 (8th Cir.

2002) (emphasizing that the complaint must show that the allegedly false statements

were untrue or misleading when the statement was made); *In re Navarre Corp. Sec. Litig.*,

299 F.3d 735, 743 (8th Cir. 2002) ("The amended complaint fails to indicate why these

---

[8]Some former employees describe an increase in customer complaints during a somewhat more-specific timeframe beginning shortly after the printers were released and continuing through the summer of 2014.  As discussed below, however, these allegations are insufficient to support scienter because they do not establish that the increase in complaints (and thus the scope of the defects with the printers) was material.

statements would have been false or misleading at the several points in time in which it is alleged they were made.").

This is not to say that plaintiffs in a securities-fraud action are always required to plead the nature of a product defect in fine-grained detail, nor that they must identify the precise date on which the nature and scope of the defect became known. In this case, however, the quality of the 5G printers—a new and developing line of complex products—was a rapidly moving target during the class period. What an executive of MakerBot knew about the 5G printers on one day easily could have differed in material respects from what that executive knew the previous day. Under these circumstances, timing is critical; pleading that defendants knew that there were various vaguely defined problems for "months" before the printers were released does not go very far toward establishing an inference that, when the defendants praised the quality of the printers on any given date during the class period, defendants were knowingly or recklessly misleading the market (as opposed to passing on what they had most recently heard from their engineers or just being overly optimistic). *See In re NVE Corp.*, 551 F. Supp. at 895 (plaintiffs failed to plead facts showing that defendants knew that it was not possible to create a commercially viable product "rather than that [defendants] were being overly optimistic").

Plaintiffs do identify one specific point in time at which particular problems with

the printers were discussed—namely, an April 13, 2014 meeting at MakerBot.  Compl.

¶¶ 53-54 & Ex. A.  But the details of this meeting are extremely sketchy.  Plaintiffs'

allegations are based on a news article about the meeting that appeared on

December 10, 2014 (eight months after the meeting took place) and that quoted an

anonymous employee who had not even attended the meeting.  Compl. ¶¶ 53-54.

According to the news article, the employee had walked into the room in which the

meeting had been held after the meeting had ended.  The employee then spotted

notations on a whiteboard—notations that appeared to the employee to relate to

concerns with the 5G printers.[9]  Compl. ¶ 54 & Ex. A.  Nothing else is alleged regarding

this employee; although plaintiffs were careful to identify the job descriptions,

supervisors, and dates of employment of the other confidential-witness employees, they

alleged no such information about this employee.  Under the circumstances, the

---

[9]The notations included: "Goal: Reduce field failure rate"; "Top Failure[s] . . . .
Clogging . . . Homing Error"; "Improper design evaluation & oversight"; "Non-robust
drawings"; "Lack of discipline to adhere to a plan"; "Compressed manuf[acturing]
ramp time to feedback issues and ensure proper assembly"; "Loose starting technical
requirements for performance & reliability"; "No standardized testing & validation
program"; "Inadequate tests to verify performance"; "Inadequate # of validation tests to
ensure statistically confident qty"; "Lack of robust thermal analysis"; "Inadequate
component level inspection of raw mat[e]r[ia]l"; "Lack of control of vendor and . . .
suppliers"; "No proper risk identification and mitigation process"; "Lack of adequate
training for production associates"; "Lack of training for engineering staff."  Compl.
¶ 54.

employee's characterization of the purpose and tenor of this meeting is entitled to little

weight.  *See Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009)

("The allegation [of scienter] is not strong and compelling, however, because it does not

provide the sources' basis of knowledge.").

Even assuming that the anonymous employee was correct in surmising that the

meeting had been convened to discuss problems with the 5G printers, the employee's

allegations do little to establish scienter.  Every responsible company continuously

assesses its products and sets goals for improving those products; such an internal

evaluation is an everyday fact of corporate life, not reason to believe that the company's

executives know that the company's products are doomed to fail.  *In re NVE Corp.*, 551

F. Supp. 2d at 884 ("general difficulties in technology development are part and parcel

of any attempt to commercialize new technology").

Finally, although plaintiffs' allegations focus on problems with the Smart

Extruder, the complaint includes scattered allegations of additional problems with the

5G printers.  For example, plaintiffs offer statements from former employees that the

5G printers had software problems, Compl. ¶ 66, that the self-leveling function did not

work, Compl. ¶ 62, that MakerBot used poor quality materials, Compl. ¶ 70, that the

internal temperature of the Z18 was too high, Compl. ¶ 67, that MakerBot had "shoddy

quality control" and "[q]uality testing deficiencies," Compl. ¶ 69, and that one of

MakerBot's biggest international distributors did not have enough replacement extruders for its clients, Compl. ¶ 82. These allegations do nothing to shore up scienter, however, because plaintiffs offer no allegations tying these alleged problems to Stratasys's financial results.

### b. Financial Performance

Throughout the class period, defendants announced Stratasys's financial results and made statements regarding MakerBot's past and projected growth. Plaintiffs do not allege that any of defendants' statements regarding Stratasys's or MakerBot's historical performance were inaccurate. Rather, plaintiffs contend that these statements—combined with projections about MakerBot's future performance—were misleading because defendants knew that, due to problems with the 5G printers, the past financial results were illusory and the projections of growth were ill-founded.

Plaintiffs' attempt to establish scienter with respect to defendants' statements regarding financial results suffers from the same problem as plaintiffs' attempt to establish scienter with respect to defendants' statements regarding the quality of the 5G printers: Timing is everything. As noted above, the 5G printers were a new and complex product whose problems were continuously being discovered and addressed during the class period. Just as the problems with the 5G printers were a moving target, so, too, was the ability to assess the financial impact of those problems. A financial

projection could be reasonable on one day, yet considerably less reasonable a few days later, based on a problem with the 5G printers being discovered or solved.  Timing is therefore critical, yet the complaint is extremely vague in identifying the point at which any of the defendants would have known that problems with the 5G printers were likely to have a material impact on Stratasys's financial results.  *See Green Tree Fin. Corp.*, 270 F.3d at 665 ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were *materially* inaccurate." (emphasis added)).

Compounding plaintiffs' problem is the fact that, in contrast to many securities-fraud actions, defendants' financial predictions were actually fairly accurate.  MakerBot did, in fact, experience explosive growth up through 3Q14, just as defendants had predicted.  Compl. ¶¶ 156-57, 166-67, 184.  Notably, in August 2014 Stratasys substantially *increased* its projected revenue, from $660-680 million to $750-770 million.  Compl. ¶ 164.  Despite all of the problems that plaintiffs claim should have been disclosed beginning in January 2014, Stratasys came very close to meeting that increased guidance, announcing on February 3, 2015 that its anticipated 2014 revenue was $748-750 million.  Compl. ¶ 193.  It was only toward the end of 2014—after all but two of the confidential witnesses had already left MakerBot—that MakerBot's growth

slowed.  Compl. ¶ 192.  Defendants' guidance for 2015 acknowledged the slowdown in

4Q14 and projected that MakerBot would experience a much lower growth rate in 2015.

Compl. ¶ 196.

Given that defendants' statements roughly tracked MakerBot's performance,

plaintiffs have an uphill climb in trying to create a strong inference of scienter.

Plaintiffs have, for example, no plausible explanation for why defendants would

*increase* guidance long after they supposedly knew that financial disaster was looming

because of the problems with the 5G printers.  Plaintiffs point out that the increased

guidance was the result of unrelated acquisitions and claim that it is therefore

irrelevant.  The Court disagrees.  Whatever the reason for the increased guidance, the

fact remains that, if defendants knew that they were going to suffer major losses due to

problems with the 5G printers, it would have been extraordinarily reckless to increase

guidance so late in the game.  Plaintiffs also make the farfetched suggestion that, in

increasing guidance, defendants were doubling down on their scheme to defraud.  The

idea that defendants would increase guidance to mask problems that would shortly

have to be revealed is incredible, especially in the absence of any facts showing that any

individual defendant had anything to gain from such a reckless act.

Against this backdrop, plaintiffs attempt to create a strong inference of scienter

with colorful descriptions of an "avalanche" of complaints and the "sh*t hit[ting] the

fan." Compl. ¶¶ 71, 73. The PSLRA, however, requires more than rhetorical flourishes; it requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs have fallen short of this requirement. In particular, they have failed to "state with particularity" facts establishing that, at the moment that defendants made various statements about Stratasys's financial results, defendants knew that the problems with the 5G printers would have a material impact on those results.

Plaintiffs rely on the statements of several former employees regarding the scope of the problems with the 5G printers, but these allegations have multiple problems. For example, according to a former member of MakerBot's customer-support team, "the scope of the 5th generation problems was above historical norms . . . ." Compl. ¶ 80. But nothing alleged in the complaint indicates how this employee would know that. To the contrary, the employee was a member of the customer-support team, whose job was to monitor and respond to certain questions on social-media sites. Compl. ¶ 64 n.9. The employee worked at MakerBot for only a year and a half, *id.*, and there is no indication that he had access to reports or data compilations that would have given him a basis for discussing MakerBot's "historical norms."[10] *Cf. In re Hutchinson Tech., Inc. Sec. Litig.*, 536

---

[10]Curiously, the one confidential witness who *did* have direct access to reports about customer-support issues—a junior data analyst who prepared them—does not say anything about the data in those reports. *See* Compl. ¶ 77.

F.3d 952, 959 (8th Cir. 2008) (allegation that customer return rate was increasing was insufficient in the absence of allegations showing that the witness would have access to such information).  Moreover, the phrase "above historical norms" lacks specificity; it does not indicate what the historical norms were nor how much the "scope of the 5th generation problems" (itself a vague phrase) exceeded those norms.  Similarly, a former inside sales executive asserted that *all* of the 5G printers were defective and not fixable, Compl. ¶ 62, but there is no indication how this former employee—who worked for MakerBot for a mere seven months—would have any basis for making such sweeping statements about the condition of every 5G printer.

Other former employees opine that the 5G printers created financial problems for Stratasys, but their allegations are again too vague to establish scienter.  For example, an operations financial analyst who left MakerBot in September 2014 (Compl. ¶ 69 n.11) stated that the "financial impact" of the problems with the 5G printers was apparent early in the class period, two or three months after the printers were released.  Compl. ¶ 88.  But the analyst does not describe what the financial impact was, or otherwise indicate why (or even that) it was material.  Without such information, allegations such as the analyst's do nothing to establish a strong inference that defendants knew that their financial results were illusory or that their predictions of growth were false.  Indeed, this same analyst states that, by mid-2014, MakerBot's internal projections were

considered "stretch goals."  Compl. ¶ 91.  Far from supporting an inference of scienter, this allegation indicates that MakerBot believed its projections were *achievable* (if ambitious).

The analyst also states that Microsoft returned two hundred thousand dollars' worth of products because they were not selling well, and that other distributors were also making "big returns."  Compl. ¶ 94.  The analyst does not state when any of this happened, however, nor does he even state that the returned products were 5G printers. Presumably the returns occurred in or before September 2014, when the analyst left MakerBot.  Again, however, MakerBot reported positive financial results for that time period, and plaintiffs have never claimed that those financial reports were false.  It is thus difficult to understand how defendants' knowledge of these returns supports an inference of scienter.

Other allegations are similarly vague.  A former director of sales asserted that the need to replace defective extruders had an "adverse effect" on MakerBot's resellers and that he was "concerned" that MakerBot would have to cannibalize its own inventory to provide replacement parts to customers.  Compl. ¶ 83.  Nebulous allegations of an "adverse impact" do not establish that defendants would have known that these problems were material.

Several employees reported an increase in customer complaints and a drop in sales starting a few months after the 5G printers were released.  For example, the former inside sales executive recalled that almost every one of his customers contacted MakerBot because of problems with their printers.  Compl. ¶ 80.  His sales began to drop by mid-May 2014 and were very low in June.  Compl. ¶¶ 80, 90.  He further stated that, based on discussions at sales meetings, sales for other inside sales executives had also decreased dramatically.  Compl. ¶ 91.  Other former employees also reported an increase in customer complaints and returns in the summer of 2014.  Compl. ¶¶ 73-74, 81.  Former employees reported that, as a result of the increase, MakerBot's criteria for permitting returns became more strict, Compl ¶ 76, and MakerBot started hiring more support staff in the fall of 2014 to deal with the increase in customer complaints and returns, Compl. ¶ 81.  Another employee alleged that there was so much negative commentary on social media that Pettis agreed to shut down the forums sometime in July or August of 2014.  Compl. ¶ 75.

Again, however, none of this indicates when—or even if—defendants knew that problems with the 5G printers would materially affect Stratasys's financial results.  The fact that the total *volume* of returns increased (and that MakerBot had to add more employees to deal with that increased volume) does not establish that the *rate* of returns increased—or, more importantly, that the returns would materially impact Stratasys's

financial results.  As noted, MakerBot was reporting strong growth in revenue during this time, and plaintiffs do not claim that those numbers were inaccurate.  What is missing is any factual allegation that puts these reports of customer complaints and returns in perspective.  Without such information, these allegations amount to anecdotal evidence from a handful of employees.  *See In re Hutchinson*, 536 F.3d at 959 ("Nothing in the complaint puts the returns spoken of by CW1 in perspective or suggests that they were something other than normal business fluctuations.").

As for the inside sales executive's statement that MakerBot's sales were collapsing in May and June of 2014, his information is belied by MakerBot's actual results for 2Q14, which, again, have never been restated.  True, this discrepancy could be partly explained by the executive's statement that the team that worked with resellers was still able to make its sales goals because the resellers were not yet aware of problems with the printers.  Compl. ¶ 91.  But another employee claimed that sales to resellers had declined in the months leading up to September 2014 because MakerBot had loaded the channel.  Compl. ¶ 93.  MakerBot was still experiencing strong growth in 3Q14, however, Compl. ¶ 184, which undercuts any inference that these employees' experiences were universal.

Plaintiffs generally allege that product returns and requests for refunds caused MakerBot to incur warranty costs that affected Stratasys's financial results.  Compl.

¶¶ 71, 87, 89.  But plaintiffs do not quantify these costs in any way, nor do they allege

when Stratasys began incurring these costs or when defendants would have known that

these costs would materially impact the bottom line.  At oral argument, plaintiffs stated

that, in 4Q14, Stratasys's warranty reserves increased from $63,000 to $400,000.  These

facts are not pleaded in the complaint, however, and in any event there is no context

from which it is possible to ascertain whether this increase was material.  Moreover,

given that nearly all of the confidential-witness employees left MakerBot before the

fourth quarter—and the two remaining employees do not provide any time-specific

details about problems in the fourth quarter—it is not possible to tie the fourth-quarter

increase in the warranty reserves to problems in earlier quarters.

### c. Motive

Plaintiffs also allege that defendants had a motive to artificially inflate Stratasys's

stock price during the class period.  Specifically, plaintiffs allege that defendants

wanted to inflate the price of Stratasys stock in order to finance the acquisition of two

companies, Solid Concepts and Harvest Technologies, which Stratasys acquired on

July 15 and August 1, respectively.  Compl. ¶¶ 236-37.

"'[M]otive and opportunity are generally relevant,' but particularly important to

establishing scienter is a showing of unusual or heightened motive to meet the Reform

Act standard."  *In re K-Tel*, 300 F.3d at 894 (quoting *Green Tree Fin. Corp.*, 270 F.3d

at 660).  "[U]nsupported allegations with regard to motives generally possessed by all

corporate directors and officers are insufficient as a matter of law."  *Id.*  "The 'plaintiffs

must assert concrete and personal benefit to the individual defendants resulting from

the fraud.'"  *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).  "A complaint

must show 'that the benefit to an individual defendant is unusual,' for example, that the

benefit is of an 'overwhelming magnitude' and received under 'suspicious

circumstances.'"  *Horizon Asset Mgmt.*, 580 F.3d at 766 (quoting *In re Cerner Corp. Sec.

Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005)).

       Although the allegations regarding these corporate acquisitions are relevant,

they do little more than identify the motive generally possessed by all corporate

executives to have more money so that the company can spend more money—on

acquisitions, on improvements, on new hiring, on whatever.  Such allegations are

insufficient to support an inference of scienter.  *Cf. In re K-Tel*, 300 F.3d at 894 (desire to

make company appear attractive to potential buyers "may be too thin a reed on which

to hang an inference of scienter" (citation and quotations omitted)).

       Critically, plaintiffs do not allege that any of the individual defendants stood to

gain personally or in an unusual manner from these acquisitions.  *Cf. Horizon Asset

Mgmt.*, 580 F.3d at 766 (universal desire to make company seem more profitable, even

when tied to a debt offering by company's subsidiary, was insufficient to support an

inference of scienter).  Moreover, as discussed above, Stratasys raised its guidance

shortly after these acquisitions were completed, which severely undercuts any inference

of scienter.  Under the circumstances, the allegations of motive do not push any

inference of scienter over the line from "reasonable" to "strong."

### 3.  Remaining Allegations

Finally, plaintiffs allege that defendants made false statements with respect to

other miscellaneous matters, including inventory levels, customer acceptance of the

Z18, the self-serviceability of the Smart Extruders, and the quality of printers at the

"BotFarm" (where MakerBot demonstrated its printers to clients and investors).

With respect to inventory:  Plaintiffs allege that, on August 7, 2014, Reis and

Simha stated that only two to three percent of Stratasys's revenue was due to channel

inventory, that Stratasys and MakerBot had "no extra inventory," and that inventory

was "not an issue."  Compl. ¶ 169.  But plaintiffs do not allege that the actual

percentage of revenue due to inventory was higher than the two to three percent figure

cited by Reis and Simha.  In the context of that (undisputed) figure, the remaining

statements are not misleading.

With respect to the Z18:  Plaintiffs allege that, on November 5, 2014, Reis stated

that "we see very good acceptance to the Z18" and that the Z18 was "very well

received."  Compl. ¶ 186.  Plaintiffs allege nothing showing that this statement was false

at the time that it was made.  As noted, seven of the nine confidential witnesses had

already left MakerBot by September 2014, and the remaining two employees had

nothing specific to say about the Z18's sales.

With respect to self-serviceability:  Plaintiffs allege that MakerBot CEO Jennifer

Lawton made statements on January 14, 2015 implying that the Smart Extruders were

designed from the beginning to be self-serviceable, which is inconsistent with the fact

that users would void the warranty if they tried to repair the extruders themselves.

Compl. ¶¶ 62, 190-91.  Lawton's statements could have been clearer, but they were not

materially misleading.  Lawton acknowledged problems with the early extruders,

explained that MakerBot had made changes to them, and stated that "[w]e've also

learned over the last year that we can *make* the extruder serviceable, so the *current*

version of the extruder is self-serviceable."[11]  Compl. ¶ 190 (emphasis added).

Finally, with respect to the BotFarm:  Plaintiffs allege that it was a common

practice for employees to take products printed by older generation printers and place

them on the platforms of 5G printers to mislead visitors into believing that the items

had been produced by the 5G printers.  Compl. ¶¶ 59, 108.  Plaintiffs do not allege that

defendants were aware of this practice, however, nor do they describe with any

---

[11]At oral argument, plaintiffs acknowledged that the warranty later changed to
permit users to service the Smart Extruder.  Hr'g Tr. 59-60.

particularity any instance on which this occurred.[12]  Plaintiffs also allege that Pettis and

Lawton would routinely misstate to investors that products at the BotFarm had just

been printed, Compl. ¶¶ 59, 108, but again, plaintiffs fail to allege any particulars

regarding these statements, such as when or to whom they were made.

#### 4.  Section 20 Claim

Plaintiffs allege that all of the defendants are liable as controlling persons under

15 U.S.C. § 78t.  Without an underlying violation of the Act, however, a § 78t claim

necessarily fails.  *Lustgraaf*, 619 F.3d at 874.  The Court has found that plaintiffs have

failed to state a claim under § 78j(b), and thus the Court dismisses the § 78t claim.

### III.  CONCLUSION

In this case, as in so many securities-fraud cases, the Court has struggled with

the question of whether the complaint adequately alleges scienter.  The Court has no

difficulty finding that plaintiffs' allegations create a *reasonable* inference of scienter.

Unfortunately for plaintiffs, however, the PSLRA requires a *strong* inference of

scienter—and, for the reasons described above, the Court finds that plaintiffs'

allegations fall short of creating such an inference.  In addition, the Court finds that

---

[12]A former employee alleges that he told Lawton about problems he was having
with the 5G printers at the BotFarm, but he does not allege that he informed Lawton
that employees were misleading visitors about how the displayed products were
actually printed.  Compl. ¶ 107.

almost all of the statements regarding the quality of the 5G printers were inactionable

puffery.  The Court therefore dismisses plaintiffs' complaint.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.       Defendants' motion to dismiss [Docket No. 92] is GRANTED.

2.       Plaintiffs' consolidated amended complaint [Docket No. 84] is DISMISSED

WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  June 30, 2016                           s/Patrick J. Schiltz_____
                                               Patrick J. Schiltz
                                               United States District Judge